**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

STEREO OPTICAL CO., INC.,

                    Plaintiff,

    v.

THOMAS J. JUDY, JACQUELINE K. JUDY,
MR. RALPH E. CRAIG, MR. RICHARD J.
UNGER, and VISION ASSESSMENT
CORPORATION,

                Defendants.

Civil Action No. 08 C 2512

Judge Kocoras

Mag. Judge Schenkier

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS COUNTS I-IV AND VII-XIV OF
STEREO'S COMPLAINT PURSUANT TO RULE 12(b)(6)**

Defendants (collectively "VAC") move to dismiss Counts I-IV and VII-XIV of Plaintiff

Stereo Optical's ("Stereo") Complaint under Federal Rule of Civil Procedure 12(b)(6) as set

forth below.

## I.  INTRODUCTION

This lawsuit was commenced almost a year after Stereo was aware that VAC had

commenced business and, according to the Complaint, almost seven months after Stereo knew of

the VAC products accused therein.  Stereo's blunderbuss Complaint contains a mishmash of

vague and general allegations that serve as nothing more than an improper and bad faith attempt

by Stereo to stifle legitimate and lawful competition from VAC.  The core of Stereo's

Complaint, and the sole basis for jurisdiction of this Court, are the copyright infringement

claims, which appear to allege that all of VAC's stereopsis products (depicting a housefly, a

butterfly, the letter E and other objects) infringe alleged copyrights for Stereo's products and a

copyright registration for a "random dot butterfly test initially registered in 1980."  Complaint ¶¶

15 and 47.  The core is rotten, however.  The Complaint contains no allegation that any of

Stereo's products are protected by a copyright registration or that the only specified copyright

registration covers anything other than some "butterfly" depicted in the registration's deposit

copy (yet no deposit copy was annexed to the Complaint, or provided by Stereo's counsel, or

available at the Copyright Office).  Stereo also alleges trade secret misappropriation for a

"customer list;" yet no such list is identified (reality is that such "customers" are routinely public

attendees of trade shows, for instance, and are otherwise well-known).  Stereo's other alleged

secrets are also not explicated.  Moreover, most of Stereo's other counts are preempted by trade

secret and copyright law.  Further, Stereo has denominated a Count for "Intentional Interference

with Contract" but failed to allege the requisite elements of tortious interference.

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) ("*Twombly*"), requires

that Stereo's Complaint must provide enough detail to give VAC fair notice of what Stereo's

claims are, and the grounds therefor, and to show that it is plausible, rather than merely

speculative, that Stereo is entitled to relief.  Stereo's Complaint does not meet this standard in

large measure.

## II.    APPLICABLE LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a complaint (or

portions thereof) may be dismissed if it fails "to state a claim upon which relief can be granted."

A court must draw all reasonable inferences in favor of the plaintiff, construe all well-pleaded

allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-

pleaded facts and allegations in the complaint.  *Bontkowski v. First Nat'l Bank of Cicero*, 998

F.2d 459, 461 (7th Cir. 1993); *Perkins v. Silverstein*, 939 F.2d 463, 466 (7th Cir. 1991).  As the

Supreme Court explained in *Twombly*, however, the "plaintiff's obligation to provide the

'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  127 S.Ct. at 1964-65.

In order to avoid dismissal, a proper complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds upon which it rests.  *Id.* at 1964.  Further, to be cognizable, the factual allegations contained within a complaint must raise a claim for relief "above the speculative level."  *Id*. at 1965.  "[I]f they do not, the plaintiff pleads itself out of court."  *Equal Employment Opportunity Comm'n v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007).  It is no longer sufficient for a complaint "to ***avoid foreclosing*** possible bases for relief; it must actually ***suggest*** that the plaintiff has a right to relief," by causing that relief to be more than speculative.  *Id.* at 777 (emphasis in original).

### III.    ARGUMENT

#### A.    Summary of Argument

Stereo's copyright infringement counts (Counts I, II, and III) should be dismissed for failure to comply with 17 U.S.C. § 411(a) (no registrations besides "butterfly") and for failure to state a claim for which relief can be granted according to Rule 12(b)(6).  Count IV should be dismissed for failure to identify the supposedly misappropriated trade secrets.  Counts VII, IX-XII, and XIV should be dismissed because they are preempted by Stereo's purported trade secret count (Count IV).  Similarly, Counts VIII, IX, XI, XII, and XIV should be dismissed as preempted by Stereo's purported copyright infringement counts.  Stereo's purported "Intentional Interference with Contract" count (Count VIII) should be dismissed because Stereo failed to plead a valid and enforceable contract that VAC allegedly interfered with.  Lastly, there is no cause of action under Federal, State, or common law for Stereo's "accounting" count (Count XIII), and that count should also be dismissed.

**B.      Stereo's Copyright Infringement Claims Should Be Dismissed**

Counts I, II, and III, as well as other copyright infringement assertions made by Stereo in

other portions of its Complaint, are based on:

- an alleged copyright for Stereo Optical's Fly SO-001 ("Fly") product;

- an alleged copyright for Stereo Optical's Stereo Butterfly SO-005 ("Butterfly")
  product;

- an alleged copyright for Stereo Optical's Randot SO-002 ("Randot") product;

- an alleged copyright for Stereo Optical's Random Dot "E" SO-003 ("Random Dot
  'E'") product; and

- a copyright registration (Registration No. VA0000084496; Copyright Volume
  3560, Doc. 593) for a random dot butterfly test initially registered in 1980 by Mr.
  Ned Steinfeld, a competitor of Stereo Optical at the time (referred to as "the
  Steinfeld butterfly copyright registration").[1]

*See, e.g.,* Complaint, ¶¶ 15 and 47.  Other than the Steinfeld butterfly copyright registration,

which appears to be limited to the butterfly depicted in the deposit copy for that registration,

there are no copyright registrations alleged or identified anywhere in its Complaint.  In particular

there are no allegations that Stereo has any copyright registrations the above stereopsis products,

a housefly, the letter E or any objects other than a butterfly.

---

[1] This is not a copyright registration covering Stereo's Butterfly; it is a registration obtained by Mr. Ned Steinfeld of some stereopsis product shown in the missingdeposit copy depicting a butterfly that was the subject of a copyright infringement lawsuit filed by Mr. Steinfeld against Stereo in  1989 – Civil Case No. 89-1669 in the Southern District of New York in front of Judge Mukasey – and settled after the court ruled that Stereo's Butterfly did not infringe the Steinfeld butterfly copyright registration.

**1.      *Counts I-III Should Be Dismissed As Involving Products  Without Copyright Registrations***

Stereo's copyright infringement claims based on alleged copyrights for Stereo's Fly, Butterfly, Randot, and Random Dot "E" products should be dismissed because they are not based on properly registered copyrights.  According to 17 U.S.C. § 411(a), "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."  Courts have routinely and consistently dismissed copyright infringement claims that are based on non-registered works.  *See, e.g.*, *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 116 (2nd Cir. 2003) (holding that "section 411(a) barred the district court from considering whether [the unregistered] copyright had been infringed"); *Baker v. Universal Interactive Studios*, No. 00-1551, 2000 WL 1544775, at *1 (7th Cir. Oct. 13, 2000) (unpublished decision) (citing 17 U.S.C. § 411(a) and upholding dismissal of copyright action "because the complaint does not allege that the work has been registered") (Ex. A); *Conan Props., Inc. v. Mattel, Inc.*, 601 F. Supp. 1179, 1182 (S.D.N.Y. 1984) ("In order to proceed in its copyright infringement action, plaintiff is required to comply with the statutory requirement that all copyrights be registered. . . . Without registration of the copyrights the suit is barred and absent an allegation that the copyrights have been registered the complaint is defective."); *Am. Hosp. Ass'n v. Henderson*, No. 80-4820, 1981 WL 601618, at *4 (N.D. Ill. June 22, 1981) (granting summary judgment to defendant on copyright infringement claims that were based on non-registered works) (Ex. B).

**2.      *Counts I-III Should Also Be Dismissed Insofar As They Rely on the Steinfeld Registration***

Stereo's Complaint fails to show – either through a detailed description or through a copy attached as an exhibit – exactly what work, if any, is covered by the Steinfeld registration that

VAC's products allegedly infringe.  There is, quite simply, nothing to indicate to VAC exactly what they are accused of infringing in this registration.  Including a description or copy of the work with the complaint allows the defendants to "have notice of the specific works in question." *Burns v. Rockwood Distrib. Co.*, 481 F. Supp. 841, 846 n.3 (N.D. Ill. 1979).  Because of this deficiency, Stereo's copyright infringement allegations with respect to the Steinfeld registration fail to state a claim for which relief is more than speculative and should be dismissed.

Accordingly, the Court should dismiss all of Stereo's copyright infringement claims.

### C.     Count IV, Misappropriation of Trade Secrets, Should Be Dismissed

In Count IV, Stereo vaguely alleges that VAC misappropriated "written processes, customer lists, product costs and pricing information" but provides no detail.  Complaint, ¶ 63.  For allegations of trade secret misappropriation under the Illinois Trade Secret Act ("ITSA"), courts require "a degree of specificity" as to the identity of the trade secrets supposedly misappropriated.  *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, No. 93-556, 1993 WL 358148, at *5 (N.D.Ill. Sept. 14, 1993) (*citing Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992)) (Ex. C).  Count IV should be dismissed for failure to identify the trade secrets that VAC supposedly misappropriated.  *See id.* (dismissing misappropriation of trade secrets claim because plaintiff "failed to specify with any exactitude which pieces of information actually constitute trade secrets").

### D.     Illinois Trade Secret Act Preempts Counts VII, IX-XII, and XIV

The ITSA is the exclusive remedy under Illinois law for misappropriation of trade secrets.  76 ILL. COMP. STAT. 1065/8(a).  Section 8 explains that the ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."  *Id.*  The Seventh Circuit has interpreted

this to mean that Illinois has abolished all common law recoveries for the misuse of secret information. *Composite Marine Propellers, Inc.*, 962 F.2d at 1265. "[T]he key to determining whether the common law claims are preempted is to analyze each claim and its relationship to the facts or conduct of the trade secret claim. If the common law claims rely on the trade secret facts, they are preempted and will be dismissed." *Lucini Italia Co. v. Grappolini*, 231 F. Supp. 2d 764, 768 (N.D. Ill. 2002). "[I]f the operative facts are ***arguably*** cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois." *Learning Curve Toys, L.P. v. Playwood Toys, Inc*., No. 94-6884, 1999 WL 529572, at *3 (N.D. Ill. July 20, 1999) (emphasis added) (Ex. D).

### 1.     *Count VII, Conversion, is Preempted*

In Count VII, Stereo alleges that VAC intentionally interfered with Stereo's rights to exclusive use and possession of its proprietary computer and paper files, product information, and customer lists. Complaint, ¶ 79. This claim is merely another charge that VAC misappropriated Stereo's secret information, for which ITSA is the exclusive remedy. The conversion claim is preempted by the ITSA and should be dismissed. *See Automed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 922 (N.D. Ill. 2001) (dismissing a conversion claim over software and design plans taken by defendant because they were among the trade secrets misappropriated); *Thomas & Betts Corp. v. Panduit Corp*., 108 F. Supp. 2d 968, 973 (N.D. Ill. 2000) (preempting conversion claim because factual allegations asserted nothing more than misappropriation of trade secrets).

### 2.     *Count IX, Civil Conspiracy, is Preempted*

In Count IX, Stereo alleges, *inter alia*, that VAC conspired to deprive Stereo of its legal rights, property, confidential information, and trade secrets by improper means. Complaint, ¶ 93.

To the extent that this claim relies on Stereo's trade secret allegations and constitutes a charge of conspiracy to misappropriate trade secrets, it is preempted by the ITSA.  *See Automed Techs.*, 160 F. Supp. 2d at 922 (dismissing claim of conspiracy to steal confidential information as preempted); *see also Abanco Int'l, Inc.  v. Guestlogix Inc*., 486 F. Supp. 2d 779, 782 (N.D. Ill. 2007) (dismissing conspiracy claim since the tort underlying the conspiracy claim is the misappropriation of trade secrets); *Thomas & Betts Corp.*, 108 F. Supp. 2d at 975 (preempting civil conspiracy claim because it was factually based on trade secret misappropriation).

### 3.    *Count X, Breach of Fiduciary Duty, is Preempted*

In Count X, Stereo alleges, *inter alia*, that Mr. Judy held a position of special trust in fiduciary capacity to hold trade secrets and other confidential information "sacred."  Complaint, ¶ 99.  Since these assertions are essentially misappropriation of trade secrets allegations, the fiduciary duty claim, to the extent that it is based upon those allegations, is preempted by the ITSA.  *See Composite Marine Propellers*, 962 F.2d at 1265 (preempting fiduciary duty claim under ITSA); *Thomas & Betts Corp.*, 108 F. Supp. 2d at 973 (preempting fiduciary duty claim because taking confidential documents and trade secret information was the factual basis for the breach).

### 4.    *Count XI, Unjust Enrichment, is Preempted*

In Count XI, Stereo alleges, *inter alia*, that VAC received the benefit of the Plaintiff's secret and copyrighted information.  Complaint, ¶ 104.  This claim is a restitutionary claim which is explicitly preempted by Section 8(a) of the ITSA and therefore should be dismissed to the extent that it relies upon alleged misappropriation of trade secrets.  76 ILL. COMP. STAT. 1065/8(a); *see Web Commc'ns Group, Inc. v. Gateway 2000, Inc*., 889 F. Supp. 316, 321 (N.D.

Ill. 1995) (preempting unjust enrichment claim after finding that it is essentially a claim for restitution).

### 5.     Count XII, Constructive Trust, is Preempted

In Count XII, Stereo alleges, *inter alia*, that VAC's conduct constituted constructive or actual fraud because the individual defendants breached their duty not to use trade secrets and confidential information for their own benefits.  Complaint, ¶¶ 110 and 112.  Although identified as a "Count," under Illinois law, a constructive trust is not a separate cause of action, but rather an equitable remedy that may be imposed to redress unjust enrichment.  *C.H. Robinson Worldwide, Inc. v. Command Transp. LLC*, No. 05-3401, 2005 WL 3077998, at *6 n.4 (N.D. Ill. Nov. 16, 2005) (declining to analyze preemption of constructive trust separately under the ITSA due to its status as a remedy, not a claim) (Ex. E); *Eychaner v. Gross*, 779 N.E.2d 1115, 1143 (Ill. 2002).  Consequently, as Stereo's unjust enrichment claim (Count XI) is preempted under the ITSA, Stereo's corresponding remedy – constructive trust – for its unjust enrichment claim must be dismissed as well.

### 6.     Count XIV, Consumer Fraud and Deceptive Business Practices, is Preempted

In Count XIV, Stereo alleges, *inter alia*, that VAC utilized unfair and deceptive methods in violation of the Uniform Deceptive Trade Practices Act, including conspiracy to defraud Stereo of its property, trade secrets, and legal rights.  Complaint, ¶ 124.  Factually based on alleged misappropriation of trade secrets, this claim is preempted by the ITSA and should be dismissed.  *See Thomas & Betts Corp.*, 108 F. Supp. 2d at 975 (preempting fraud claim because factual allegations of fraud amounted to claim for misappropriation of trade secrets).

### E.     The Copyright Act Preempts Counts VIII, IX, XI, XII, and XIV

The Copyright Act's preemption provision, 17 U.S.C. § 301(a), bars "equivalent" state causes of action that purport to protect rights that the Act already protects, as specified by 17 U.S.C. § 106.  *Goes Lithography Co. v. Banta Corp.*, 26 F.Supp. 2d 1042, 1047 (N.D. Ill. 1998) (holding that claims for unfair competition and deceptive trade practiceswere preempted by the Copyright Act).  A state law claim is equivalent if (1) the work in which the right is asserted is fixed in tangible form and comes within the subject matter of copyright, and (2) the rights granted under state law are equivalent to the exclusive rights outlined in § 106.  *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n.*, 805 F.2d 663, 674 (7th Cir. 1986).

For the purposes of the preemption analysis set forth below, there can be no dispute as to the first prong of the equivalency test:  Stereo specifically asserted copyright protection over four of its products, alleged copyright infringement, and used copyright terminology liberally throughout its Complaint.

Therefore, it is left for this Court to determine whether Stereo's non-copyright counts are "equivalent" to the copyright action.  A state right is "equivalent" to federal copyright protection if the state law is violated by the exercise of any right set forth in § 106, including the rights to reproduce, distribute, perform, and display copyrighted material.  *Id.* at 676-77.  State law claims only avoid preemption by incorporating an "extra element that changes the nature of the action so that it is qualitatively different from a copyright infringement claim."  *Goes Lithography*, 26 F.Supp. 2d at 1048.  Indeed, if those additional elements that are required by the state cause of action do not differ in kind from those necessary for copyright infringement, the cause of action is equivalent.  *Balt. Orioles*, 805 F.2d at 678 n.26.

### 1.    *Count VIII, Intentional Interference with Contract, is Preempted*

In Count VIII, Stereo alleges that VAC "produced, marketed and sold Stereo's copyrighted works, and/or prepared, produced, marketed and/or sold derivatives of Stereo's copyrighted works to various Stereo clients."  Stereo also alleges that Defendants "intentionally and tortuously [sic] interfered with Plaintiff's business contracts . . . by soliciting, enticing and/or encouraging said customers to purchase VAC's ***infringing*** products."  Complaint, ¶ 86 (emphasis added).  Stereo did not allege any additional behavior with respect to its intentional interference with contract claim.

These allegations are qualitatively equivalent to the rights protected by the Copyright Act.  Further, the additional elements of knowledge and intent required for an intentional interference with contract claim do not render the asserted right different in kind than the rights protected in a copyright infringement claim.  Therefore, Count VIII of Stereo's Complaint is preempted and should be dismissed.  *See Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp. 2d 953, 959 (N.D. Ill. 2002) (holding that claim for tortious interference with contract was preempted by the Copyright Act).

### 2.    *Count IX, Civil Conspiracy, is Preempted*

In Count IX, Stereo repeated some of the allegations used to support its copyright claim and its claim for intentional interference with contract.  Complaint, ¶ 94.  Stereo then drew the conclusion that these allegations constitute civil conspiracy.  Complaint, ¶ 96.  To the extent that Count IX's conspiracy allegations rest on copyright infringement (and/or the corresponding intentional interference with contract allegations), it is qualitatively equivalent to the rights protected by the Copyright Act and should be dismissed as preempted.  *See Higher Gear*, 223 F.Supp. 2d at 960 (holding civil conspiracy claim preempted by the Copyright Act "because it is

premised on the allegations supporting the preempted tortious interference claim"); *see also Do It Best Corp. v. Passport Software, Inc.*, No. 01-7674, 2005 WL 743083, at *14 (N.D. Ill. Mar. 31, 2005) (preempting civil conspiracy claim because the claim alleges conspiracy to infringe and rests on the tort of copyright infringement) (Ex. F).

### 3.    Count XI, Unjust Enrichment, is Preempted

In Count XI, Stereo alleges, *inter alia*, that VAC "received the benefit of the Plaintiff's copyrighted works."  Complaint, ¶ 104.  Because these allegations are qualitatively equivalent to the rights protected by the Copyright Act and Stereo failed to provide any unique basis for its unjust enrichment claim, Count XI of the Plaintiff's Complaint should be dismissed as preempted.  *See Igram v. Page*, No. 98-8337, 2000 WL 263707, at *4 (N.D. Ill. Feb. 28, 2000) (holding unjust enrichment claim preempted by the Copyright Act) (Ex. G).

### 4.    Count XII, Constructive Trust, is Preempted

In Count XII, Stereo alleges, *inter alia*, that VAC's "producing, marketing and selling reproductions and/or derivative works based on Stereo's copyrighted works, confidential and proprietary information," constitutes constructive or actual fraud and a constructive trust over the "fruits" of VAC's activities.  Complaint, ¶¶ 111-12.  As explained above, under Illinois law, a constructive trust is not a separate cause of action, but rather an equitable remedy that may be imposed to redress unjust enrichment.  *C.H. Robinson,* 2005 WL 3077998, at *6 n.4; *Eychaner,* 779 N.E.2d at 1143.  But as Stereo's unjust enrichment claim (Count XI) is preempted under the Copyright Act, Stereo's corresponding remedy – constructive trust – must be dismissed as well.

### 5.    Count XIV, Consumer Fraud and Deceptive Business Practices, is Preempted

In Count XIV, Stereo alleges, *inter alia*, that VAC has infringed its copyrighted works resulting in a violation of the Consumer Fraud and Deceptive Business Practices Act.

Complaint, ¶ 124.  This claim is qualitatively equivalent to the rights protected by the Copyright

Act, and should be dismissed as preempted.  *See Villa v. Brady Publ'g*, No. 02-570, 2002 WL

1400345, at *3 (N.D. Ill. June 27, 2002) (holding consumer fraud and deceptive business

practices claim – based on inclusion of a copy of copyright owner's artwork – preempted by the

Copyright Act) (Ex. H).

## F.    Count VIII, Intentional Interference with Contract, Does Not Adequately State a Claim for Relief

A motion to dismiss should granted if the plaintiff fails "to state a claim upon which

relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Such is the case with Stereo's Count VIII.  The

elements of a claim for intentional interference with contract are "(1) the existence of a valid and

enforceable contract; (2) the defendant's knowledge of it; (3) intentional and malicious

inducement of the breach; (4) the subsequent breach by the third person due to the defendant's

wrongful conduct and (5) damage to the plaintiff."  *Ramsey v. Greenwald*, 414 N.E.2d 1266,

1272 (Ill. App. Ct. 1980).  In Count VIII, Stereo alleges that VAC sold products to "various

Stereo clients, including, but not limited to Brad Grills and Nik Apostolou at Designs for Vision,

among others."  Complaint, ¶ 85.  However, beyond the vague reference to "Plaintiff's business

contracts and relationships with Designs for Vision and others," Stereo never actually alleges

that there exists a valid and enforceable contract between Stereo and Brad Grills, Nik Apostolou,

or Designs for Vision, let alone between Stereo and the ambiguous "others."  Complaint, ¶ 86.

This count is fatally defective.  *See Ill. Bell Tel. Co. v. Plote, Inc.*, 778 N.E.2d 1203, 1211 (Ill.

App. Ct. 2002) (affirming dismissal of intentional interference of contract claim for failure to

plead all elements of claim).

G.      **Count XIII, Accounting, Also Does Not Adequately State a Claim for Relief**

In Count XIII, Stereo purports to seek an "accounting."  Complaint, ¶ 121.  However, no

such cause of action exists in the context alleged.  Indeed, a reading of the claim shows that this

claim is, at best, a request for discovery related to Stereo's copyright allegations.  Therefore, the

Court should dismiss Count XIII.

## IV.      CONCLUSION

For the reasons set forth above, Counts I-IV and VII-XIII should be dismissed.  A

proposed order is being submitted herewith for the Court's convenience.

| | |
|---|---|
| July 18, 2008 | Respectfully submitted.<br><br>s/Michael H. Baniak<br>Michael H. Baniak<br>  *baniak@mbhb.com*<br>Sean M. Sullivan<br>  *sullivan@mbhb.com*<br>Jessica L. Lunney<br>  *lunney@mbhb.com*<br>McDonnell Boehnen Hulbert & Berghoff LLP<br>300 South Wacker Drive, Suite 3100<br>Chicago, Illinois  60606<br>(312) 913-0001  Telephone<br>(312) 913-0002  Facsimile<br><br>*Counsel for Thomas J. Judy, Jacqueline K. Judy, Ralph E. Craig, Richard J. Unger, and Vision Assessment Corporation* |

14

Michael H. Baniak
Sean M. Sullivan
Jessica L. Lunney
MCDONNELL BOEHNEN
HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, Illinois 60606
Telephone:    (312) 913-0001
Facsimile:    (312) 913-0002

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEREO OPTICAL CO., INC.,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS J. JUDY, JACQUELINE K. JUDY, RALPH E. CRAIG, RICHARD J. UNGER, and VISION ASSESSMENT CORPORATION,<br><br>Defendants. | Civil Action No. 08-CV-2512 (CPK/SIS)<br><br>*FILED ELECTRONICALLY*<br><br>**PROPOSED ORDER** |

**THIS MATTER** having come before the Court on Notice of Motion by Defendants Thomas J. Judy, Jacqueline K. Judy, Ralph E. Craig, Richard Unger, and Vision Assessment Corporation to Dismiss Counts I-III and VII-XIV of Stereo's Complaint, and the Court having considered the submissions of counsel, and for good cause shown;

**IT IS,** on this ____ day _____ of 2008,

**ORDERED**, pursuant to Federal Rule of Civil Procedure 12(b)(6), that:

A.    Counts I-III are dismissed in their entirety, pursuant to 17 U.S.C. § 411(a), to the extent that they allege copyright infringement of unregistered works and, under Rule 12(b)(6), for failure to state a claim upon which relief can be granted;

B.    Count IV is dismissed in its entirety, under Rule 12(b)(6), for failure to state a claim upon which relief can be granted;

C.    Count VII is dismissed in its entirety due to preemption under the Illinois Trade Secret Act (76 ILL. COMP. STAT. 1065/8(a));

D.    Count VIII is dismissed in its entirety due to preemption under the Copyright Act (17 U.S.C. § 301(a)), or alternatively, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted;

E.    Count IX is dismissed in its entirety due to preemption under the Illinois Trade Secret Act (76 ILL. COMP. STAT.1065/8(a)) and the Copyright Act (17 U.S.C. § 106);

F.    Count X is dismissed, in its entirety, due to preemption under the Illinois Trade Secret Act (76 ILL. COMP. STAT. 1065/8(a));

G.    Count XI is dismissed in its entirety due to preemption under the Illinois Trade Secret Act (76 ILL. COMP. STAT. 1065/8(a)) and the Copyright Act (17 U.S.C. § 106);

H.    Count XII is dismissed in its entirety due to preemption under the Illinois Trade Secret Act (76 ILL. COMP. STAT. 1065/8(a)) and the Copyright Act (17 U.S.C. § 106);

I.    Count XIII is dismissed in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted; and

J.      Count XIV is dismissed in its entirety due to preemption under the Illinois Trade

Secret Act (76 ILL. COMP. STAT. 1065/8(a)) and the Copyright Act (17 U.S.C. § 106).


_____
Hon. Charles P. Kocoras U.S.D.J.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 18, 2008, a copy of the foregoing was

served via electronic mail, and via the Court's electronic filing system, on the following

attorneys of record:

> Grant Blumenthal
>   gblumenthal@tamblum.com
> TAMARI & BLUMENTHAL, LLC
> 55 W. Monroe Street, Suite #2370
> Chicago, Illinois  60603
> (312) 236-6200  Telephone
> (312) 416-7963  Facsimile


> s/Jessica L. Lunney
> Jessica L. Lunney (lunney@mbhb.com)
> MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
> 300 S. Wacker Drive, Suite 3100
> Chicago, Illinois  60606-6709
> (312) 913-0001  Telephone
> (312) 913-0002  Facsimile

# Exhibit A



234 F.3d 1272, 2000 WL 1544775 (C.A.7 (Ill.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**234 F.3d 1272,   (C.A.7 (Ill.))2000 WL 1544775**

Ⓒ Baker v. Universal Interactive Studios
C.A.7 (Ill.),2000.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA7 Rule
53 for rules regarding the citation of unpublished
opinions.)
United States Court of Appeals, Seventh Circuit.
Antwan Kevin BAKER, Plaintiff-Appellant,
v.
UNIVERSAL INTERACTIVE STUDIOS and Edgar
Bronfman, Jr., Defendants-Appellees.
**No. 00-1551.**

Submitted Oct. 10, 2000.FN*

FN* After an examination of the briefs and
the record, we have concluded that oral
argument is unnecessary, and the appeal is
submitted on the briefs and the record. See
Fed. R.App. P. 34(a); Cir. R. 34(f).
Decided Oct. 13, 2000.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No. 99
C 2016. Suzanne B. Conlon, Judge.

Before Hon. RICHARD A. POSNER, Hon. FRANK
H. EASTERBROOK, and Hon. ANN CLAIRE
WILLIAMS, Circuit Judges.

Order

***1** Antwan Baker filed suit, purportedly under 42
U.S.C. § 1983, accusing the owners of a theme park of
using the contents of his book "GREAT AMERIKA
HE MADE ME A STAR." in their marketing and
promotion. The foreword of this self-published book
conveys its flavor:

TODAY is your: you this book's presently active
interrelated interactive reader's, INDEPENDENCE
DAY as no other within your individual life's decision,
and this book was written to specifically encourage/
inspire each one of it's readers to make the right choice,
and CATCH MY RIDE, who is the GUIDING LIGHT

within all creation of life on earth, and who is also
given humanity the master key that opens all THE
DOORS within all of life's limitless opportunistical
possibilities. This book is an authentic biblical
interpreted, simplified, comprehensible, provoking,
concise, nonbias, nontraditional, masterpiece of
literary work, that interactively enacts within being a
real life daily encouraging narrative instrumental
instructive essential / directive guidance tool for all
ages, that is also a real life active interrelated
interactive international historical true saga, within
TOTAL entered entrance within the actual life of it's
author's past, present, and future!

The district judge observed that neither defendant is a
state actor, so litigation under § 1983 is impossible.
Treating Baker's complaint as one for conversion
under Illinois law, the district court dismissed the
action for failure to state a claim on which relief may
be granted. Fed.R.Civ.P. 12(b)(6).

Complaints need not plead law, so Baker's reference to
§ 1983 is not fatal. *Bartholet v. Reishauer A.G.*
*(Zürich),* 953 F.2d 1073 (7th Cir.1992). Liberally read,
as complaints should be, Baker's alleges copyright
infringement and comes within federal jurisdiction
under 28 U.S.C. § 1331. See 17 U.S.C. § 501. Even
seen as a copyright action, however, it was properly
dismissed, if only because the complaint does not
allege that the work has been registered, and "no
action for infringement of the copyright in any United
States work shall be instituted until registration of the
copyright claim has been made in accordance with this
title."17 U.S.C. § 411(a). What is more, Baker's
complaint and brief are so diffuse that it is impossible
to discern the gravamen of his claim. A complaint
need not plead facts, but it must include enough to
show the nature of the grievance. No concrete
grievance emerges from Baker's complaint, the
dismissal of which is therefore

AFFIRMED.

C.A.7 (Ill.),2000.
Baker v. Universal Interactive Studios
234 F.3d 1272, 2000 WL 1544775 (C.A.7 (Ill.))

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

234 F.3d 1272                                                                    Page 2
234 F.3d 1272, 2000 WL 1544775 (C.A.7 (Ill.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**234 F.3d 1272,   (C.A.7 (Ill.))2000 WL 1544775**


END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

Westlaw.

Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1981 WL 601618 (N.D.Ill.)
**1981 WL 601618 (N.D.Ill.)**

American Hosp. Ass'n v. Henderson
N.D.Ill.,1981.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois.
**AMERICAN HOSPITAL ASSOCIATION**,
Plaintiff,
v.
John A. HENDERSON, SMG Marketing Group, Inc.,
and Crain Communications, Inc., Defendants.
**No. 80 C 4820.**

June 22, 1981.

*MEMORANDUM OPINION AND ORDER*

ASPEN, J.
**\*1** Plaintiff, American Hospital Association ("AHA"), brought this action for copyright infringement [17 U.S.C. § 501] and false description or representation under the Lanham Trademark Act [15 U.S .C. 1125(a) ] against defendants, SMG Marketing Group, Inc. ("SMG"); John A. Henderson ("Henderson"), president of SMG; and Crain Communications, Inc. ("Crain"). AHA has also joined state claims against the defendants for fraud, deceptive trade practices, unfair competition, common law misappropriation and conversion, and breach of fiduciary duty. Jurisdiction over the federal counts is asserted pursuant to 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121, and over the state claims in accordance with principles of pendent jurisdiction. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726-27 (1966).

The defendants have answered the complaint and the plaintiff, AHA, has moved for partial summary judgment with respect to liability and injunctive relief on its claim for copyright infringement (Count I). The defendants have moved for summary judgment on both the copyright infringement and Lanham Act claims (Counts I and II) and dismissal of inde pendent state claims (Counts III through VII) for lack of subject matter jurisdiction.

The United States Court of Appeals for the Seventh Circuit has observed that "[w]ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure

whenever appropriate."*Kirk v. Home Indemnity Co.,* 431 F.2d 544, 560 (7th Cir.1970). In support of a motion for summary judgment, the moving party has the burden of showing that there is no dispute as to any genuine issue of fact material to a judgment in his favor as a matter of law. *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10 (7th Cir.1979). While the non-moving party is entitled to all reasonaable inferences that can be made in its favor from the evidence presented, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962); *Moutoux v. Gulling Auto Electric, Inc.,* 295 F.2d 573, 576 (7th Cir.1961), it may not merely rely on its pleadings but rather must affirmatively set forth specific facts in affidavits or otherwise showing that there are issues that must be decided at trial in response to the moving party's assertions that no genuine issues of material fact exist. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289-90, 88 S.Ct. 1875 (1968); *Kirk v. Home Indemnity Co.,* 431 F.2d 554, 560 (7th Cir.1970).

The facts in this case are relatively straightforward and it is essentially with regard to the law to be applied to these facts that the parties disagree. The plaintiff, AHA, is a national trade association whose membership is composed of hospitals, other health care institutions, and individuals involved with the health care industry. The AHA provides a variety of services for its members, including the publication of literature relating to the health care field. One of AHA's publications is its copyrighted annual *American Hospital Association Guide to the Health Care Field* ("AHA Guide"), the 1978 edition of which stands at the center of this lawsuit.

**\*2** The AHA Guide contains approximately 600 pages of information and data on health care institutions, organizations and agencies, listings of individuals engaged in the health care field, and a purchasing directory of manufacturers, suppliers and distributors of health care products. Almost half of the publication (about 250 pages) is devoted to detailed statistical data concerning AHA member hospitals and hospitals accredited by the Joint Commission on Accreditation of Hospitals, including: (a) name, address, and phone number; (b) number of beds; (c) number of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

admissions; (d) type of ownership or control of the hospital; and (e) type of services provided. The data concerning type of control and available services of each institution is reduced to a one- or two-digit classification code. The information in the AHA Guide is derived from an annual survey conducted by AHA, the results of which are compiled and stored on computer data tapes ("AHA Date Tapes"). The information contained in the 1978 edition of the AHA Guide is based on the results of the AHA survey conducted in 1977 and stored on the 1977 AHA Data Tape. The 1978 edition of the AHA Guide was published on August 25, 1978, and a copyright covering the work was issued by the Register of Copyrights effective October 11, 1978.

The 1977 AHA Data Tape, however, is not subject to an independent copyright. Prior to 1977, the AHA conducted an annual survey pursuant to a grant from the United States Department of Health, Education and Welfare ("HEW"). In accordance with the terms of the HEW grant, AHA produced computer data tapes for HEW ("HEW Data Tapes") which, in addition to the non-financial statistical information contained on the corresponding AHA Data Tapes, contained data concerning from 250 to 300 hospitals and institutions not listed on the AHA Data Tapes. The HEW Data Tapes were not copyrighted and, thus, were in the public domain and publically available from HEW at $200 per tape. AHA conducted its final survey and produced its last data tape for HEW in 1976.

In 1977, the AHA conducted its own survey and produced a complete data tape of the results itself at a cost of approximately $180,000. As stated earlier, the information contained in the 1978 edition of the AHA Guide is derived from the 1977 AHA Data Tape, just as the information in earlier editions of the AHA Guide had been derived from the data tapes produced by AHA for HEW. Between August, 1978, and December, 1980, 73 copies of the 1977 AHA Data Tape were sold to various institutions for internal research and analysis of the statistical data. All the purchasers signed a "Data Purchase and Use Agreement" in which they agreed not to unilaterally disclose, publish, reproduce, or distribute the information contained in the 1977 AHA Data Tape. Much of the information on the 1977 AHA Data Tape was available in a different format in the 1978 AHA Guide. However, certain information, including the

number of surgical operations performed at an institution and a seven-digit hospital identification number, was contained in the 1977 AHA Data Tape but was not printed in the 1978 AHA Guide.

**\*3** Defendant Henderson was employed by AHA from November, 1971, to July 1, 1977. From June, 1974, until the termination of his employment in 1977, Henderson was the Director of Marketing Services for the Publication Division of AHA and he had extensive knowledge of the manner in which AHA compiled the information contained in the AHA Guide and the AHA and HEW Data Tapes. Defendant SMG is a Delaware corporation, incorporated in November, 1976, engaged in the business of market research and management consulting for manufacturers and suppliers in the health care field. Henderson was a shareholder of SMG at the time it was incorporated and became its president shortly after he was terminated at AHA. In June, 1979, SMG published a 304-page marketing guide entitled *Hospital Market Atlas: United States* ("SMG Atlas") which was designed as a marketing and sales tool for health care manufacturers and suppliers. The SMG Atlas was published in cooperation with "Modern Healthcare," a Crain publication. The SMG Atlas contains coded maps that identify hospitals and other health care institutions in each state and selected cities. It also contains a listing of hospitals, laboratories, and medical group practice by state, including: (a) name, address, and phone number; (b) number of beds; (c) number of admissions; (d) type of ownership or control; (e) type of services provided; (f) a six-digit hospital identification number; and (g) number of surgical operations. The six-digit identification number in the SMG Atlas corresponds to the last six-digits of the seven-digit identification number assigned to each institution in the 1977 AHA Data Tape. The rest of the information in the SMG Atlas, except for the number of surgical operations which are only listed in the AHA Data Tape, can be found in the 1978 AHA Guide, as well as the 1977 AHA Data Tape.

The SMG Atlas was compiled in 1977 and 1978. SMG and Henderson admit that the statistical information relating to hospitals contained in the SMG Atlas, including the classification code numbers and the six-digit hospital identification number, was derived from an uncopyrighted 1976 HEW Data Tape that SMG purchased from HEW in October, 1977. In

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1981 WL 601618 (N.D.Ill.)
**1981 WL 601618 (N.D.Ill.)**

addition, Henderson and SMG admit that they used the 1977 AHA Data Tape to update the admissions and beds data for those hospitals listed in the 1976 HEW Data Tape. They do not admit copying anything from the 1978 edition of the AHA Guide.

*Copyright Infringement*

AHA has moved for summary judgment on its claim of copyright infringement on the ground that the admitted use of the 1977 AHA Data Tape, at least with regard to the beds and admissions data, in compiling the SMG Atlas constitutes infringement of AHA's copyright in the 1978 edition of the AHA Guide which, AHA asserts, also extends to the 1977 AHA Data Tape. Alternatively, AHA argues that its publication of 73 copies of the AHA Data Tape without notice of copyright does not forfeit any common law copyright it may have in either the guide or the computer tape and that, in any case, the omission of copyright notice from a relatively small number of copies of the tape distributed to the public does not automatically result in forfeiture of its rights because of the savings clause of the Copyright Act of 1976, 17 U.S.C. § 405(a)(1) (formerly section 21 of the Copyright Act of 1909). In their cross-motion for summary judgment on the copyright claim, the defendants argue that the copyright in the 1978 edition of the AHA Guide does not protect the 1977 AHA Data Tape and that AHA may not enforce any alleged independent copyright in the 1977 AHA Data Tape in an action for infringement without first registering a copyright with the Register of Copyrights pursuant to 17 U.S.C. § 411(a). Alternatively, the defendants maintain that AHA's omission of copyright notice from all the copies of the 1977 AHA Data Tape distributed between 1978 and 1980 is fatal to AHA's copyright infringement claim.

**\*4** At the outset, the Court notes that AHA has brought forth absolutely no evidence tending to show that the defendants copied anything from the 1978 edition of the AHA Guide in compiling the SMG Atlas. In fact, the evidence suggests the contrary since the SMG Atlas contains information, such as the six-digit hospital identification numbers and the statistics on surgical operations, that is contained in the 1977 AHA Data Tape and the 1976 HEW Data Tape but not in the 1978 AHA Guide. Thus, AHA's sole argument in support of its infringement claim seems to be based upon the defendants' use of the 1977 AHA Data Tape.

AHA's argument that copyright protection for the 1977 AHA Data Tape is somehow subsumed within the copyright on the 1978 edition of the AHA Guide because both contain essentially the same 'original work of authorship' is wholly without merit. Indeed, AHA cites no authority in support of its novel position aside from a tortured interpretation of the literal language of the copyright statute itself. Section 102 of the Copyright Act of 1976 [FN1] states that "[c]opyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), including "literary works," which are defined in section 101 as "works, other than audiovisual works, expressed in words, numbers, or other ... symbols or indicia, regardless of the nature of the material objects, such as books, periodicals ... tapes ... in which they are embodied." 17 U.S.C. § 101. Thus, AHA contends that its "original work," namely the data on hospitals and other health care institutions, is protected by copyright regardless of the medium in which it is expressed. However, the portions of the Act to which AHA refers merely go to the *copyrightability* of particular works. While the AHA may have secured a separate copyright in the 1977 AHA Data Tape to the extent that the tape constituted an original work of authorship within the meaning of the Act, it does not follow that the copyright it did obtain in the 1978 AHA Guide covers all the media in which the information contained in the Guide might be expressed, in whatever form. [FN2]

> **FN1.** The Copyright Act of 1976, 17 U.S.C. § 101 *etseq.*, applies to this case since the cause of action arose after the January 1, 1978, effective date of the Act. A cause of action for infringement is deemed to arise when the allegedly infringing publication takes place. *See* Bromhall v. Rorvik, 478 F.Supp. 361, 366 (N.D.Ill.1979). The SMG Atlas was published in June, 1979.

> **FN2.** Even if we were to agree with AHA that its copyright in the 1978 AHA Guide somehow encompasses the 1977 AHA Data Tape, AHA would be deemed to have forfeited any rights it had, at least in the tape, by its publication of all 73 copies of the tape without any copyright notice. AHA's reliance on 17 U.S.C. § 405(a)(1) (1976) [formerly 17 U.S.C. § 21 (1909) ] is misplaced in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

context of this case. That section protects a copyright owner who has omitted notice "from no more than a relatively small number of copies ... distributed to the public."While section 405(a)(1) was intended to be slightly less restrictive than former section 21 (under which the owner's rights were forfeited unless notice was mistakenly omitted from only "a particular copy or copies"), it still does not prevent forfeiture when proper copyright notice is "totally absent from all public copies of a work."Data Cash Systems, Inc. v. J S & A Group, Inc., 628 F.2d 1038 (7th Cir.1980). Moreover, AHA can draw no comfort from the "limited publication" doctrine in order to preserve its alleged statutory copyright. At common law, a copyright owner did not forfeit his common law copyright by a publication of his work to a limited class of persons for a limited purpose. Such a "limited publication" preserved the common law copyright owner's rights against alleged infringers. See Data Cash Systems, Inc. v.. J S & A Group, Inc., *supra*, 628 F.2d at 1042;Burke v. National Broadcasting Co., Inc., 598 F.2d 688, 691-93 (1st Cir.1979). Under the Copyright Act of 1976, common law copyright has been abolished, however. 17 U.S.C. § 301(a). Thus, the limited publication doctrine could not aid the AHA even if it was attempting to assert a common law copyright in the 1977 AHA Data Tape at this late date. The common-law limited publication doctrine is similarly of no aid to AHA in its attempted assertion of a statutory copyright in the tape.

It is equally clear that AHA may not bring an infringement action to enforce any independent copyright it may have in the 1977 AHA Data Tape without first registering such copyright with the United States Register of Copyrights.Section 411(a) of the Copyright Act of 1976, 17 U.S.C. § 411(a), clearly provides that "no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."AHA's cause of action for infringement, measured by publication of the alleged infringing work in June, 1979, arises after the January 1, 1978, effective date of the 1976 Act, and thus AHA must comply with that Act's registration provisions.

Bromhall v. Rorvik, 478 F.Supp. 361, 365 (N.D.Ill.1979).

*Lanham Act Claims*

**\*5** AHA's allegations of false description or representation in violation of 15 U.S.C. §§ 1125(a) are based upon statements in the SMG Atlas and in a SMG brochure promoting the Atlas to the effect that the information in the Atlas was "the most current available" from several sources, including the American Hospital Association. It is undisputed that at the time the SMG Atlas was published in June, 1979, the health care data contained therein was the most current available from the AHA since the 1978 AHA Data Tape and the 1979 AHA Guide were not then available for distribution. AHA maintains that while SMG's representations may well have been true at the time they were first made, coinciding with the publication of the SMG Atlas in June, 1979, they later became untrue when the 1978 AHA Data Tape and 1979 AHA Guide became available late in 1979.

With respect to the statements contained in the SMG Atlas, AHA's claims of false description or representation are without merit. The representation that the Atlas contained the most current data then available was true as of the date the Atlas was published. Furthermore, that statement remained true until AHA made available its 1978 AHA Data Tape and 1979 AHA Guide containing updated data late in 1979.[FN3]Common sense dictates that persons interested in the "most current" data available in 1980 or subsequent years would realize that the SMG Atlas published in June, 1979, was only current as of the date of its publication.[FN4]Furthermore, while continued reference to the SMG Atlas as containing the most current data available from AHA and other sources in advertisements or promotional materials after the updated AHA materials were released might constitute false description or representation, that does not appear to be what occurred in this case. Rather, SMG apparently deleted all reference to the AHA in its advertising brochures late in 1979, at approximately the same time that the 1978 AHA Data Tape and 1979 AHA Guide became available.[FN5]

> FN3. AHA has not indicated the exact dates upon which the sources containing updated data became available.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

FN4. In any case, SMG has apparently voluntarily deleted all reference to AHA in the copies of the SMG Atlas sold after AHA filed this action in September, 1980.

FN5. It is the Court's impression, from the statements of the parties in their respective memoranda filed to date, that the original SMG promotional brochures were withdrawn at approximately the same time that the updated AHA material appeared. If that is not in fact the case, the Court will entertain an appropriate motion to reconsider this portion of our opinion.

There is nothing to the contrary the court's opinion in *American Brands, Inc. v. R.J. Reynolds Tobacco Co., 413 F.Supp. 1352 (S.D.N.Y.1976),* cited by AHA as the "dispositive case" on this matter. In that case, the defendant had continued to advertise its cigarette as having the lowest tar content of all the cigarettes on the market after the plaintiff had introduced a new brand with a lower tar content. The court expressly refused to take any action with regard to magazine advertisements that were true when printed but which became outdated with the introduction of plaintiff's new product. 413 F.Supp. at 1358. The court did order the elimination of advertising that continued to refer to defendant's cigarette as "the lowest tar of all cigarettes" after the introduction of plaintiff's new product. *Id.*

Finally, there is nothing in the SMG Atlas or the promotional brochure that admits of the construction, urged by AHA, that the SMG Atlas was somehow produced in conjunction or association with the AHA. The introduction to the SMG Atlas states:

**\*6** All the hospitals and statistical information is the most current available from SMG MARKETING GROUP, INC., the American Hospital Association, the Department of Health, Education and Welfare, the National Center for Health Statistics, various directories of the hospital industry and other health care data sources.

The allegedly offending brochure states:
Utilizing the most current data from the American Hospital Association, American Medical Association, the Department of HEW, the Bureau of the Census, and other data sources, SMG has formed the most

complete health care resource center in the United States.

Neither statement can be fairly read as falsely describing or representing that the SMG Atlas was published in association with the AHA or any of the other institutions mentioned in violation of 15 U.S.C. § 1125(a). Rather, both statements merely identify the sources of the data contained in the SMG Atlas which would be familiar to anyone in the health care field as primary data sources.

Accordingly, for the reasons set forth in this opinion, AHA's motion for partial summary judgment is denied and the defendant's motion for summary judgment on the copyright infringement and Lanham Act claims is granted. It is so ordered.

In the absence of an independent basis of federal jurisdiction, the Court declines to exercise jurisdiction over the pendent state law claims. Courts and commentators generally agree that when the federal claims are dismissed, the court need not retain the pendent state claims in the absence of any prejudice to the parties or the commitment of significant judicial time and effort. *SeeHousing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 2064 n. 26 (1975); Fields v. Fidelity General Insurance Co., 454 F.2d 682, 686 (7th Cir.1971);* S. Schenkier, *Ensuring Access to Federal Courts: A Revised Rationale For Pendent Jurisdiction,* 75 Nw.U.L.Rev. 245, 292-93 (1980). It is so ordered.

N.D.Ill.,1981.
American Hosp. Ass'n v. Henderson
Not Reported in F.Supp., 1981 WL 601618 (N.D.Ill.)

END OF DOCUMENT

# Exhibit C

Westlaw.

Not Reported in F.Supp.                                                                                   Page 1
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)
**1993 WL 358148 (N.D.Ill.)**

Thermal Zone Products Corp. v. Echo Engineering, Ltd.
N.D.Ill.,1993.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
**THERMAL  ZONE** PRODUCTS CORP. and Benjamin J. Bellas, Plaintiffs,
v.
ECHO ENGINEERING, LTD. and Nicholas Jackman, Defendants.
**No. 93 C 0556.**

Sept. 14, 1993.

MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.
**\*1** Plaintiff Thermal Zone Products Corporation ("Thermal Zone") and Benjamin Bellas ("Bellas") ("collectively Plaintiffs") brought this action against Defendants Echo Engineering, Ltd. ("Echo") and Nicholas Jackman ("Jackman") (collectively "Defendants") seeking remedy for trademark infringement pursuant to 15 U.S.C. § 1125(a) (Count I); for trademark infringement pursuant to 15 U.S.C. § 1114(1) (Count II); for common law unfair competition under the laws of Illinois and other states (Count III); for deceptive and unfair trade practices, pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, et seq. (Count IV); for deceptive and unfair trade practices, pursuant to the Illinois Consumer Fraud and deceptive Business Practices Act, 815 ILCS 505/1, et seq. (Count V); for statutory dilution under the laws of Illinois, 765 ILCS 1035/15 (Count VI); and for misappropriation of Plaintiffs' confidential trade secret information, pursuant to the Illinois Trade Secrets Act, 765 ILCS 1065/1et seq.  (Count VII).

Defendants move to dismiss Counts V, VI, and VII for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, we grant Defendants' Motion To Dismiss as to Counts VI and VII and deny the Motion To Dismiss as to Count V.

BACKGROUND

For over seven years Thermal Zone, and its predecessor companies or owners, have actively engaged in the business of manufacturing and marketing cooking ovens, for use by mass producers of baked goods. The ovens manufactured by the Plaintiffs and their predecessors include many unique features, such as pulse heating, composite design, uniformity of cooking across a wide product conveyor belt, uniform air flow, direct impingement, laminar air flow in specific zones, separately controlled temperature, humidity and air velocity above and below the conveyor belt, and the incorporation of many different cooking styles in one machine. Plaintiffs claim that the design, plans, details and specifications of these ovens, which enable the Plaintiffs to successfully incorporate all of these features, are trade secrets.

Over a period of many years and at a significant expense, Plaintiffs claim they have developed over 3000 pages of confidential technical information, including drawings, plans and specifications relating to the manufacture of these ovens, which incorporate these trade secrets. For many years, Plaintiffs and their predecessors have sold their ovens under their "Thermal Zone" trademark, throughout the United States. Thermal Zone is the valid and authorized current owner of the trademark "Thermal Zone" and the United States Trademark registration: # 1,444,022. This trademark was initially issued to Bellas, Inc. ("Bellas"), a predecessor of Thermal Zone.

On January 8, 1988, Bellas entered into a Security Agreement with the Bank of Lancaster County, Strasburg, Pennsylvania, (the "Bank") to secure the payment of a Promissory Note (the "Note") that it had signed with the Bank in the amount of Fifty-five Thousand Dollars ($55,000.00). Under the Security Agreement, the Bank had a security interest in, among other things, "certain intangible property, specifically, any copyrights, trademarks, patents, trade secrets and technical processes and procedures now or at any time in the future owned by Bellas, Inc." The Bank assigned all of its rights, title, and interest in the Note and Security Agreement to Anthony Billeci ("Billeci") by an Assignment dated August 24, 1989 for payment

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)
**1993 WL 358148 (N.D.Ill.)**

in full on the Note. On March 14, 1990, a private auction of the assets of Bellas, Inc., as described in the Security Agreement assigned to Mr. Billeci by the Bank of Lancaster County, was held.

**\*2** At the private auction, the secured assets of Bellas were sold to Billeci, the highest bidder, for the sum of Seventy Thousand Dollars ($70,000.00). The assets sold were those listed in the Security Agreement, including among other things, certain general intangible property including all trademarks owned by Bellas, including the trademark "Thermal Zone", all goodwill associated therewith, and any other copyrights, patents, trade secrets and technical processes and procedures owned by Bellas at the time of the auction.

The trademark "Thermal Zone" was assigned by Mr. Billeci to Plaintiff Thermal Zone on November 9, 1990. Trademark Registration No. 1,444,022 for the "Thermal Zone" trademark is valid and subsisting under 15 U.S.C. 1115(b).

Since approximately December 1990, Plaintiff, Bellas, received verbal authorization to use the "Thermal Zone" trademark and confidential technical information. On December 21, 1992, the parties executed a formal License Agreement whereby the Plaintiff, Bellas, was licensed the right to use the "Thermal Zone" registered trademark, as well as the technical confidential trade secret information associated with the development and manufacture of Thermal Zone's cooking ovens, for a term of five years.

Plaintiffs' cooking ovens have, for over seven years prior to the acts complained of in this complaint, been widely marketed to the food processing industry, including institutional and retail, under the registered trademark "Thermal Zone".

Plaintiffs claim that by reason of this marketing, advertising and extensive sales, Plaintiffs' "Thermal Zone" trademark has gained widespread and favorable public acceptance and recognition by both the trade and the public and has become an asset of incalculable value symbolizing Plaintiffs' quality products and goodwill. Plaintiffs have spent substantial sums of money, time and effort to advertise and promote their cooking ovens identified by their distinctive trademark through, in part, national and local

advertising, including advertising tear sheets or inserts and articles in newspapers and magazines distributed in major metropolitan areas.

Plaintiffs claim that such efforts have created and reinforced the association of this trademark with Plaintiffs in the minds of the trade and the consuming public. As a result of their high quality and extensive advertising and sales, the products bearing Plaintiffs' "Thermal Zone" trademark enjoy acceptance by the trade and the public resulting in substantial total sales of these ovens.

Defendant Echo is an Irish company which is manufacturing and attempting to sell cooking ovens bearing Plaintiffs' "Thermal Zone" trademark in the United States. Defendant, Nicholas Jackman, is a citizen of the Republic of Ireland and is the current President of the Defendant Echo.

In December 1988, Defendant Jackman entered into an agreement with Plaintiff Bellas, and Thermal Zone's predecessor, Bellas, Inc., among others, entitled Bellas Ireland Limited Share Subscription agreement, whereby Defendant was authorized to operate a newly formed company, named Bellas Ireland Limited, for the manufacture and sale of industrial cooking ovens exclusively throughout the Continent of Europe. This agreement also provided a license authorizing Bellas Ireland to use Plaintiffs' trademarks as well as Plaintiffs' trade secret information, for the sale and manufacture of industrial cooking ovens exclusively in Europe.

**\*3** The Plaintiffs' trade secrets were provided to Defendants under a confidential relationship. Bellas Ireland was required to keep that information strictly confidential and not to disclose it or use it outside the terms of that License. Bellas Ireland was required to return all such confidential technical information upon termination of that License.

Plaintiffs assert that on October 19, 1990, and again on January 22, 1991, the License Agreement was cancelled and revoked and the Irish company, then called Thermal Zone Technologies, was given notice to terminate the use of the trademark and to return all confidential information. Defendant Jackman has refused to cease and desist use of this information or to return it to the Plaintiffs. Defendants are now apparently using the confidential technological

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 3
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)
**1993 WL 358148 (N.D.Ill.)**

information to manufacture infringing ovens bearing Plaintiffs' "Thermal Zone" trademark.

On October 11, 1992, Defendant Echo and Defendant Jackman made a proposal to sell a "Thermal Zone" oven to Miniat Corporation ("Miniat") located at 945 West 38th Street, Chicago, Illinois. At that time, Defendant provided a proposal form, as well as a brochure depicting Plaintiffs' "Thermal Zone" ovens to Miniat. In addition, Plaintiff Bellas was informed that the brochure provided to Miniat was also a copy of Plaintiffs' brochures. Also, the proposal provided to Miniat was a copy of one previously provided to Defendant Jackman for use in Europe.

Upon learning of Defendants' visit to the United States and attempts to solicit Miniat's business, Plaintiff Bellas contacted Miniat's Vice President, Mr. David J. Miniat, concerning Defendants' unauthorized use of Plaintiffs' mark and trade secret information. On November 24, 1992, Plaintiffs provided a proposal to sell one of its "Thermal Zone" cooking ovens to Miniat Corp.

In addition, on two occasions, in telephone conversations with Mr. Oliver O'Toole, a corporate officer of Defendant Echo, Plaintiff Bellas, demanded that Defendants cease and desist from infringing Plaintiffs' trademark and to return all of Plaintiffs' confidential proprietary information. In response to these demands, Mr. O'Toole refused to discontinue use of the trademark and technical data and offered to pay a sales commission to Plaintiffs if they would allow Defendants' "Thermal Zone" oven to be sold in the United States to this customer. Plaintiffs refused.

Although to date, Miniat Corp has not yet purchased an industrial cooking oven, Defendants have begun to market and advertise in the United States and apparently plan to advertise and sell to the public, industrial cooking ovens bearing Plaintiffs' established "Thermal Zone" trademark to the same customers and potential customers of Plaintiffs. These cooking ovens will be advertised and sold in direct competition with Plaintiffs' ovens.

## DISCUSSION

When considering a motion to dismiss, we assume as true all factual allegations contained in the complaint and make all possible inferences in favor of the plaintiff. *Gorski v. Troy,* 929 F.2d 1183, 1186 (7th Cir.1991).

### *Illinois Consumer Fraud Act*

**\*4** Defendants first move to dismiss Count V which is based on the Illinois Consumer Fraud Act, 815 ILCS 505/1, asserting that Plaintiffs have failed to allege a injury to the general consumer as required under the Act. Defendants claim that although a public injury need not be shown in order to establish a violation of the act, some impact upon consumer interests is necessary. Defendants claim that the only impact alleged in the complaint is that which directly effects the Plaintiffs as competitors.

Illinois state and federal courts were split for a number of years on the issue of whether a claim under the Consumer Fraud Act required proof of a public injury to the general consumer. *See First Comics, Inc. v. World Color Press, Inc.,* 884 F.2d 1033 (7th Cir.1989). Then, in 1990, the Illinois legislature amended the Consumer Fraud Act by adding: "Proof of a public injury, a pattern, or an effect on consumers generally shall not be required." Ill.Rev.Stat. (1990) ch. 121 1/2 , ¶ 270a(a), as amended by P.A. 86-801, § 1.

After analyzing the legislative history of the Act and its amendment, one court held:

.... there is enough legislative history on the amendment of the Act to conclude that the Illinois legislature did intend that the amendment be applied retroactively, i.e. that the change in the law is not substantive but a mere clarification.... The amendment clearly is prospective-all statutory amendment retroactively. We therefore find that in this case the Illinois Consumer Fraud Act does not require proof of a public injury or an effect on consumers generally.

*Resolution Trust Corp. v. Krantz,* 757 F.Supp. 915, 922-23 (N.D.Ill.1991).

Recently, the Seventh Circuit has had the opportunity to revisit this issue in *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628 (7th Cir.1992). In *Hardin,* the trial court had not instructed the jury that to find a violation of the Consumer Fraud Act the jury must find that the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 4
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)
**1993 WL 358148 (N.D.Ill.)**

Defendants' acts injured consumers generally. The Defendants argued on appeal that the statute requires such a public injury and therefore that the jury instructions were prejudicial and erroneous.

The court analyzed the history of the amendment as well as the dicta in *First Comics* and came to the conclusion that the legislature intended to clarify the law. The Circuit cited to Resolution Trust as analogous law and then held that the jury instructions properly reflected the law.   *Id.* at 638. In keeping with the Seventh Circuit's reasoning, we also hold that the statute was merely clarified by the amendment. We therefore find that Plaintiff need not demonstrate an injury to the general public and that Plaintiff's complaint sufficiently alleges a cause of action under the Illinois Consumer Fraud Act.

*Illinois Anti-Dilution Act*

Defendants next move to dismiss Count VI for failure to state a claim based on the Illinois Anti-Dilution Statute. Defendants assert that Plaintiffs are clearly competitors and that the Anti-Dilution Statute does not apply to competitors. After reviewing Plaintiffs' complaint we note that Plaintiffs' own allegations assert that Plaintiffs and Defendants are competitors. For example, Plaintiffs allege that Defendants "plan to advertise and sell to the public, industrial cooking ovens ... to the same customers and potential customers as Plaintiffs."  Complaint, ¶ 19.

**\*5** On August 6, 1993, the Seventh Circuit re-affirmed its holding in *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 380 (7th Cir.1984) that the "Anti-Dilution statutes are unavailable to competitors."   *AHP Subsidiary Holding Co. v. Stuart Hale Co.,* Nos. 92-1437, 92-1472, 1993 U.S.App. LEXIS 20218, at \*25 (7th Cir. August 6, 1993). We therefore dismiss Count VI for failure to state a claim under the Illinois Anti-Dilution

*Trade Secrets*

Defendants next move to dismiss Count VII for failure to state a claim for relief under the Illinois Trade Secrets Act. 765 ILCS 1065/1 *et seq.*   A trade secret is defined under the Act as:

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method technique, drawing, process, financial data, or list of actual or potential customers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain secrecy or confidentiality.

Plaintiffs claim that they have developed over 3000 pages of technical information, including drawings, plans, and specifications for the manufacture of their "Thermal Zone" ovens which constitute trade secrets.

In order to establish improper use of trade secrets under Illinois law, the plaintiffs must establish that the information was secret, that it was misappropriated and that it was used in the appropriator's business. *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992). When addressing the area of trade secret law, the Seventh Circuit has required a degree of specificity when defining certain pieces of information as trade secrets. The Circuit has cautioned: "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets."   *Id.*

Further, the Illinois Appellate Court has held that blueprints, plans and specifications are not per se trade secrets. *Colony Corp. of America v. Crown Glass Corp.,* 430 N.E.2d 225 (Ill.App.Ct.1981). Although Plaintiffs have made blanket generalizations regarding the information and documentation of their cooking ovens, they have failed to specify with any exactitude which pieces of information actually constitute trade secrets. In order for this court to attempt to categorize the alleged material as a trade secret, it is necessary for the court to be directed as to how this information is unique and protected. The necessary detail required in pleading a cause of action under this Act is not present in the complaint.

We further note that Plaintiffs' oven have been extensively offered to the public throughout the United States for over two years. Although Plaintiffs

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)
**1993 WL 358148 (N.D.Ill.)**

assert that their product was in the public domain, they have failed to allege that their sales were subject to any type of confidentiality agreement. As the court in National Presto stated: ".... sales alone bespeak an intent to abandon any trade secret protection that the unit may have previously enjoyed." *National Presto Industries, Inc. v. Hamilton Beach, Inc.,* 18 U.S.P.Q.2d 1933 (BNA) (N.D.Ill.1990). The court in *National Presto* noted that the plaintiff's lack of confidentiality agreements placed the Plaintiffs' product "squarely within that never land between trade secrets and patent." *Id.* at 2003.

**\*6** Therefore because Plaintiffs have failed to allege specific facts to support its claim of trade secret violations under the Illinois Trade Secret Act, we grant Defendants' motion to dismiss as to Count VII.

CONCLUSION

Defendants' motion to dismiss Count V is denied. Defendants' motion to dismiss Counts VI and VII is granted.

N.D.Ill.,1993.
Thermal Zone Products Corp. v. Echo Engineering, Ltd.
Not Reported in F.Supp., 1993 WL 358148 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit D**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

▶Learning Curve Toys, L.P. v. Playwood Toys, Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
**LEARNING CURVE TOYS**, L.P., Plaintiff,
v.
PLAYWOOD TOYS, INC., Defendant.
**No. 94 C 6884.**

July 20, 1999.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
**\*1** Learning Curve Toys L.P., a toy manufacturer,
sought a declaratory judgment that its activities do not
violate any rights of PlayWood Toys, Inc., a toy
designer. PlayWood filed an eight-count counterclaim,
naming Learning Curve as well as three individuals,
Roy Wilson, Harry Abraham and John Lee
(collectively, "Counterdefendants"), all currently or
formerly employed by Learning Curve. The individual
Counterdefendants now move for summary judgment.
For the reasons set forth below, the motion is granted
in part and denied in part. Because many of the
arguments made by the individual Counterdefendants
are equally applicable to Learning Curve L.P., the
court grants summary judgment in favor of Learning
Curve on certain claims as well.

*BACKGROUND*

Judge Grady, who was assigned this case originally,
outlined the nature of the dispute in his earlier ruling
on Learning Curve's own motion for summary
judgment, *Learning Curve Toys, L.L.C. v. PlayWood*
*Toys, Inc.,* No. 94 C 6884, 1998 WL 46894 (N.D.Ill.
Jan. 30, 1998), so the court will set forth only a brief
summary here. The court views disputed facts in the
light most favorable to PlayWood. In February 1993,
Wilson and Abraham visited PlayWood's offices to
discuss a joint business venture in manufacturing toys,
particularly toy trains. (12N Response ¶ 24.) [FN1]An
express confidentiality agreement governed the
exchange of ideas at this meeting. (12N Add'l Facts ¶
1.) PlayWood proposed production ideas for cutting

grooves in the wooden train tracks, to make them look
more realistic, and to generate a "clickity-clack"
sound.(*Id.* ¶ 3.) Learning Curve was receptive to this
idea, and PlayWood created a prototype and delivered
it to Learning Curve. (*Id.* ¶ 4.) PlayWood proposed
calling the product "Clickity-Clack Track." (Clausi
Dep., at 141-42.) PlayWood had no patent or
trademark on its idea, nor any registered rights in the
name "Clickity-Clack Track." (12N Response ¶¶ 43,
44, 46.) PlayWood itself was not at that time a
manufacturer or distributor of toys (the court has no
information that this status has changed), but had
produced some prototypes of the track. (*Id.* ¶¶ 23-26.)

> FN1. Rather than submit another 12M
> statement, Counterdefendants have chosen to
> rely on facts as presented in PlayWood's 12N
> statement filed in July 1997 in opposition to
> Learning Curve's motion for summary
> judgment. The court has considered this
> document, as well as the exhibits both sides
> have attached to their briefs.

Learning Curve backed off, and the parties never
closed a formal deal. "In 1994, Learning Curve
patented and began to manufacture a toy train track
called Clickety-Clack Track ® which made a 'clickety
clack' noise when traversed by a toy train."*Learning*
*Curve Toys,* 1998 WL 46894, at \*1. At the heart of this
dispute is the question of which company originated
the idea for the more realistic-looking, clickity clack
sound-producing toy railroad track. Learning
Curve was the first to enlist the assistance of the courts
in resolving this dispute, filing this suit for a
declaratory judgment in December 1994.

PlayWood counterclaimed, alleging that Learning
Curve is liable for breach of implied-in-fact contract
(Count I), unjust enrichment (Count II), "idea
misappropriation" (Count III), and violations of the
Illinois Consumer Fraud and Deceptive Business
Practices Act (Count IV), Illinois Trade Secrets Act
(Count V), Sections 44(b) and 43(a) of the Lanham
Act (Counts VI and VII), and the Uniform Deceptive
Trade Practices Act (Count VIII). Learning Curve
moved for summary judgment on all eight
counterclaims in 1997. Judge Grady granted the
motion with respect to Count I, but denied summary

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

judgment on the remaining claims. After analyzing the implied contract issues in Counts I and II, Judge Grady stated with regard to the other counts:

**\*2** There are disputed issues of material fact on the remaining counterclaims. For example, it is disputed whether PlayWood designed the toy track, whether PlayWood and Learning Curve had a confidentiality agreement, whether PlayWood otherwise attempted to keep the train track design secret, and the extent of damages sustained by PlayWood. As trial is necessary on these issues, [the court] will, in the interest of judicial economy, deny summary judgment on the remaining counterclaims.

*Learning Curve Toys,* 1998 WL 46894, at \*5.

The individual Counterdefendants now move for summary judgment a second time.[FN2] PlayWood has moved to strike portions of Counterdefendants' reply brief, on the grounds that they contain arguments not raised in the opening brief. The court has taken this motion into account as it considers the summary judgment issues.

> FN2. All Counterdefendants were party to the first motion for summary judgment.

Counts II & III-Unjust Enrichment [FN3] and Idea Misappropriation

> FN3. The court uses the terms "unjust enrichment," "quasi-contract" and "implied-in-law contract" interchangeably.

Counterdefendants maintain that these counterclaims must be dismissed altogether, because they are preempted by the Illinois Trade Secrets Act (ITSA).[FN4] By its terms, the ITSA displaces other causes of action that provide civil remedies for misappropriation of a trade secret. 765 ILCS 1065/8.[FN5] Counterdefendants argue that PlayWood is using theories of unjust enrichment and misappropriation to attempt to obtain redress for the same conduct that PlayWood identifies as violative of the ITSA, and therefore these counterclaims fall within the scope of the ITSA preemption provision and must be dismissed. Counterdefendants cite three cases-*Nilssen v. Motorola, Inc.,* 963 F.Supp. 664, 683-84 (N.D.Ill.1997), *Web Communications Group,*

*Inc. v. Gateway 2000, Inc.,* 889 F.Supp. 316, 321 (N.D.Ill.1995), and *Pope v. Alberto-Culver Co.,* 296 Ill.App.3d 512, , 694 N.E.2d 615, 619 (1st Dist.1998)-in support of their argument.

> FN4. Although PlayWood did not respond to this argument in its latest briefs, the court has referred to PlayWood's briefs from the first summary judgment.

> FN5.765 ILCS 1065/8 states:

> (a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.

> (b) This Act does not affect:

> (1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty;

> (2) other civil remedies that are not based upon misappropriation of a trade secret;

> (3) criminal remedies, whether or not based upon misappropriation of a trade secret; or

> (4) the definition of a trade secret contained in any other Act of this State.

These cases cited by Counterdefendants plainly establish that a plaintiff may not resort to common law causes of action as well as the ITSA to obtain relief for the same alleged wrongdoing. *See Web,* 889 F.Supp. at 321 (finding unjust enrichment claim preempted "to the extent [it was] directed at trade secret misappropriation"). PlayWood contends, however, that the ITSA only preempts claims that require misappropriation of a trade secret as an element. PlayWood insists that "[t]rade secret misappropriation

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

[under the ITSA] and idea misappropriation are distinct causes of action that seek to protect different types of intellectual property ."(PlayWood March 9, 1999 Response, at 11). PlayWood does not fully explain its reasoning, but the court interprets it to be essentially a pleading-in-the-alternative approach: PlayWood believes its ideas are protectible as trade secrets under the ITSA; however, if the ideas do not meet the requirements of trade secrets, PlayWood believes it is still entitled to pursue common law causes of action for Counterdefendants' alleged theft of ideas.

**\*3** The caselaw from the Seventh Circuit, and in this district, belies PlayWood's argument. *See* Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising to the Level of Trade Secrets,* 29 LOY. U. CHI.L.J. 841, 886 n. 176 (1998) (collecting cases). The purpose of the ITSA was to codify all the various common law remedies for theft of ideas. *See Pepsico, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995). The ITSA did not establish a parallel statutory regime to complement the common law; rather, it "abolished common law theories of misuse of such [secret] information.... Unless defendants misappropriate[ ] a statutory trade secret, they d[o] no legal wrong."*Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992). Thus, plaintiffs who believe their ideas were pilfered may resort only to the ITSA; the alleged theft of ideas cannot support multiple claims under different theories of recovery. *See Powell Prods., Inc. v. Marks,* 948 F.Supp. 1469, 1474 (D.Colo.1996) (dicta) (preemption appropriate under the Uniform Trade Secrets Act where " 'other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation'' ") (quoting ROGER M. MILGRIM, MILGRIM ON TRADE SECRETS, § 1.01[4], at 1-68.14 (1996)).

*C & F Packing Co. v. IBP, Inc.,* No. 93 C 1601, 1994 WL 30540 (N .D. Ill. Feb. 1, 1994) illustrates this rule. There, the plaintiff, a meat products business, negotiated a deal whereby Pizza Hut was to use the plaintiff's sausage in its restaurants. The plaintiff disclosed to Pizza Hut, under a confidentiality agreement, information regarding a secret process for making sausage. The deal went sour, and the plaintiff brought suit for misappropriation of trade secrets as well as several common law actions, including unjust

enrichment and unfair competition. The court held that the common law claims were preempted,[FN6] since they were based on the same course of events-specifically, Pizza Hut allegedly using the plaintiff's ideas without permission-as the statutory claim. 1994 WL 30540, at *7 (noting that the "common law claims cannot be meaningfully distinguished from plaintiff's statutory misappropriation claim"). Numerous other cases have similarly interpreted the ITSA preemption provision. *See, e.g., Precision Screen Machs., Inc. v. Elexon, Inc.,* No. 95 C 1730, 1996 WL 495564, at *4 (N.D.Ill. Aug. 28, 1996) (tortious breach of a confidential relationship claim preempted); *cf. Thermodyne Food Svc. Prods., Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1309 (N.D.Ill.1996) ("To the extent that the breach of fiduciary duty claim is premised on conduct other than the misappropriation of Thermodyne technology, the claim survives.").

> FN6.*C & F Packing Co.* considered the preemption provision of the Kansas Uniform Trade Secrets Act. However, the Kansas and Illinois statutes were both derived from the Uniform Trade Secrets Act, and their preemption provisions are practically identical. The Kansas statute states: "[t]his act displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret."K.S.A. 60-3326(a).

In sum, the ITSA does not, as PlayWood contends, simply preempt common law claims for which misappropriation of a trade secret is an element. Rather, the provision eliminated common law claims based on conduct which might support an ITSA action. In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois. This strict interpretation is fatal to PlayWood's idea misappropriation and unjust enrichment counterclaims, and Counterdefendants' motion for summary judgment is granted on those two counterclaims.

Count IV-Consumer Fraud and Deceptive Business Practices Act

**\*4** Counterdefendants contend that PlayWood's Consumer Fraud and Deceptive Business Practices

Not Reported in F.Supp.2d                                                Page 4
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

Act (Consumer Fraud Act) claim must be dismissed because it does not implicate "consumer protection concerns," and therefore PlayWood does not have standing to sue under the statute. Both parties addressed this issue as part of Learning Curve's earlier motion for summary judgment. PlayWood protests that the court should disregard Counterdefendants' re-submission of this argument because this time around they did not raise it until their reply brief, and because Judge Grady already rejected it. From this court's reading of the earlier decision, however, it does not appear that Judge Grady reached the issue. Rather, he denied summary judgment "in the interest of judicial economy" because trial was necessary to decide several factual issues, and because the court could consider a motion for judgment as a matter of law at a later time. *Learning Curve,* 1998 WL 46894, at [*]5. Since it is potentially dispositive of the claim, the court will re-examine Counterdefendants' argument, and refer to the briefing from the first summary judgment motion for PlayWood's response.

The Consumer Fraud Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact ... in the conduct of any trade or commerce." 815 ILCS § 505/2. The law was designed "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices." *Id.* § 505/1 (historical notes).

Although PlayWood is not a consumer of Learning Curve toys, a plaintiff who is not a consumer of the defendant's goods or services may sue under the Consumer Fraud Act if the alleged wrongful conduct "involves trade practices directed to the market generally or otherwise implicates consumer protection concerns." *Athey Prods. Corp. v. Harris Bank Roselle, 89 F.3d 430, 437 (7th Cir.1996).* Counterdefendants maintain that PlayWood cannot show that "any Illinois consumer was ever confused over the source of Learning Curve's Clickity-Clack Track product ... or that any Illinois consumer was directly injured from Learning Curve's conduct."(Learning Curve Reply, at 9-10.) PlayWood concedes that it has identified no individual consumer who has been confused about the origin of Clickity-Clack Track. (PlayWood 12N Response ¶ 62.) But PlayWood argues that there is a

genuine dispute over who invented the product, and that Learning Curve improperly markets itself as the originator of the product in its promotional materials. PlayWood's position is that by holding itself out as the creator Clickity-Clack Track, Learning Curve engages in deliberate "deception on the market" which harms PlayWood as well as consumers. (PlayWood July 8, 1997 Response, at 14-15.)

**\*5** PlayWood's claim falls short. Trade practices directed at "the market generally" must still cause harm to consumers to be cognizable, *Amon v. Harrison,* No. 91 C 980, 1994 WL 532025, at [*]3 (N.D.Ill. Sept. 29, 1994) (statute does not "authorize a suit by a non-consumer where there is no injury to consumers"), and PlayWood does not meet this requirement. PlayWood cannot substitute conclusory allegations of "fraud on the market" for its obligation to show injury to consumers. See *American Broadcast Co. v. Maljack Prods., Inc.,* 34 F.Supp.2d 665, 680-81 (N.D.Ill.1998); *Amon,* 1994 WL 532025, at [*]3. Even if consumers are deceived about the origins of Clickity-Clack Track-a contention which PlayWood supports with inference, rather than direct evidence-the court cannot perceive how these consumers are harmed by such a deception.

Nor does Learning Curve's alleged deception implicate "consumer protection concerns." Although courts have struggled to define the scope of this term, see *Brody v. Finch Univ. of Health Sciences,* 298 Ill.App.3d 146, 159, 698 N.E.2d 257, 269 (2d Dist.1998), it generally involves sharp practices designed to mislead consumers about a competitor company, see *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 533, 546 N.E.2d 33, 39 (2d Dist.1989) (finding standing for plaintiff whose competitor distributed 15,000 disparaging brochures to consumers), or public health, safety or welfare issues, see *Stickle Enters., Ltd. v. CPC Int'l, Inc.,* No. 96 C 3123, 1997 WL 767301, at [*]4 (N.D.Ill.Dec. 3, 1997) (allowing plaintiff to challenge competitor's deceptive actions to promote sale of contaminated animal feed). By these standards, Learning Curve's alleged misrepresentation does not implicate consumer protection concerns. Consequently Counterdefendants' motion for summary judgment on Count IV is granted. As the problems identified by the individual Counterdefendants have equal force for Learning Curve L.P., Count IV is dismissed in its entirety.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

Count V-Illinois Trade Secrets Act

Counterdefendants submit that PlayWood cannot go forward with this claim because the law requires a showing that the individual defendants personally benefitted or profited from Learning Curve's misappropriation of trade secrets, and PlayWood cannot make this showing. Counterdefendants cite three cases in support of the proposition that proving that "the defendant profited" is an element of a claim under the ITSA: *Syntex Ophthalmics, Inc. v. Novicky,* 745 F.2d 1423 (Fed.Cir.1984), *vacated on other grounds,* 470 U.S. 1047 (1985); *Glenayre Electronics, Ltd. v. Sandahl,* 830 F.Supp. 1149 (C.D.Ill.1993); and *Etri, Inc. v. Nippon Miniature Bearing Corp.,* No. 85 C 615, 1989 WL 99575 (N.D.Ill. Aug. 18, 1989). These cases, however, cite the standard for a claim of common law trade secret misappropriation, not a cause of action under the ITSA. *Syntex* (*Syntex* is the seminal case, since *Etri* cites *Syntex* and *Glenayre* cites *Etri* ) outlined the elements of a misappropriation claim at common law, which included a "profit" requirement, based on the decision of *Schulenburg v. Signatrol, Inc.,* 50 Ill.App.2d 402, 200 N.E.2d 615 (4th Dist.1964), *aff'd in part and rev'd in part,* 33 Ill.2d 379, 212 N.E.2d 865 (1968), a common law misappropriation case decided more than twenty years before the 1988 effective date of the ITSA. 745 F.2d at 1434. *Etri* also involved a common law claim filed before the ITSA became effective.[FN7] 1989 WL 99575, at *6.

> FN7. *Glenayre* did not involve a common law claim, but seems inadvertently to have invoked the old standard. The profit element was not at issue in *Glenayre.*

**\*6** In short, Counterdefendants' authority is inapposite, since it pertains to a different cause of action than the one PlayWood advances in its ITSA counterclaim. The elements of an ITSA misappropriation claim are simply that the plaintiff had a trade secret, and the defendant misappropriated it for business purposes. *See Composite Marine,* 962 F.2d at 1265-66 (citing 765 ILCS 1065/2(d), *American Antenna Corp. v. Amperex Electronic Corp.,* 190 Ill.App.3d 535, 538, 546 N.E.2d 41, 44 (2d Dist.1989), and *Service Ctrs. of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 453, 535 N.E.2d 1132, 1136 (1st Dist.1989)). PlayWood is not required to show that the individual defendants

personally benefitted or profited from Learning Curve's misappropriation of trade secrets.

Counterdefendants also contend that PlayWood cannot make out the elements of an ITSA claim because PlayWood cannot show the product plans allegedly stolen by Learning Curve satisfy the definition of "trade secret" under the caselaw. Again, Playwood objects that Counterdefendants waited to present this argument in their reply brief. The parties debated this issue also in the first motion for summary judgment, and Judge Grady apparently did not find Learning Curve's position persuasive. *See Learning Curve,* 1998 WL 46894, at *5 (finding "whether PlayWood and Learning Curve had a confidentiality agreement, [and] whether PlayWood otherwise attempted to keep the train track design secret" to be disputed issues of material fact). Therefore, the court will not revisit this argument.

*Counts VI, VII, VIII-Lanham Act Section 43(a), Lanham Act Section 44(b), Uniform Deceptive Trade Practices Act*

PlayWood claims Counterdefendants violated Section 43(a) of the Lanham Act, specifically 15 U.S.C. § 1125(a)(1),[FN8] by falsely designating the origin of Clickity-Clack Track. "[A] plaintiff making a claim of false designation of origin must show that ... [the] mark is entitled to protection as a trademark, and that the false designation of origin creates a likelihood of confusion." *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1214 (7th Cir.1997) (cite omitted). Counterdefendants dispute whether PlayWood has protectible interests under the Lanham Act, and whether PlayWood can demonstrate likelihood of confusion; PlayWood protests that these arguments were not presented in a timely fashion. These questions arose in the first summary judgment motion, and Judge Grady basically reserved ruling on them. The court now reaches these issues, and will consider each party's arguments from its earlier briefs.

> FN8. This portion of the statute states:
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

PlayWood's main difficulty is that the interests for which it seeks protection are not protected by the Lanham Act. The Act provides a cause of action for a plaintiff with a "reasonable interest," in the form of some sort of "mark." *Dovenmuehle v. Gilldorn Mtge. Midwest Corp.,* 871 F.2d 697, 700 (7th Cir.1989) (quotes omitted); *see also Advanced Resources Int'l, Inc. v. Tri-Star Petroleum Co.,* 4 F.3d 327, 334 (4th Cir.1993). Typically, a mark is "a brand name, a word, 'a slogan, a symbol, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand'-so similar to that of the plaintiff's that the public may be confused as to the source of the good or service." *Advanced Resources,* 4 F.3d at 334 (quoting *Blau Plumbing, Inc. v. S.O.S. Fixit, Inc.,* 781 F.2d 604, 609 (7th Cir.1986)). Other courts have taken a broader view of a mark, to encompass "voices, uniforms, likenesses, published words, or names ... used in such a way as to deceive the public into believing that [the plaintiff] endorsed, sponsored, or approved of the defendant's product." *Id.* (collecting cases). Even under the broadest conception of what constitutes a protected interest, however, something about it is at least arguably identifiable as connected to the party alleging false designation of origin.[FN9] PlayWood does not argue that anything about Learning Curve's marketing of Clickity-Clack Track improperly co-opts a mark that customers associate with PlayWood. Absent such circumstances, PlayWood's false designation of origin claim is not sustainable under Section 43(a) of the Lanham Act. *Cf. Blau Plumbing,* 781 F.2d at 609 (remarking on the purpose of Section 43(a)); *McMahon v. City of Chicago,* No. 98 C 8026, 1999 WL 342712, at *3 (N.D.Ill. May 17, 1999) (declining to broaden the scope of Section 43 of the Lanham Act).

[FN9.] Regarding legislative purpose, the Lanham Act states:

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127.

**\*7** This point informs the likelihood of confusion inquiry. Counterdefendants note that PlayWood concedes that it has not "identified a single person who has ever been confused about the source or origin of Learning Curve's Clickity-Clack Track."(12N Response ¶ 62.) Counterdefendants further maintain that no confusion is likely to result because PlayWood does not itself manufacture toy wooden trains and track. PlayWood counters that Learning Curve "falsely market[s] the wooden toy track to the public by misrepresenting Learning Curve as its originator" and thereby creates a likelihood of confusion. (PlayWood July 7, 1997 Response, at 8.) As evidence of this false marketing, PlayWood points to language from Learning Curve catalogs and other promotional materials which states that Learning Curve "created" its toy railway system, and calls Clickity-Clack track its "most exciting innovation." (12N Add'l Facts ¶¶ 8, 10.)

"The test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a substantial number of consumers." *Rust Env't,* 131 F.3d at 1216. This inquiry is a function of seven factors, including: "(1) similarity between the marks in appearance and

suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm-off his product as that of another."*Id.* (quotes omitted). By PlayWood's own admission there is no evidence to support a finding of actual confusion (sometimes considered one of the most important factors, *see Ziebart Int'l v. After Market Assoc., Inc., 802 F.2d 220, 226 (7th Cir.1986)).*

Moreover, both the general statement of the test as well as several of the enumerated factors seem wholly inapplicable here, as they contemplate one firm's improperly capitalizing on the mark of another. In any event, PlayWood has adduced scant evidence on this issue. Even if Learning Curve's promotional materials are fallacious, and it is reasonable to infer that the public would be misled about the exact origins of the product, this is not the sort of misconception that the Lanham Act prohibits, as the language of the seven-part test indicates. PlayWood makes no claim to have manufactured toys, beyond some prototypes. Therefore, PlayWood cannot demonstrate how the public would be confused as between Learning Curve and PlayWood products, or how Learning Curve's alleged misrepresentations are allowing it to take advantage somehow of PlayWoods' recognizable mark. Without some showing of this sort, there is not sufficient likelihood of confusion to maintain a false designation of origin claim under Section 43(a).*See Libman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1361 (7th Cir.1995).*

PlayWood's attempt to produce authority to the contrary is unavailing. PlayWood cites *Keller Med. Specialties Prods. v. Armstrong Med. Indus., Inc., 842 F.Supp. 1086 (N.D.Ill.1994)* and *Legat Architects, P.C. v. United States Development Corp., 625 F.Supp. 293 (N.D.Ill.1985).* In *Keller,* the defendant stated in its catalog that it was the sole distributor of certain medical products, a claim the plaintiff disputed, and used as a basis to sue under the Lanham Act. The case is factually distinguishable because the parties in the case were business competitors, with one allegedly attempting to gain a competitive advantage over the other by its misrepresentations. Additionally, the court did not reach the likelihood of confusion issue because of inadequate discovery. 842 F.Supp. at 1092-93. *Legat* is distinguishable on its facts as well. There, the

defendant corporation commissioned building plans from the plaintiff, an architect. After receiving the plans, an architect on the plaintiff's staff allegedly signed his name to the plans and submitted them to various government agencies to obtain the necessary permits and approvals. The court held that these actions could create a likelihood of confusion. 625 F.Supp. at 299-300. However, the plaintiff architect in *Legat* had rights under a form agreement to preclude a successor from using the plans prepared by plaintiff. Further, the holding of *Legat* is something of an outlier; the court has found no other case to follow it. Finally, both cases carry less weight than the other authority cited by the court, much of which is binding. Therefore, the court declines to follow either *Keller* or *Legat.*

**\*8** PlayWood has no mark, and cannot demonstrate a likelihood of confusion. PlayWood cannot proceed-against the individual Counterdefendants or Learning Curve L.P.-with its counterclaim for unfair competition in the form of false designation of origin.

The remaining counterclaims-for unfair competition under Section 44(b) of the Lanham Act, and under the Illinois Deceptive Trade Practices Act-also share the requirement that PlayWood prove a likelihood of confusion among consumers. *See McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1167, 1174 (7th Cir.1986); Scotch Whisky Assoc. v. Majestic Distilling Co., Inc., 958 F.2d 594, 597 (4th Cir.1992)* (determining that Section 44(b) of the Lanham Act, read in conjunction with the Paris Union Convention, provides the same protections as Section 43(a)). Therefore, summary judgment is appropriate on these counts as well.

### CONCLUSION

Summary judgment is granted in favor of all Counterdefendants on Counts II, III, IV, VI, VII and VIII. Although Counterdefendant Learning Curve L.P. was not a party to the instant motion for summary judgment, the court grants summary judgment as to Learning Curve L.P. on Counts II, III, IV, VI, VII and VIII on its own motion. If there are in fact arguments that mandate differentiating between the Counterdefendants' on these counts, PlayWood may make such arguments in a motion for reconsideration.

N.D.Ill.,1999.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**1999 WL 529572 (N.D.Ill.)**

Learning Curve Toys, L.P. v. Playwood Toys, Inc.
Not Reported in F.Supp.2d, 1999 WL 529572
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

▷C.H. Robinson Worldwide, Inc. v. Command
Transp., LLC
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
**C.H. ROBINSON  WORLDWIDE**, INC., Plaintiff,
v.
COMMAND TRANSPORTATION, LLC, Paul Loeb,
and Eric Harrison, Defendants.
**No. 05 C 3401.**

Nov. 16, 2005.

Michael Dale Wexler, J. Scott Humphrey, Seyfarth
Shaw LLP, Chicago, IL, for Plaintiff.
Stephen Fedo, William John Tarnow, Neal, Gerber &
Eisenberg, Mitchell L. Marinello, Joseph S. Nacca,
Novack and Macey, LLP, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
**\*1**  Plaintiff C.H. Robinson Worldwide, Inc.
("C.H.Robinson") filed the present eight-count First
Amended Complaint against Defendants Command
Transportation, LLC ("Command"), Paul Loeb, and
Eric Harrison. C.H. Robinson alleges that Loeb and
Harrison violated the Computer Fraud and Abuse Act,
18 U.S.C. § 1030*et seq.* ("CFAA"). C.H. Robinson
also alleges state law claims of breach of contract,
misappropriation of trade secrets, unfair competition,
conversion, fraud, conspiracy, and a constructive trust
claim pursuant to the Court's supplemental
jurisdiction. *See*28 U.S.C. § 1367. Before the Court is
Defendants' Motion to Dismiss C.H. Robinson's First
Amended Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6).FN1 As discussed below, the Court
grants in part and denies in part Defendants' Motion to
Dismiss.

> FN1. Pursuant to Federal Rule of Civil
> Procedure 10(c), Defendant Eric Harrison
> adopted the arguments set forth by
> Defendants Command Transportation and
> Paul Loeb in their Memorandum in Support

of their Motion to Dismiss. (R. 27-1.)

*BACKGROUND*FN2

> FN2. As required under Rule 12(b)(6), the
> Court presumes the allegations in the
> complaint are true.

Plaintiff C.H. Robinson is a Delaware corporation
with its principal place of business in Eden Prairie,
Minnesota. (R. 15-1; First Am. Compl. ¶ 1.) C.H.
Robinson is in the business of providing commercial
logistics services, and in December 1999, purchased
substantially all of the assets of American Backhaulers
("Backhaulers"), another logistics company. (*Id.* ¶¶
1-2, 25.)C.H. Robinson's purchase of Backhaulers'
assets included, among other things, (1) the exclusive
acquisition of Express, a proprietary software program
(the "Express software"), (2) the execution of
non-competition, non-solicitation, and confidentiality
agreements by Backhaulers' employees, (3)
Backhaulers' know-how, and (4) Backhaulers'
intellectual property rights. (*Id.* ¶¶ 2, 26.)

Defendant Command Transportation, LLC, is a
Delaware limited liability company with its principal
place of business in Skokie, Illinois. (*Id.* ¶ 3.)
Command is a competitor of C.H. Robinson and is in
the business of freight brokerage services. (*Id.*) Also,
Command conducts business under the assumed
names of DND Express and DND Logistics and was
previously known as Command Logistics Systems,
LLC. (*Id.*)

Defendant Paul Loeb, an individual residing at 223
Linden Park Place, Highland Park, Illinois, is the
previous owner of Backhaulers. (*Id.* ¶ 4.) C.H.
Robinson conditioned its purchase of Backhaulers'
assets "upon Loeb ... signing and complying with a
non-compete, non-solicitation, and confidentiality
agreement."(*Id.* ¶ 27.)That agreement precluded Loeb
from (1) "competing with C.H. Robinson," (2)
"soliciting or inducing C.H. Robinson's employees to
leave for a ... period of time," (3) "utilizing or
disclosing proprietary information of C.H. Robinson,"
(4) taking any C.H. Robinson property, (5) disclosing
any "trade secrets, know-how, [or] other proprietary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)

**2005 WL 3077998 (N.D.Ill.)**

documents and information related to the business," and (6) "using any such information for [his] own benefit or the benefit of any third party so long as such information is not in the public domain."(*Id.* ¶¶ 27, 29.)Loeb worked at C.H. Robinson from December 1999 until his voluntary departure on September 30, 2002. During that time, Loeb had exposure to C.H. Robinson's confidential and proprietary information. (*Id.* ¶¶ 27, 57.)Presently, Loeb is affiliated with Command. (*Id.* ¶ 4.)

**\*2** Defendant Eric Harrison, an individual residing at 715 Astor Lane, Wheeling, Illinois, is a former employee of Backhaulers and was a key developer of the Express software. (*Id.* ¶ 5.) After C.H. Robinson purchased Backhaulers' assets in December 1999, Harrison moved to Minnesota and became C.H. Robinson's Director of Technology. (*Id.* ¶¶ 5, 33.)Harrison implemented and further developed the Express software across all of C.H. Robinson's business, at which time he had exposure to confidential and proprietary code, object code, and functionality. (*Id.* ¶¶ 5, 33-34, 57.)In April 2002, Harrison voluntarily left C.H. Robinson, at which time he entered into an agreement with C.H. Robinson that contained non-competition, non-solicitation, confidentiality, and invention assignment provisions. (*Id.* ¶ 5.) Harrison is now associated with Command as a software developer. (*Id.* ¶ 51.)According to C.H. Robinson, Loeb and Harrison, now employees of Command, have recently developed a new software program, Slingshot, "which is identical to C.H. Robinson's Express software."(*Id.* at ¶ 52.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Centers v. Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (quoting *Coney v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the

plaintiff.*Centers,* 398 F.3d at 333.

## ANALYSIS

### I. Computer Fraud & Abuse Act Claim-Count VIII [FN3]

> FN3. On June 13, 2005, the Court dismissed C.H. Robinson's initial Complaint based on its failure to properly allege diversity jurisdiction. *See* 28 U.S.C. § 1332. In its First Amended Complaint, C.H. Robinson included a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* that confers federal question subject matter jurisdiction on the Court. *See* 28 U.S.C. § 1331. The Court will address this count first in order to ensure that the Court has subject matter jurisdiction over the remaining counts.

C.H. Robinson alleges that Loeb and Harrison violated Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the Computer Fraud and Abuse Act ("CFAA"). Defendants argue that C.H. Robinson has failed to state a claim under the CFAA because C.H. Robinson (1) did not properly allege the requisite damage or loss as those terms are defined by the CFAA, and (2) did not allege that Loeb and Harrison unlawfully accessed C.H. Robinson's computer system.

### A. Loss or Damage

First, Defendants argue that C.H. Robinson failed to properly allege that it suffered the requisite damage or loss as those terms are defined by the CFAA.Section 1030(g) provides, in relevant part, that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," and "[a] civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."*See* 18 U.S.C. § 1030(g). Thus, a party bringing a civil action under the CFAA must allege both: (1) a violation of one of the subsections of Section 1030; and (2) one of the listed factors in Section 1030(a)(5)(B)(i)-(v).*See Charles Schwab & Co., Inc. v. Carter,* No. 04 C 7071, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005)*. The factors in Sections

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

1030(a)(5)(B)(i)-(v) do not address prohibited conduct, but instead list specific forms of "damage" or "loss" that are "possible harmful results of violations of other parts of the statute."*Id.*

**\*3** Here, C.H. Robinson alleges that it "suffered damages as a result of Harrison's and Loeb's actions in an amount to be determined at trial."(R. 15-1, First Am. Compl. ¶ 103.) Viewing the allegations in the First Amended Complaint in a light most favorable to C.H. Robinson, C.H. Robinson is claiming "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value."*See*Section 1030(a)(5)(B)(i). C.H. Robinson's allegations of loss consist of (1) the loss in value of trade secrets such as the Express software and other proprietary and confidential information that was not previously known to the public, and (2) the loss of competitive advantage. (R. 15-1, First Am. Compl. ¶¶ 58, 59.)

In a similar matter where a plaintiff alleged wrongful copying of proprietary financial modeling computer software, the Court discussed damages under the CFAA:

Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. In addition, a district court in the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff.

*Charles Schwab & Co., Inc.,* 2005 WL 351929, at \*3 (citations omitted). Similarly, "[c]aselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system."*Id.* (quoting *Pacific Aerospace & Elec., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003)). C.H. Robinson has properly alleged "loss" under the CFAA based on its allegations of the loss in value of trade secrets and loss of competitive edge.

Meanwhile, Defendants did not develop their cursory argument that *Nexans Wires S.A. v. Sark-USA, Inc.,*

319 F.Supp.2d 468, 476-78 (S.D.N.Y.2004) should control. Defendants' attempt at developing this argument in their Reply Brief does not save the day because when a defendant fails to raise or develop an issue until reply, he waives the argument because the plaintiff has had no chance to respond. *See Kelso v. Bayer Corp.,* 398 F.3d 640, 643 (7th Cir.2005) (citation omitted). Accordingly, Defendants' argument concerning C.H. Robinson's "loss" fails.

B. Unlawful Access

Second, Defendants contend that C.H. Robinson has not alleged unlawful access of its computers as required under Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the CFAA. More specifically, Defendants argue that C.H. Robinson fails to allege that Loeb or Harrison accessed C.H. Robinson's protected computer system to steal the trade secret information at issue. Plaintiff argues that it properly stated a CFAA cause of action by alleging that Loeb and Harrison intentionally exceeded their authorized access when they accessed C.H. Robinson's protected network to acquire the Express software for the benefit of themselves and Command.

**\*4** The Court turns to the federal notice pleading standards under Federal Rule of Civil Procedure 8(a)(2). In alleging its claim under the CFAA, C.H. Robinson incorporates by reference all allegations from paragraphs 1 through 63, including the allegations of Loeb's and Harrison's inappropriate use of C.H. Robinson's proprietary information and software code in developing Slingshot. (R. 15-1, First Am. Compl. ¶¶ 53-57.) It further alleges that Loeb and Harrison did not have authorization to access C.H. Robinson's "computer systems, computerized information, access software, access source code, access object code, or continue to possess C.H. Robinson electronic files and data for their personal gain."(*Id.* ¶ 101.)C.H. Robinson alleges that Loeb and Harrison violated sections of the CFAA through these actions. (*Id.* ¶ 102.)These allegations satisfy the liberal notice pleading standards of Rule 8(a).*See Gale v. Hyde Park Bank,* 384 F.3d 451, 453 (7th Cir.2004) ( "All a complaint need do is narrate a claim for relief.")

Defendants nonetheless assert that C.H. Robinson failed to allege that Loeb or Harrison unlawfully accessed a protected computer to obtain information

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

involving an interstate or foreign communication as required under Section 1030(a)(2)(C) because C.H. Robinson did not suggest that Loeb or Harrison intercepted interstate communications. Defendants, however, ignore relevant language from Section 1030(a)(2)(C) that prohibits a person from unlawfully accessing a computer to "obtain information from any protected computer *if the conduct should involve an interstate or foreign commerce.*" 18 U.S.C. § 1030(a)(2)(C) (emphasis added). The plain language of this statute indicates that the conduct of unlawfully accessing a computer, and not the obtained information, must involve interstate of foreign commerce. *See Charles Schwab & Co., Inc. v. Carter, 2005 WL 2369815, at *8 (N.D.Ill. Sep.27, 2005)* (downloading substantial volumes of files from plaintiff's computers involved interstate commerce because plaintiff maintained interstate computer network). Here, C.H. Robinson alleges that its "computer system is a protected computer and network which is used across state lines in interstate commerce."(R. 15-1, First Am. Compl. ¶ 100.) Viewing the allegations in a light most favorable to C.H. Robinson, it is reasonable to infer that Defendants' conduct involved interstate commerce.

Finally, Defendants contend that C.H. Robinson failed to allege with the particularity required by Federal Rule of Civil Procedure 9(b) that Loeb or Harrison accessed a protected computer "knowingly and with intent to defraud." Under Rule 9(b), "intent, knowledge and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The Rule's particularity requirements do not apply to intent allegations. Defendants' motion to dismiss Count VIII is denied.

## II. Breach of Contract-Count I

**\*5** Defendants contend that C.H. Robinson did not properly allege that Loeb and Harrison breached their non-competition agreements and asset purchase agreements. Citing Illinois law, Defendants specifically argue that C.H. Robinson failed to indicate the essential elements of a contract and the exact contracts at issue. It is well-established, however, that the Federal Rules of Civil Procedure-not state procedural rules-govern diversity actions and state law claims brought in federal court through supplemental jurisdiction. *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co., 412 F.3d 745, 750 (7th*

Cir.2005); *Houben v. Telular Corp., 309 F.3d 1028, 1032-36* (7th Cir.2002). As previously noted, under the liberal federal notice pleading standard, a complaint need only state "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. at 47;see also Shah v. Inter-Cont'l Hotel Chicago Operating Corp., 314 F.3d 278, 282* (7th Cir.2002).

In its First Amended Complaint, C.H. Robinson identifies which contracts are at issue. (*See* R. 15-1, First Am. Compl. ¶¶ 27-31, 65.) Further, C.H. Robinson alleges how Loeb and Harrison breached these agreements, by listing six different actions, including utilizing or disclosing the Express software.(*Id.* ¶ 67.)As such, C.H. Robinson has given Defendants notice of its breach of contract claim and the grounds upon which it rests. Accordingly, the Court denies Defendants' motion to dismiss Count I of the First Amended Complaint.

## III. Illinois Trade Secrets Act-Count II

As a threshold matter, Defendants contend that C.H. Robinson, as a Delaware corporation with its principal place of business in Minnesota, did not properly allege why the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, *et seq.*, should apply under Count II. Under the *Erie* doctrine "a federal court is not authorized to apply a different substantive law in a diversity case from the law that a state court would apply were the case being litigated in a state court," and thus Illinois law is the source for choice-of-law rules under the circumstances. *FDIC v. Wabick, 335 F.3d 620, 624-25* (7th Cir.2003) (*Erie* doctrine applies to non-diversity cases where state law supplies the rule of decision). Under Illinois trade secrets law, courts must apply the law of the state where the alleged wrong took place or where the benefit was obtained, which is typically the defendant's principal place of business. *See Mergenthaler Linotype Co. v. Leonard, 66 Ill.App.3d 789, 803, 23 Ill.Dec. 352, 383 N.E.2d 1379 (Ill.App.Ct.1978); see also Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V., 391 F.3d 871, 879* (7th Cir.2004). Because Command's principal place of business is in Illinois and Defendants received the benefits of Harrison and Loeb's alleged misappropriation of C.H. Robinson's trade secrets in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

Illinois, Illinois law applies.

**\*6** Next, Defendants contend that Count II does not identify what C.H. Robinson claims is a trade secret. In its First Amended Complaint, C.H. Robinson alleges how Loeb and Harrison unlawfully acquired C.H. Robinson's trade secrets, describes the trade secrets in sufficient detail, and explains how Defendants are using the trade secrets. (R. 15-1, First Am. Compl. ¶¶ 38-63, 70-76.) Further, despite Defendants' contention, litigants are not required to disclose details when alleging the misappropriation of a trade secret "for the simple reason that such a requirement would result in public disclosure of the purported trade secret."*Automed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 920-21 (N.D.Ill.2001) (citation omitted). Plaintiff has satisfied its pleading requirements for Count II, and the Court denies Defendants' motion to dismiss Count II.

IV. Preemption Under Illinois Trade Secrets Act-Counts III through VII

Next, Defendants contend that the ITSA preempts C.H. Robinson's common law claims of unfair competition, conversion, fraud, conspiracy, and constructive trust.[FN4]They argue that Section 8 of the ITSA preempts all common law claims if they are arguably based, in whole or in part, on allegations of misappropriation of trade secrets. *See*765 ILCS 1065/8; *see also PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995) ("ITSA abolishes any common law remedies or authority contrary to its own terms").Section 1065/8(a) states that the "Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."*McDonald's Corp. v. American Motorists Ins. Co.,* 321 Ill.App.3d 972, 986, 255 Ill.Dec. 67, 748 N.E.2d 771 (Ill.App.Ct.2001). By its plain terms, the ITSA preempts claims "only when they rest on conduct that is said to misappropriate trade secrets."*Hecny Transp., Inc. v. Chu,* --- F.3d ----, ----, 2005 WL 2842081, at \*2 (7th Cir. Oct.31, 2005). In other words, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information."*Id.* The Court thus reviews the claims that Defendants challenge to determine whether they are dependent on the misappropriation of a trade secret. *See Thomas & Betts Corp. v. Panduit Corp.,* 108

F.Supp.2d 968, 972 (N.D.Ill.2000); *see, e.g., McDonald's Corp.,* 321 Ill.App.3d at 986, 255 Ill.Dec. 67, 748 N.E.2d 771.

> FN4. Whether the ITSA preempts C.H. Robinson's constructive trust claim is not at issue, because under Illinois law a constructive trust is not a separate cause of action, but rather an equitable remedy. *See Eychaner v. Gross,* 202 Ill.2d 228, 274, 269 Ill.Dec. 80, 779 N.E.2d 1115 (2002). Indeed, C.H. Robinson admits that it is seeking a constructive trust for remedial purposes, and thus the Court need not dismiss Count VII. *See, e.g., Chicago Park District v. Kenroy, Inc.,* 107 Ill.App.3d 222, 224-25, 63 Ill.Dec. 134, 437 N.E.2d 783 (Ill.App.Ct.1982).

A. Unfair Competition-Count III

Under its unfair competition claim, C.H. Robinson alleges that "Defendants are unfairly competing in the market place by utilizing C.H. Robinson's confidential information in the marketplace, soliciting and or hiring C.H. Robinson employees, soliciting C.H. Robinson's employees for employment to gain access to C.H. Robinson's confidential information, soliciting confidential information from C.H. Robinson employees, and/or utilizing C.H. Robinson's property or proprietary software."(R. 15-1, First Am. Compl. ¶ 79.)

**\*7** C.H. Robinson's unfair competition allegations fall squarely within the ITSA's preemption clause because the claim is premised on its confidential information and proprietary software. *See Thomas & Betts Corp.,* 108 F.Supp.2d at 973 (unfair competition allegations simply described how defendants used plaintiff's confidential information). In other words, the unfair competition claim is "dependent upon the existence of competitively significant secret information."*Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at \*2. In fact, in alleging its claim under the ITSA, C.H. Robinson unequivocally states that "[t]he proprietary business, software, and customer information of C.H. Robinson constitute trade secrets."(R. 15-1, First Am. Compl. ¶ 70.) Although C.H. Robinson argues that the unfair competition claim is premised on Defendants' illegal solicitation and hiring of C.H. Robinson's employees, C.H. Robinson cannot ignore its allegations that the unlawful use of its trade secrets underscores its claim.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**2005 WL 3077998 (N.D.Ill.)**

Therefore, the ITSA preempts C.H. Robinson's unfair competition claim and the Court grants Defendants' motion to dismiss Count III with prejudice.

B. Conversion-IV

Next, C.H. Robinson alleges that "Defendants individually or in concert with another removed from C.H. Robinson or retained its property (software and/or information) without authorization, and converted it to their own use."(R. 15-1, First Am. Compl. ¶ 83.) Due to C.H. Robinson's bare-boned allegation, it is unclear if the "information" or "software" Defendants allegedly converted were trade secrets, and the Court cannot determine whether the ITSA preempts this claim. On that same note, due to these nebulous allegations, C.H. Robinson has not fulfilled the federal notice pleading standard because the allegations do not "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. at 47; *see also Conner v. Illinois Dep't of Natural Res.,* 413 F.3d 675, 679 (7th Cir.2005) ( "pleading is still vitally important to inform the opposing party of the grounds upon which a claim rests"). As such, the Court grants Defendants' motion to dismiss Count IV without prejudice and grants C.H. Robinson leave to amend this claim.

C. Fraud-Count V

In Count V, C.H. Robinson alleges that "Defendants individually or in concert with one another falsely represented to C.H. Robinson that it was exclusively purchasing Express, that the agreements entered into with Harrison and Loeb were being honored and/or that C.H. Robinson's property had been returned upon Harrison's and Loeb's termination of employment."(R. 15-1, First Am. Compl. ¶ 89.) C.H. Robinson further alleges that Defendants' misrepresentations resulted in the loss of monies and goodwill concerning the Express software. (*Id.* ¶ 90.)

Again, the Express software is C.H. Robinson's proprietary software and is a basis for C.H. Robinson's Illinois Trade Secret Act claim. Because C.H. Robinson's fraud claim rests on conduct that is, in essence, the misappropriating of trade secrets, the ITSA preempts this claim. *See Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at *2. The Court grants Defendants' motion to dismiss Count V with

prejudice.

D. Conspiracy-Count VI

**\*8** C.H. Robinson also alleges a common law conspiracy claim. In Count VI, C.H. Robinson states that certain individuals had a "meeting of the minds to improperly compete with C.H. Robinson, acquire C.H. Robinson's proprietary software and information, utilize or disclose CH. Robinson's software, property, confidential information or trade secrets information, not allow C.H. Robinson to realize the benefit of its bargains with Harrison and/or Loeb and waste revenues of C.H. Robinson."(R. 15-1, First Am. Compl. ¶ 93.) Because C.H. Robinson unequivocally alleges that these individuals conspired to acquire its proprietary software, confidential information, and trade secrets, the ITSA preempts this conspiracy claim. Hence, the Court grants Defendants' motion to dismiss Count VI with prejudice.

*CONCLUSION*

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court dismisses Plaintiff's common law claims under Counts III, V, and VI with prejudice. The Court dismisses Count V without prejudice. Plaintiff has until December 6, 2005 to file a Second Amended Complaint.

N.D.Ill.,2005.
C.H. Robinson Worldwide, Inc. v. Command Transp., LLC
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit F**

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

**H**Do It Best Corp. v. Passport Software, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DO IT BEST CORP., Plaintiff,
v.
PASSPORT SOFTWARE, INC., Defendant
PASSPORT SOFTWARE, INC., Counter-Plaintiff,
v.
DO IT BEST CORP., Counter-Defendant.
**No. 01 C 7674.**

March 31, 2005.

Daniel Paul Albers, Amy Lovell Wilson, Jonathan
Paul Froemel, Marc Steven Silver, Barnes &
Thornburg, Chicago, IL, for Plaintiff.
Forrest L. Ingram, Martin B. Tucker, Forrest L.
Ingram, P.C., Donald L. Johnson, Johnson Law Firm,
Julie Ann Boynton, Law Offices of Julie Ann Boynton,
Robert C. Heist, R. Connor & Associates, P.C.,
Richard Francis O'Malley, Elizabeth Wylie Milnikel,
Kyle David Rettberg, Sidley Austin Brown & Wood
LLP, Chicago, IL, Robert J. Emery, Law Offices of
Robert Emery, Glenview, IL, D. Randall Brown,
Barnes & Thornburg, Fort Wayne, IN, for Defendants.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
**\*1** Plaintiff/Counter-Defendant Do It Best Corp.,
("DIB" or "Do It Best"), an Indiana corporation,
operates a hardware cooperative of some 4500
member stores. Defendant/Counter-Plaintiff Passport
Software, Inc., ("Passport" or "PSI"), an Illinois
corporation, is a licensed reseller of certain
point-of-sale software owned by RealWorld
Corporation. On January 19, 1989, Passport and Do It
Best entered into a written Dealer License Agreement
by which Passport licensed the Real Wold software to
Do It Best in return for royalty payments. Over the
years from January 1994 through February 2001,
Passport provided DIB with custom modifications to
the licensed software. DIB contends it purchased these
modifications. Passport insists that although DIB paid
development fees to PSI for some of the modifications,
DIB did not ever purchase software and only had

rights to use the Passport software pursuant to the
license.

The software furnished to DIB by PSI included a
copyright notice, and PSI now holds
federally-registered copyrights in the software at issue
in this case. In late September 2000, PSI learned that
DIB had deleted copies of PSI's copyright notice from
what PSI claims is licensed software and was
distributing the software without permission and
without paying license fees. PSI issued a notice of
default, and this lawsuit followed. DIB seeks a
declaration that it is not in breach of the parties' 1989
agreement, and PSI has countersued, asserting claims
against DIB and its general counsel, Thomas
Burroughs. After voluntarily dismissing certain of
those claims, PSI filed a Third Amended
Counterclaim in which it charged DIB with breach of
contract (Count I); trade secret misappropriation
(Count II); civil conspiracy (Count VI); copyright
infringement (Count VII); fraud (Count IX);
violations of the Lanham Act (Count XI) and tortious
interference with contract (Count XII). In addition,
PSI claimed that Burroughs is guilty of contributory
copyright infringement (Count X). In an earlier
opinion, this court dismissed the fraud claim, but
denied Defendants' motions to dismiss the
contributory copyright infringement claim, the
Lanham Act claim, and the tortious interference claim.

Nine motions for summary judgment are now before
the court. In six separately-filed motions, DIB seeks
judgment in its favor on PSI's trade secret, civil
conspiracy, copyright infringement, breach of contract,
tortious interference, and Lanham Act claims. In a
seventh motion, DIB also seeks partial summary
judgment on PSI's claims for damages. PSI has filed
its own cross-motions for summary judgment on the
copyright infringement claim and Lanham Act claims.
In this opinion, the court addresses the motions for
summary judgment on copyright infringement, breach
of contract, trade secret misappropriation, civil
conspiracy, and damages.

*FACTS*

An introduction to the facts at issue here is set forth in
this court's opinion on DIB's motion to dismiss. *See*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　　　Page 2
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

*Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, 2004 WL 1660814 (N.D.Ill. July 23, 2004). Recognizing that the facts Passport alleged in its counterclaim were presumed true at that stage-a presumption that Passport no longer enjoys-the court nevertheless refers the reader to that earlier opinion for context. For each of their nine motions for summary judgment, the parties have submitted separate Local Rule 56.1 Statements, many of which contain the same information. The exhibits, stacked together, reach nearly the waist of a tall female judge. Rather than attempting to create one comprehensive narrative from the parties' multiple submissions, the court will present a brief synopsis here, and identify more specific facts relevant to each motion together with the analysis of that motion.

**\*2** PSI is engaged in the business of developing and licensing business software. In the 1980's, PSI entered into an agreement with RealWorld Corporation under which PSI was licensed to use certain RealWorld software, to modify and enhance that software and, to the extent of such modifications, to add PSI's own copyright and trade secrets notices to those of RealWorld. (Master Distributor Agreement, PSI Exhibit G, ¶¶ 4.4, 12.1.) The relationship between PSI and DIB began in 1989, when the parties entered into a Dealer License under which PSI delivered a version of the RealWorld software that PSI had enhanced and converted to a programming language compatible with DIB's business. DIB distributed the program to hundreds of its member stores. Beginning in 1992, PSI developed modifications and enhancements to the program at DIB's request, and DIB itself also modified and enhanced the program. Under the terms of the Dealer License, all of those enhancements, regardless of their authorship, were subject to the terms of the License, in which PSI and RealWorld retained rights in the copyrights and trade secrets in the software. (Dealer License for RealWorld Software, PSI Exhibit I, ¶¶ 6.1, 6.2.)

The Dealer License provided for a five-year term, renewable under certain circumstances for an additional five years. Although DIB now asserts that the agreement terminated in 1994, the parties' business dealings continued; both parties continued to enhance and modify the software including, in 1996 and 1997, modifications to render the code "Y2K-compliant." PSI obtained copyright protection over this version of the software, now known as "RW2000®," in 2002.

(Copyright registrations, PSI Exhibits D, F.) In August or September 2000, DIB asked PSI to propose a price for DIB's purchase of an "unlimited right" to the software. RealWorld offered to sell its rights for $200,000, (Undated e-mail message from Ellen Saley, PSI Exhibit FFF), and PSI offered to sell DIB an unlimited right to use the enhanced software for $1.8 million. DIB made a counteroffer of $250,000 and asked PSI to assist in determining which portions of the software were owned by RealWorld and which by PSI. (Wygant Letter of 9/19/00, PSI Exhibit GGG; Williams memorandum of 9/20/00, PSI Exhibit HHH.) In the course of doing so, PSI claims it learned for the first time that DIB had copied code written by PSI and was using it in a module without paying license fees for that module. (Miller Letter of 10/2/00, PSI Exhibit LLL.)

Still later, PSI discovered that DIB was engaged in direct negotiations with RealWorld's successor corporation, Great Plains Software, Inc., for purchase of RealWorld's source code. (Undated Schafer e-mail, PSI Exhibit OOO.) On November 30, 2000, DIB and Great Plains entered into an agreement by which Great Plains sold software to DIB for $150,000 and agreed to "cooperate in good faith in any litigation" between DIB and PSI concerning the rights in the software. (Great Plains Source Code License Agreement, DIB Exhibit 2, ¶¶ 2(d)(iv)(a), 9(b).) DIB did not in fact use the software it had purchased from Great Plains, however. Karla Wygant, DIB's manager of retail data processing, testified that she compared the Great Plains software with the PSI source code DIB had been using, and placed the Great Plains software in a file cabinet. DIB continued using the software furnished by PSI. (Wygant Dep., PSI Exhibit L, at 23:8-25:17.) In February 2001, DIB advised PSI it would no longer provide a royalty report reflecting its sublicensing of software because "we are no longer buying product from you."(Gibson e-mail message, 2/8/02, PSI Exhibit PPP.)

**\*3** In a certified mail letter of February 14, 2001, PSI declared DIB in default under the January 19, 1989 Dealer License and terminated its relationship with DIB based on DIB's failure to report sublicenses and failure to pay royalties. (Miller Letter, 2/14/01, PSI Exhibit J.) On May 14, 2001, Great Plains terminated the licensing agreement that its predecessor, RealWorld, had entered into with PSI. (Schafer Letter, 5/14/01, PSI Exhibit LLLL.) Great Plains sent a copy

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

of the termination of letter to DIB, whose general counsel, Thomas Burroughs, commented that "[p]erhaps, termination of the relationship will cause" PSI, which Burroughs characterized as "totally unrealistic and unreasonable" to "have a change of heart," (presumably concerning PSI's demand for royalties from DIB). (Burroughs e-mail message, PSI Exhibit NNNN.)

On October 4, 2001, DIB filed this lawsuit seeking a declaratory judgment that it is not in breach of any legal obligations to PSI. DIB now seeks summary judgment on several of PSI's counterclaims. In this opinion, the court addresses DIB's motion for summary judgment on PSI's copyright infringement, breach of contract, and trade secret infringement claims, as well as DIB's motion for partial summary judgment on damages issues.

*DISCUSSION*

I. Copyright Infringement

In Count VII of its Third Amended Counterclaim, PSI alleges that, since February 14, 2001, DIB has made, used and distributed PSI's copyrighted software without PSI's consent and is therefore guilty of copyright infringement. The Copyright Act of 1976 protects original works of authorship fixed in a tangible medium of expression. 17 U.S.C. § 102(a). The protection extends to a broad array of subject matter including pictorial, graphic, sculptural and literary works, 17 U.S.C. § 102(a)(1), which includes computer programs. *qad. inc. v. ALN Associates, Inc., 974 F.2d 834, 835 (7th Cir.1992).*

DIB seeks summary judgment on PSI's copyright infringement claim for three reasons: First, that DIB enjoys an "irrevocable implied license" to use PSI's software; second, that DIB is a joint author of the software; and third, that PSI is guilty of misuse of its registrations. (DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 1.) The court considers those arguments in turn.[FN1]

> [FN1.] In a 27-page response brief, PSI responded to each of the three arguments. DIB's Reply Memorandum nevertheless shrilly asserts that PSI "waived any argument" challenging DIB's purported

defense that the source code at issue here is not copyrightable. Having again reviewed DIB's opening memorandum, the court finds no reference there to an argument that the PSI source code is not original. As noted, the opening memorandum presented arguments of implied license, joint authorship, and misuse of registrations, and did not explicitly challenge the originality of PSI's work. The court concludes that PSI did not waive the matter by failing to respond to an argument not made in DIB's opening brief. On receipt of DIB's reply memorandum, PSI filed a motion seeking leave to file a supplemental pleading on the issue of copyrightability, should the court reach that issue. As the court determines DIB did not properly present it, PSI's Motion to File Adjunct Pleading Relating to the Copyrightability of its Software (Doc. No. 266) will be denied as moot.

A. Irrevocable Implied License

DIB argues, first, that PSI granted it an implied license to use source code, including source code in Passport's copyright registrations, with its member stores. The Seventh Circuit has recognized that a nonexclusive license may be granted orally, or may even be implied from conduct. *I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir.1996).* The existence of an implied license is an affirmative defense to a claim of copyright infringement. *Id.* DIB bears the burden of proving the existence of an implied license. *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc., 322 F.3d 26, 40 (1st Cir.2003).* To do so, DIB must show that (1) DIB requested creation of the work; (2) PSI created it and delivered it to DIB; and (3) PSI intended that DIB copy and distribute the work. *Kennedy v. National Juvenile Detention Ass'n, 187 F.3d 690, 694 (7th Cir.1999); see also Shaver, 74 F.3d at 776.*

**\*4** Of these factors, the first two are essentially undisputed. PSI created and modified the custom software and provided it to DIB. PSI urges, however, that there is no evidence that PSI intended for DIB to use the source code outside the parameters of the parties' written agreement. Indeed, PSI contends, the existence of an express license agreement precludes proof of any implied license. *See Slamecka v. Empire Kosher Poultry, Inc., 290 F.Supp.2d 934, 939*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(N.D.Ill.2003) (quoting other case law for the proposition that an "implied in fact contract will not be recognized if there is an express contract between the parties concerning the same subject on which the implied contract claim rests"); *Mahurkar v. C.R. Bard, Inc.,* No. 92 C 4803, 1993 WL 259446 at *10 n. 4 (N.D.Ill. July 6, 2003) (recognizing this principle in a patent license dispute).

There is ample evidence in the record that DIB officers believed that DIB's rights to use the software at issue here derived from written agreements. It is undisputed that the parties entered into an express license agreement, the Dealer License, in 1994, with a five-year renewable term. In its answer to the Third Amended Counterclaim, DIB admitted that it executed the Agreement dated January 19, 1989, (Answer, PSI Exhibit C, ¶ 20.) By its terms, the Dealer License covered source code bearing PSI's proprietary notice (and that of Real World, the originator of the software), as well as "any subsequent corrections, enhancements or modifications to the items which Licensor may furnish to Licensee during the terms of this License."(Dealer License, PSI Exhibit I, ¶ 1.3.) The Dealer License provided that PSI and Real World retained all copyright, trade secrets and other proprietary rights in the software. (*Id.* ¶ 3.2.)The Dealer License anticipated the payment of fees by DIB for a "non-exclusive license to use ... the RealWorld proprietary computer software items" and included a schedule of additional fees to be paid for distribution of the software to additional parties. (*Id* page 1; Royalty Schedule A.)

The License was scheduled to expire in 1994, but there is evidence that through Gary Zoller, its manager of retail data services, DIB agreed to continue operating under the terms of the Dealer License, at least until 1999. (Zoller Dep., PSI Exhibit O, at 18.) In two 1999 letters, John Snider, DIB's Vice President of Information Technology, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In a letter to Great Plains dated February 15, 2001, DIB's general counsel Thomas Burroughs stated his belief that the License had expired in 1999. (Burroughs Letter, PSI Exhibit Q.) Further, in hundreds of agreements that DIB made with its member stores from 1989 through 2000, DIB acknowledged that it was granting sublicenses "pursuant to a license agreement we have with Passport Software, Inc." and that "[a]ll copyright

and other proprietary rights in portions of the Software enhanced by PSI or [DIB] are and remain the valuable property of the respective companies."(Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

**\*5** This court agrees with PSI that the parties' execution of the Dealer License, and DIB's explicit acknowledgment of and adherence to its terms, are inconsistent with an implied license arising from the parties' conduct. The fact that DIB approached PSI in August or September 2000 seeking to purchase unlimited rights in the software is powerful evidence that DIB did not at that time believe it already possessed such rights. Notably, in its Third Amended Complaint, PSI alleges that DIB's unauthorized use of the copyrighted software began on February 14, 2001. On that date, PSI sent DIB a notice of default, demanding that DIB pay fees and charges and royalties PSI claimed were due under the Dealer License. (Notice of Default, PSI Exhibit J.) In determining whether an implied license exists, the court must consider objective evidence of the parties' intent. *Meisner Brem Corp. v. Mitchell,* 313 F.Supp.2d 13, 16 (D.N.H.2004), citing *Danielson,* 322 F.3d at 42.The February 14, 2001 letter constitutes a clear indication that at least as of that date, PSI had no intention to permit DIB's continued use of the software. At a minimum, the court concludes there are disputes of fact on the issue of whether PSI delivered software to DIB with the intent that DIB could continue using and distributing that software, without payment of royalties, after the termination of their agreement.

As noted earlier, PSI not only opposes DIB's motion for summary judgment on the copyright infringement issue, but has filed its own motion for summary judgment on Count VII. Where parties file cross-motions for summary judgment, the court is required to adopt a "Janus-like perspective," viewing the facts for purposes of each motion through the lens most favorable to the non-moving party. *See Granzow v. Eagle Food Centers, Inc.,* 27 F.Supp.2d 1105, 1106 (N.D.Ill.1998). This approach sometimes requires denial of both motions. *Id.* Based on the evidence described above, a jury could find that DIB understood that it was bound by the terms of the Dealer License, at least through January 1999, and that PSI did not intend to permit DIB's use of the copyrighted work under any implied license prior to

Not Reported in F.Supp.2d                                          Page 5
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

that date.

The court is far less certain of PSI's intentions after that date. PSI knew or should have known that by its terms, the Dealer License expired at the latest by January 1999, but PSI has offered no explanation for its failure to take steps to renegotiate the license or retrieve its copyrighted software from DIB at that time. Indeed, PSI apparently made no effort to enforce the requirements for renewal even in 1994 but continued performing programming on the software to meet DIB's needs. John Snider of DIB has testified that as of January 1999, he was "confused whether the dealer license was in effect technically."(Snider Dep., DIB Ex. 41, at 37:12-13.) John Miller, PSI's President, has asserted that "PSI operated under the terms of the Dealer License from 1989 through March 2001," (Miller Aff. ¶ 67), but PSI has not offered evidence that DIB officials understood that the Dealer License itself-as opposed to other individual licenses or agreements or oral commitments-continued in force. Nor has PSI explained how it was that PSI was unaware that "DIB had not been complying with all of the provisions of the Dealer License" before PSI "discovered" this fact in "mid to late 2000." (*Id.* ¶ 68.)*Cf. Viacom Int'l Inc. v. Fanzine Int'l Inc.,* No. 98 CIV. 7448, 2000 WL 1854903 at *5 (S.D.N.Y. July 12, 2000)* ("[F]ailure by the copyright owner to object to reproduction of copyrighted works may provide the basis for implying a nonexclusive license, but this basis for an implied license is available only when the owner's silence is coupled with knowledge of the copying.") As DIB points out, PSI officials acknowledged that PSI prepared and provided custom programming, including software designed to address "Y2K" problems, for distribution by DIB to its members. (DIB Reply Memorandum in Support of its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 8-9, citing deposition transcripts of John and Muriel Miller.) The court does not agree with DIB that the fact that it paid PSI for this programming requires the conclusion that an implied license arose; PSI might well have intended for the custom programming to be covered by the terms of the Dealer License or by other writings. Because PSI apparently did not arrange for a renewal of that written agreement, however, a reasonable trier of fact might conclude that it intended for DIB to distribute the work pursuant to an implied license after January 1999.

**\*6** Viewing the evidence in the light most favorable to each side on the other's motion, the court concludes there are disputes of fact concerning the existence of an implied license after January 1999.

B. Joint Authorship

In the alternative to its implied license argument, DIB contends that it is a joint author of PSI's copyrighted software. Both parties agree concerning the relevant legal standards. To qualify as a joint author, DIB must show (1) that the parties intended to be joint authors at the time the work was created and (2) that each author's contribution to the work is independently copyrightable. *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1068-71 (7th Cir.1994); *see also* 17 U.S.C. § 101. The court need not address the second prong of this test because it concludes that there are disputes of material fact concerning the first prong.

The language of a written agreement between the parties can constitute evidence of their intentions concerning co-authorship. *Thomson v. Larson,* 147 F.3d 195, 204 (2d Cir.1998). As described in part above, the terms of the Dealer License are plainly at odds with DIB's contention that both parties intended for DIB to be a co-author of the software. Paragraph 3.2 of the Dealer License notes that the "Licensed Software embodies substantial creative efforts of both RealWorld and PSI," but makes no mention of any contribution on the part of DIB. (Dealer License, PSI Exhibit I, at 3.2.) In that same paragraph, the agreement provides that "[a]ll copyright ... and other intellectual and proprietary rights in the Licensed Software are and remain the valuable property of RealWorld and PSI...."(*Id.*)Paragraph 1.3 of the agreement explains that the copyrighted software, referred to at this point as "Sublicensed Software" includes not only the source code originally delivered to DIB in 1989, but also "any subsequent corrections, enhancements of modifications to the items...."(*Id.* ¶ 1.3(d).) DIB was entitled, under the language of the Dealer License, to "modify and enhance the Licensed Software," but the use of such software "whether modified or enhanced ... shall remain subject to all of the terms and conditions of this Agreement."(*Id.* ¶¶ 6.1, 6.2.)

In addition, the language of agreements between DIB and hundreds of its member stores for use of the software is inconsistent with its claim of joint

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 6
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

authorship. *Cf. Erickson,* 13 F.3d at 1072 (noting that licensing agreement between copyright holder and a third party undermined plaintiff's claim of joint authorship). In an appendix to its form agreement, DIB warned its member stores that copyrights in the software "are and remain the valuable property of [RealWorld Corporation]." (E.g., Appendix 2 to Computer Software License Agreement between DIB and Wannemakers, PSI Exhibit CC.) DIB explicitly asserted that it acted as an "independent contractor" with respect to PSI and was "not PSI's nor RWC's agent, partner, franchisee, joint venturer or employee."(*Id.*)

**\*7** Joint authorship is an affirmative defense to a claim of copyright infringement. *SHL Imaging, Inc. v. Artisan House, Inc.,* 117 F.Supp.2d 301, 314 (S.D.N.Y.2000). The court concludes DIB has not met its burden of establishing that there are no disputes of fact on this matter.

C. Misuse

Finally, DIB intends that PSI has misused its copyright registrations by seeking to extend its copyright protection over software to which it has no rights. As it does with respect to the issues of implied license and joint authorship, DIB bears the burden of proof on this matter.

The defense of copyright misuse "bars a culpable plaintiff from prevailing on an action for the infringement of the misused copyright."*Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 972 (4th Cir.1990). The defense recognizes that "copyright law [seeks] to increase the store of human knowledge and arts by awarding ... authors with the exclusive rights to their works for a limited time ... [but] the granted monopoly power does not extend to property not covered by the ... copyright."*Id.* at 976.As the Ninth Circuit observed in *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1027 (9th Cir.2001), most of the cases that recognize this defense "involve unduly restrictive licensing schemes." Indeed, in the Seventh Circuit, copyright misuse is ordinarily analyzed under conventional antitrust principles. *USM Corp. v. SPS Techs., Inc.,* 694 F.2d 505, 512 (7th Cir.1982); *see Data General Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1186 n. 63 (1st Cir.1994); *Chamberlain Group, Inc. v. Skylink Techs., Inc.,* 381 F.3d 1178, 1201 (Fed.Cir.2004) ("Because nothing in Seventh

Circuit law contradicts *Data General,* we similarly conclude that it is the standard that the Seventh Circuit would most likely follow.") As the Supreme Court has stated: "The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.' " *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 479 n. 29, 112 S.Ct. 2072, 119 L.Ed.2d 265, (1992) (quoting *Times-Picayune Publ'g Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)).

DIB here does not credibly assert that PSI is guilty of using its copyright to restrain DIB's use of non-copyrighted material, or of other anticompetitive conduct. Instead, DIB appears to suggest that PSI's copyright registrations contained intentional misrepresentations in that they failed to identify other authors of the source code Passport was seeking to register.[FN2]DIB urges that Passport has no right to charge DIB with infringing source code that RealWorld or DIB itself authored.

> FN2. DIB points out that intentional misrepresentations can invalidate a copyright registration. (DIB's Reply Memorandum in Support of its Motion for Summary Judgment on PSI's Copyright Infringement Claim, at 16.) The court does not understand DIB to be arguing that the court should find PSI's copyrights invalid, however. In any event, a finding of misuse does not ordinarily invalidate a copyright. *Alcatel USA, Inc. v. DGI Technologies, Inc.,* 166 F.3d 772, 793 n. 81 (5th Cir.1999), citing *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 972 (4th Cir.1990).

As this court understands PSI's claims, however, PSI is not seeking to bar DIB from using source code which DIB authored. Nor is the court persuaded that there are no disputes of fact concerning DIB's copyright misuse defense. The case on which DIB chiefly relies, *qad. inc. v. ALN Assocs., Inc.,* 770 F.Supp. 1261 (N.D.Ill.1991), *aff'd,*974 F.2d 834 (7th Cir.1992), is instructive but distinguishable. In *qad,* the district court initially granted plaintiff's motion to preliminarily enjoin a competitor's use of the plaintiff's copyrighted software program. Later, the

court granted summary judgment in favor of the defendant competitor after it concluded that plaintiff's witnesses had made misrepresentations at the preliminary injunction hearing: specifically, they falsely claimed the software at issue was a completely original work, of which plaintiff wrote "every line ... from scratch," and that defendant could only have obtained the code by direct copying of that original work. 770 F.Supp. at 1267.Instead, the court concluded, plaintiff qad had "copied much of the selection, order, arrangement and definitions of fields" from software developed by a third party, but failed to identify its own software as a derivative work, or to acknowledge that defendant itself could have obtained the code from the third party source.*Id.* at 1263.

**\*8** DIB has identified no similar misrepresentations on the part of PSI. In its own copyright applications, PSI clearly indicated that it was seeking registration of a derivative work and identified RealWorld software as the work from which PSI's own code was derived. (Copyright Registration, PSI Exhibit F.) PSI notes, further, that PSI's agreement with RealWorld authorized PSI to "modify and enhance the Licensed Software," combine it with other software, convert it for use in another programming language, or otherwise create derivative works. (Master Distributor Agreement for RealWorld So ftware, PSI Exhibit G, ¶ 12.1.) Federal regulations permit the depositing of "identifying portions," rather than copies, of computer programs for which copyright protection is sought, 37 C.F.R. § 202.20(c)(2)(vii)(A), and case law recognizes that a copyright may cover a program that includes previously known source code. *Computer Assocs. Int'l v. Quest Software, Inc.,* 333 F.Supp.2d 688, 697 (N.D.Ill.2004) (Moran, J.) *See also Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 260 (N.D.Ill.1993) (distinguishing *qad.* on the basis that plaintiff there had not disclosed a prior work in its copyright application).

DIB makes much of the fact that PSI's copyright registrations "incorporate source code that was written by Passport, Do It Best, and RealWorld."(DIB's Memorandum of Law in Support of Its Motion for Summary Judgment on Passport's Copyright Infringement Claim, at 16.) As noted earlier, however, under the terms of the 1994 License Agreement, DIB had rights to modify or enhance the software provided by PSI, but PSI and RealWorld retained copyrights in that enhanced software. RealWorld might have some

basis to complain about PSI's copyright claims, but the court concludes that DIB is not entitled to summary judgment on the basis of the purported misuse defense.

II. Breach of Contract

In Count I, PSI charges DIB with breach of contract. PSI's theory is that the Dealer License that the parties entered into in 1989 continued until March 2001, 30 days after PSI issued a notice of termination. The language of the Dealer License itself is inconsistent with this theory. It provides:

> This license shall be in effect ... and shall be valid until termination as provided below, or until a point in time five years hence, whichever occurs first.... [Y]ou [DIB] may renew this Agreement at the end of the five year term for an additional five year term provided you pay the then current renewal fee and sign the then current Renewal Source Code License Agreement.

(Dealer License, PSI Exhibit 1, ¶ 9.1.) Further, the Dealer License prohibits any modification that is not "in writing and signed by the party against whom such is sought to be enforced."(*Id.* ¶ 10.9.)It is undisputed that DIB never paid a renewal fee, nor did DIB sign an agreement to extend or modify the 1989 Dealer License. (Miller Dep., DIB Exhibit 3, at 101:11-20, 264:5-10.) DIB argues that these undisputed facts require judgment in its favor on PSI's breach of contract claim. In assessing this motion, the court considers whether there are disputes of fact concerning an alleged oral extension of the Dealer Agreement, and whether enforcement of such an oral agreement is barred by the statute of frauds.

A. Alleged Oral Extension

**\*9** PSI urges that the absence of a signed extension agreement is not fatal here. Illinois law permits the parties to a written contract to alter or modify its terms by a subsequent oral agreement even where the terms of the contract appear to preclude such a modification. *Tadros v. Kuzmak,* 277 Ill.App.3d 301, 312, 213 Ill.Dec. 905, 660 N.E.2d 162, 170 (1st Dist.1995) (collecting cases). Where, as here, a written contract contains a provision banning oral modifications, a party seeking to establish that such a provision is waived must offer clear and convincing evidence of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 8
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

such a waiver. See *Czapla v. Commerz Futures, LLC,* *114 F.Supp.2d 715, 718 (N.D.Ill.2000)* (citing *Roboserve, Inc. v. Kato Kagaku Co.,* 78 F.3d 266, 277 (7th Cir.1996).

In support of its argument that an oral agreement existed, PSI relies heavily on the testimony of Gary Zoller, who in 1994 served as manager of retail data services for DIB. Zoller testified that DIB continued to operate under the agreement after 1994. (Zoller Dep., PSI Exhibit O, at 18:8-9.) According to Zoller, "We had conversations with Passport, John Miller [PSI's President], and we were assured we could continue to resell the product under the license agreement."(*Id.* at 20:15-19.)Further, as described above, in two letters he wrote in 1999, DIB's Vice President, John Snider, referred to the "ten-year anniversary of the Dealer License" for the software. (Snider Letters, PSI Exhibits P, TT.) In addition, in February 2001, DIB's general counsel, Thomas Burroughs, expressed his belief that the License had expired in 1999, not in 1994. (Burroughs Letter, PSI Exhibit Q.) PSI notes, as well, the references to a "license agreement we have with Passport Software," that appear in DIB licenses with its member stores continuing into the year 2000. (Appendix 2 to representative contracts dated 1989 through 2000, PSI Exhibits BB through LL.)

As DIB emphasizes, however, there is substantial evidence that casts doubt on the assertion that the parties understood their relationship was governed by the Dealer License. For example, the parties entered into written agreements for custom programming of the software at issue here without making any mention of the Dealer License. A May 11, 1994 document, signed by Gary Zoller and John Miller, is characterized as a "working agreement between [DIB and PSI] covering the development of three software products for [DIB] by Passport Software."(5/11/94 agreement, DIB Exhibit 37.) No mention of the Dealer License, or of any contractual relationship, appears within that document. A March 24, 1994 letter from Paul Erbe of PSI "confirm[s] [PSI's] arrangements to assist [DIB] with the further development and support" of its retailing software and explains "our [PSI's] policy to bill clients monthly for costs incurred plus out-of-pocket expenses."It makes no reference to the Dealer License or to any royalties owing under that license. (Erbe letter 3/24/94, DIB Exhibit 38.) An August 1, 2000 letter from Muriel Spencer of PSI to Chuck Thatcher of DIB expresses PSI's anticipation of

"rekindling a productive working relationship," proposes the development of a new computer module, and sets out a pricing table for purchases of the module over a five-year period, again without any reference to the parties' Dealer License or to any existing contractual relationship. (Spencer letter 8/1/00, DIB Exhibit 39.)

B. Statute of Frauds

**\*10** Even if the court recognizes Mr. Zoller's communications as sufficient to create a dispute of fact concerning an oral extension agreement, DIB argues that the statute of frauds bars the enforcement of such an agreement. The Illinois statute of frauds precludes enforcement of oral contracts that cannot be performed within a year of their making. 740 ILCS 80/1; *McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 489, 223 Ill.Dec. 911, 680 N.E.2d 1347, 1351 (1997). The statute applies in cases like this one, involving a purported oral extension of a written contract which cannot be performed within one year.[FN3] *Dickens v. Quincy College Corp.,* 245 Ill.App.3d 1055, 1059, 185 Ill.Dec. 822, 615 N.E.2d 381, 384 (4th Dist.1993). As the *McInerney* court explained:

> FN3. PSI does not argue that the alleged oral extension of the Dealer License is not of this nature.

> The period of one year, although arbitrary, recognizes that with the passage of time evidence becomes stale and memories fade. The statute proceeds from the legislature's sound conclusion that while the technical elements of a contract may exist, certain contracts should not be enforced absent a writing. It functions more as an evidentiary safeguard than as a substantive rule of contract. As such, the statute exists to protect not just the parties to a contract, but also-perhaps more importantly-to protect the fact finder from charlatans, perjurers and the problems of proof accompanying oral contracts. *Id.* at 489, 223 Ill.Dec. 911, 680 N.E.2d at 1351.

There is no suggestion here that PSI, or any of its witnesses, are "charlatans or perjurers." But this case presents obvious problems of proof. DIB insists there was no continuing obligation under the License Agreement and that it agreed, instead, to make individual purchases of custom programming and licensing on a project-by-project basis. PSI insists the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

Dealer License continued to control the parties' relationship, but offers no evidence of the precise terms of that agreement, nor any explanation for its failure ever to collect royalty fees from DIB, to insist that DIB sign a renewal agreement, or even to make reference to the License Agreement in its correspondence with DIB.[FN4] As another judge of this court has observed, "While the plaintiff might have been comfortable with proceeding somewhat informally in its dealings with defendant, it cannot later expect the court to complete the negotiation process and arrive at terms on its behalf." *Doyle's Const. & Remodeling, Inc. v. Wendy's Int'l, Inc.,* 144 F.Supp.2d 969, 975 (N.D.Ill.2001), citing *J.F. McKinney & Assocs. v. General Electric Inv. Corp.,* 183 F.3d 619, 622 (7th Cir.1999).

> FN4. DIB notes, further, that as Gary Zoller explained, PSI always used DIB's then-current software when it worked on any new programming and was therefore always aware of the source code DIB was using and sublicensing to its members. (DIB's Memorandum of Law in Support of its Motion for Summary Judgment on Passport's Breach of Contract Claim, at 11-12, citing Zoller Dep., DIB Exhibit 19, at 41:25-42:10.) Yet until 2001, PSI never suggested that DIB was in breach of any agreement between the parties. The court is uncertain how was that PSI did not, prior to September 2000, discover DIB's alleged misuse of its code, but concludes that disputes of fact preclude summary judgment on DIB's laches defense.

PSI urges that certain exceptions to the statute of frauds are available here. First, PSI notes the letters written by John Snider of DIB in January and March 1999 in which he refers to the "ten year anniversary" of the Dealer License. Snider's January letter refers to the possibility that the parties' relationship might "need[ ] to be modified," and his March letter opines that the parties ought not "be limited by the historical agreement." In a letter written on February 15, 2001, the day after PSI notified DIB of default, General Counsel Thomas Burroughs advised RealWorld's successor of his "belief that the agreement expired by its own terms in 1999." PSI correctly observes that the writing necessary to satisfy the statute of frauds need not be a single document, *Bower v. Jones,* 978 F.2d 1004, 1008 (7th Cir.1992), and need not be " 'in and of

itself the contract in question ...*so long as the intention of the parties can be established.*' " *Dresser Indus., Inc. v. Pyrrhus AG,* 936 F.2d 921, 929 (7th Cir.1991) (quoting *Yorkville Nat'l Bank v. Schaefer,* 71 Ill.App.3d 137, 140, 27 Ill.Dec. 263, 388 N.E.2d 1312, 1315 (2d Dist.1979)). PSI recognizes that the documents on which it relies to satisfy the statute of frauds must enable the court to determine all the terms of the bargain. (Passport Software Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Breach of Contract Claim, at 6.)

**\*11** In the court's view, the Snider and Burroughs letters do not meet that test. Mr. Snider's letters are ambiguous; although he refers to the "anniversary" of the Dealer License, he does not acknowledge explicitly that its terms continued to govern the parties' dealings; in fact, his March letter refers to the agreement as "historical." Mr. Burroughs's 2001 letter to Great Plains observes that the Dealer License "had a five year initial term, and was subject to one renewal term of five years," supporting Burroughs's belief that the agreement had expired in 1999. Contrary to PSI's characterization of this letter as one that "confirms the existence of the oral contract," (*id.* at 8, 27 Ill.Dec. 263, 388 N.E.2d 1312), this letter refers only to the parties' written agreement. At best, Burroughs's letter could constitute an admission that the Dealer License continued in force until 1999; it does not support PSI's contention that the License continued indefinitely.

The court turns, then, to PSI's remaining arguments; that compliance with the statute of frauds is excused under the doctrines of part performance or full performance. Under the full performance doctrine, an oral agreement may be enforced according to its terms if it has been fully performed by the party seeking enforcement. *Strzelecki v. Schwarz Paper Co.,* 824 F.Supp. 821, 825 (N.D.Ill.1993), citing *Meyer v. Logue,* 100 Ill.App.3d 1039, 1043-44, 56 Ill.Dec. 707, 427 N.E.2d 1253, 1256 (1st Dist.1981). Full performance renders the statute of frauds inapplicable because it "constitutes strong evidence that a contract existed." *Greenberger, Krauss & Tenenbaum v. Catalfo,* 293 Ill.App.3d 88, 96, 687 N.E.2d 153,159 (1st Dist.1997), citing *Meyer,* 100 Ill.App.3d at 1043-44, 56 Ill.Dec. 707, 427 N.E.2d at 1256. Partial performance is another basis for an exception to the statute of frauds. The doctrine of partial performance is "rooted in the equitable concept of

Not Reported in F.Supp.2d                                                                                                     Page 10
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

reliance," *Dickens*, 245 Ill.App.3d at 1061, 185 Ill.Dec. 822, 615 N.E.2d at 385, and applies "to cases where there [have] been such acts of performance by the party" so that it "cannot be restored to [its] original position." *Gibbons v. Stillwell*, 149 Ill.App.3d 411, 415-16, 102 Ill.Dec. 864, 500 N.E.2d 965, 969 (5th Dist.1986).

PSI has not been specific about precisely what activities constitute "performance" for this purpose. Presumably PSI includes its own failure to prohibit DIB from continuing to use its software or to notify DIB that the Dealer License was terminated; but the court is unwilling to characterize PSI's silence and failure to act as "performance" that binds DIB to the terms of an agreement. PSI also performed additional programming and software development in the years after 1994. DIB insists PSI did this work pursuant to additional individual agreements and that DIB paid PSI on a project-by-project basis for this additional work. Although PSI contends that all of the additional programming was a function of the Dealer License, its witnesses acknowledged that DIB paid it for all of that additional programming (John Miller Dep., DIB Exhibit 3, at 174:9-176.23; Muriel Miller Dep., DIB Exhibit 13, at 79:14-80.15; 84:4-86:10), and there is no evidence that the programming work itself constituted evidence of the continuing existence of the Dealer License. PSI points out that it continued to assign serial numbers for DIB's member stores, but there is no evidence that PSI attempted to collect license fees or royalties on these sublicenses. Thus, in the court's view, PSI's purported "full performance" does not constitute evidence that the Dealer License Agreement continued in effect after 1999.

**\*12** To the extent PSI invokes the "partial performance" doctrine as a basis for an exception to the requirement of a writing, the court notes that this doctrine supports only equitable relief and is inapplicable where, as here, the party asserting the existence of a contract seeks money damages. *Trustmark Ins. Co. v. General Cologne Life Re Ins. Co. of Am.*, No. 00 C 1926, 2004 WL 1745777 (N.D.Ill. Aug.2, 2004), citing *Payne v. Mill Race Inn*, 152 Ill.App.3d 269, 278, 105 Ill.Dec. 324, 504 N.E.2d 193, 199-200 (2d Dist.1987) (doctrine of partial performance applies only where "it is impossible or impractical to ... compensate the performing party for what he has parted with, or for the value of his performance"); *Gibbons*, 149 Ill.App.3d at 416, 102

Ill.Dec. 864, 500 N.E.2d at 969 (refusing to apply doctrine of part performance where "the plaintiff had an adequate remedy at law for damages"); *Cherry Payment Sys., Inc. v. Rogers*, No. 92 C 5918, 1995 WL 584062, at \*3 (N.D.Ill. Oct.3, 1995) (noting that under Illinois law, "the availability of damages to compensate [the performing party] ... will ordinarily preclude reliance on the equitable doctrine of partial performance."). As this court understands the claims, PSI seeks monetary damages for DIB's alleged breach of contract. The part performance doctrine is not applicable in this context.

DIB's motion for summary judgment on PSI's breach of contract claim is denied with respect to the period until January 1999, and otherwise granted.

III. Trade Secret Misappropriation

Computer software may constitute trade secrets and may be entitled to trade secret protection where the owner has taken appropriate steps to protect the secrecy of the information. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F.Supp.2d 688, 695 (N.D.Ill.2004); *see CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F.Supp. 337 (M.D.Ga.1992); *Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.*, 199 F.Supp.2d 1271 (M.D.Fla.2001); *Electronic Data Systems Corp. v. Heinemann*, 268 Ga. 755, 493 S.E.2d 132 (Ga.1997). DIB's sole argument for summary judgment in its favor on this claim is PSI's purported failure to identify its trade secrets with the appropriate degree of specificity. In *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir.2002), a provider of medical business management software attempted to enforce trade secret rights against a competitor and former customer, identifying, as its trade secret, " 'a 43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package'." *Id. at 583*. Affirming summary judgment in favor of defendants on this claim, the Seventh Circuit had little difficulty concluding that this broad description is not nearly specific enough to qualify for trade secret protection under Wisconsin law.

DIB contends PSI's description of its trade secret is similarly overbroad. In response to DIB's initial interrogatories on this matter, PSI claimed its trade secrets are "the processes and methodologies

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

encompassed in" forty features of the licensed software. (Answers to Interrogatories, DIB Exhibit 10, at 4.) In a supplemental answer, PSI reduced the features in which it claimed trade secret protection from 40 to 28 (Supplemental Interrogatory Answer, DIB Exhibit 11) but furnished, in addition, 831 pages of source code which it contends is protected material. According to DIB, these 831 pages "include every line of code in Do It Best's CS2000 system ever authored by Passport, without regard to the value or secrecy of any of the lines of code."(DIB's Memorandum of Law in Support of Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 5.) Indeed, John Miller, President of PSI and PSI's designated Rule 30(b)(6) witness on this issue, acknowledged that "most, if not all" of the projects that Passport worked on for Do It Best are, in PSI's view, trade secrets. (Miller Dep., DIB Exhibit 3, at 198:14-22.) Even more broadly, Mr. Miller testified that PSI's trade secrets include "the design, the structure, the programming methods, and the integration of that code within the body of code, so it's the way in which we solved business problems."(*Id.* at 196:16-20.)

**\*13** DIB urges that this description is simply too broad to support trade secret protection under the Seventh Circuit's standards. For example, in the *IDX Systems* case, where the plaintiff claimed a 43-page document describing the "methods and processes underlying" its software was a sufficiently specific description, the court responded:

> No, it isn't. These 43 pages describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package. Which aspects are known to the trade, and which are not? That's vital under the statutory definition. Likewise, IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets.

*Id.* at 583-84.In *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1266 (7th Cir.1992), plaintiff claimed that certain manufacturing techniques were trade secrets. Reversing a jury verdict against individuals who had been employed by plaintiff's material supplier, the court explained that plaintiff had identified no commercially valuable adaptations of the well known manufacturing techniques and was not entitled to trade dress protection for those techniques. *Id.* at 1266.As the *IDX Systems* court explained, *Composite Marine* stands for the proposition that a plaintiff seeking trade dress protection "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."285 F.3d at 584, citing *Composite Marine,* 962 F.2d at 1266.

Passport's submissions come dangerously close to doing exactly that. In its response to DIB's motion for summary judgment on this claim, PSI instructs that "to determine PSI's trade secret, [DIB] need merely look at the lines of code which PSI identified and *examine the design, structure, and programming techniques and the integration* into the code which DIB is using...." (Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Trade Secret Misappropriation Claim, at 10.) Passport correctly notes language in *Thermodyne Food Service Prods., Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1305 (N.D.Ill.1996) that recognizes the possible trade secret status of "a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process design and operation of which in unique combination affords a competitive advantage...." The court there recognized a trade secret in the "interrelationship" of otherwise unprotectable component parts." *Id.* at 1305 n. 5.

The court here harbors some doubt as to whether PSI's identification of every line of code it developed for DIB is sufficiently specific as a description of its trade secrets. The court does recognize, however, that PSI's submissions differ from those criticized in some of the case law. PSI did identify specific lines of code and specific software features for which it claims protection. This differs markedly from *Lynchval Sys. Inc. v. Chicago Consulting Actuaries, Inc.,* No. 95 C 1490, 1998 WL 151814 (N.D.Ill. Mar.27, 1998), which DIB argues supports its position here. In *Lynchval,* the plaintiff was unable to identify any "computer printouts, formulae, memoranda, or any other tangible technical data," identifying its trade secrets, nor to show "how, when and by whom" its purportedly protected programs were developed.

**\*14** The court recognizes that DIB may have other objections to PSI's claim of trade secret protection for

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

the software at issue in this case. Without more information (including, possibly, expert testimony concerning the nature of PSI's disclosure of code here), the court denies DIB's motion for judgment in its favor on the defense of lack of specificity.

IV. Civil Conspiracy

Count VI of PSI's Third Amended Counterclaim charges DIB with civil conspiracy. Its allegations in support of that claim focus on DIB's conduct in interfering with PSI's relationship with Great Plains and PSI's rights to use the RealWorld software. In response to DIB's motion for summary judgment on this claim, PSI describes its theory differently:

> DIB and Great Plains, each for its own motive, knowingly and voluntarily participated in a common scheme to allow DIB to continue to use the software which PSI had delivered to DIB under the terms of the Dealer License and which each knew was an enhanced version of the RealWorld software which contained PSI's copyrighted code.

(Passport Software Inc.'s Memorandum of Law in Opposition to the Motion of Do It Best Corporation for Summary Judgment on Passport's Civil Conspiracy Claim, at 1.) As thus constructed, DIB correctly characterizes PSI's claim as one of conspiracy to infringe. DIB argues in its reply memorandum that such a claim is preempted, citing *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.,* 223 F.Supp.2d 953 (N.D.Ill.2002). Specifically, Judge Castillo observed there that a "cause of action for civil conspiracy exists only if one of the parties to the agreement commits a tort in furtherance of the agreement."*Id.* at 959, citing *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 63, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994). The tort at issue in *Higher Gear* was a claim of tortious interference which was itself a claim that the defendant had created software that "closely functioned and resembled" and therefore infringed plaintiff's licensed software. *Id.* at 959.Like the tortious interference claim itself, Judge Castillo concluded that the plaintiff's civil conspiracy claim was preempted by federal copyright law.

The court concludes that PSI's civil conspiracy arguments rest on a "tort" of copyright infringement. As such, that claim appears to be preempted. Because

DIB made this argument for the first time in its reply brief, however, the court recognizes that PSI is entitled to respond to this argument, if it wishes to do so. DIB's motion for summary judgment on the civil conspiracy claim is therefore granted without prejudice. PSI will be free to move for reconsideration if it wishes to submit argument on this issue only.

V. Damages

Passport claims that it is entitled to a variety of damages in this case, including (1) maintenance fees that DIB collected for providing technical support to its members; (2) damages incurred from the date the parties' relationship began in January 1989 through March 2004; and (3) statutory damages and attorneys' fees under the Federal Copyright Act. 17 U.S.C. § 412. DIB argues that under the express terms of the Dealer License, Passport is not entitled to any maintenance fees. DIB also argues that Passport cannot recover damages incurred prior to 2001, the year in which DIB's wrongful conduct allegedly began. Finally, DIB claims that statutory damages are unavailable under the Copyright Act because the alleged infringement commenced before Passport registered its copyright.

A. Maintenance Fees

**\*15** Passport's damages expert, Darren Guccione, submitted an expert report stating that Passport is entitled to "monthly maintenance charge[s] of $200 per store that was to be earned by Passport as the new licensor and service provider for DIB's member-stores."Guccione also included revenues DIB generated from maintenance fees in his unjust enrichment analysis. DIB argues that this analysis is flawed because none of DIB's members had an obligation to seek monthly maintenance from Passport either before or after the relationship between Passport and DIB ended. (Do It Best's Memorandum of Law in Support of its Motion for Partial Summary Judgment on Damages (hereinafter "DIB Damages Mem."), at 6.) DIB first points to paragraph 9.6 of the Dealer License, which expressly provides that DIB could continue to support its members after the License expired:

> Upon termination of this License by expiration of its terms or pursuant to paragraph 9.2, [Do It Best] may apply in writing to [Passport] for permission to retain one copy of the Licensed Software for the

Not Reported in F.Supp.2d                                                                                      Page 13
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

sole purpose of supporting [Do It Best's] sublicensees. Upon termination of this License pursuant to paragraph 9.4, [Do It Best] may apply in writing directly to RealWorld for permission to retain one copy of the Licensed Software for the sole purpose of supporting [Do It Best's] sublicensees.

(Dealer License ¶ 9.6.) In addition, Passport's President, John Miller, admitted in his deposition that sublicensees were not obligated to use Passport for support. (Miller Dep., at 239.) Passport advances several theories to demonstrate that it is entitled to maintenance fees, none of which is persuasive.

1. Recovery Under the Copyright Act

Passport first suggests that DIB's revenues from the maintenance fees somehow derived from its infringing activities and are thus a compensable component of damages arising from DIB's copyright infringement. (PSI Damages Resp., at 2.) [FN5]"Copyright law allows a copyright owner to recover his actual damages and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Ocean Atlantic Woodland Corp. v. DRH Cambridge Homes, Inc.,* 262 F.Supp.2d 923, 927 (N.D.Ill.2003) (citing 17 U.S.C. § 504(b).) A copyright owner's right to recover an accused infringer's profits is "limited to profits flowing from the infringing activities." *Id.* (citing *Leigh v. Engle,* 727 F.2d 113, 138 (7th Cir.1984)).

> FN5. Passport Software, Inc.'s Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim is cited as "PSI Damages Resp., at __."

Passport claims that the maintenance fees constitute such recoverable profits because "the charges to members for support and maintenance [are] mandatory when a member purchases software," and because "the vast majority of all members continue to receive support and maintenance."(Pl. Damages Resp., at 4.) The problem with this argument is that under the Dealer License, DIB was entitled to maintenance fees under its own relationship with member stores, relationships that were expressly contemplated by the Dealer License. In other words, the maintenance fees were not a product of allegedly infringing activities.

*Ocean Atlantic Woodland,* 262 F.Supp.2d at 927.

**\*16** Also unpersuasive is Passport's assertion that DIB "profited from infringing PSI's copyrighted software including bundling it with other products and services including support and maintenance."(Pl. Damages Resp., at 5-6.) Passport offers the analogy, drawn from *Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923 (7th Cir.2003), of a defendant that copyrights a book verbatim and then offers to give the book to customers for free as long as they pay $25 for a bookmark that cost the defendant 10 cents and has a fair market value of 50 cents. (*Id.* at 3) (citing *Bucklew,* 329 F.3d at 933.)As the *Bucklew* court explained, "[t]o hold in such a case that the defendant's profits from infringement were zero would approve a formula for evading copyright law."*Bucklew,* 329 F.3d at 933.In this case, conversely, there is no evidence that DIB set the maintenance fees artificially above the market rate in an effort to reallocate profits from infringing activity. Nor has Passport shown how the fees were "bundled" to any infringing activity such that DIB improperly profited from them. Indeed, as discussed above, Passport contends that DIB's furnishing of the software to its member stores was authorized until 2001 by the Dealer License. Under that theory, at least from 1989 through 2001, there was no infringing activity. Thus, Passport is not entitled to maintenance fees as a component of damages under the Copyright Act.

2. Recovery Under the Trade Secrets Act

Passport next argues that it is entitled to recover maintenance fees as a component of damages for DIB's trade secret misappropriation. Under the Illinois Trade Secrets Act ("ITSA"), damages may include "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss."765 ILCS 1065/4. Defendants may be liable under the Act "even if the defendants created a new product, if they could not have done so without use of the trade secret."*Hexagon Packaging Corp. v. Manny Gutterman & Assocs. Inc.,* 120 F.Supp.2d 712 (N.D.Ill.2000) (citing *Mangren Research and Dev. Corp. v. National Chemical Co.,* 87 F.3d 937, 944 (7th Cir.1996)). Passport claims that "like copyright infringement, [Passport] is entitled to unjust enrichment caused by DIB's misappropriation of [Passport's] trade secrets which had been delivered to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

DIB under the terms of the Dealer License."(Pl. Damages Resp., at 6-7.)

As with the copyright infringement theory of recovery, Passport has not shown how DIB's alleged misappropriation of trade secrets was related to its provision of maintenance services. Passport offers numerous facts that purportedly establish a violation of the ITSA, but there is nothing to tie that alleged violation to DIB's provision of maintenance services to its members. PSI does not suggest such services would not have been provided absent misuse of its trade secrets. Thus, the ITSA does not provide a basis for recovering maintenance fees.

3. Recovery Under the Lanham Act

**\*17** Passport's attempt to recover maintenance fees under § 35 of the Lanham Act, 15 U.S.C. § 1117, also fails. Passport correctly notes that

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117. Aside from this quote, however, Passport offers only the conclusory assertion that "[s]ince support and maintenance fees were an element of DIB's profits, [Passport] is entitled under the Lanham Act to such fees considered as a part of its damage claim."(Pl. Damages Resp., at 19.) This is wholly insufficient to withstand summary judgment on this issue.

4. Recovery for Breach of Contract

As yet another theory in support of its claim for maintenance fees, PSI argues that this claim flows from DIB's breach of contract. Specifically, PSI contends that upon termination of the Dealer License, PSI was entitled to step into DIB's shoes and would have the right to perform maintenance and service on the software for DIB's member stores. Passport cites paragraph 9.5 of the Dealer License, which provides:

> Upon termination of the Dealer License for any reason whatsoever, then: (b) for all Sublicenses [sic] issued hereunder by Dealer, such sublicensees shall be permitted the continued and uninterrupted use of the Object Code and User Manual(s) of the sublicensed items for the balance of the term of their Sublicenses provided that said sublicensees are not and will not be in default thereunder, and that all of Dealer's rights (but none of its obligations) relating to the Licensed Software under such sublicenses shall automatically be assigned to Licensor (or directly to Real World if Licensor's License has been terminated);....

Dealer License ¶ 9.5. Passport claims that "[o]ne of the rights which DIB had relating to the Licensed Software was the right to receive maintenance and support payments from members," and that "DIB's right to receive these support and maintenance fees accrued to [Passport] upon termination of the parties' agreement."(Pl. Damages Resp., at 9-10.)

DIB's challenge to this theory focuses on the fact that the Dealer License itself does not mention DIB's provision of maintenance and service to its member stores.[FN6] Paragraph 9.5 does, however, anticipate that rights under the sublicenses with member stores would be assigned to PSI on termination, and the Support Services Agreement between DIB and its members calls for monthly payment for "support services" provided by DIB for its members' equipment. The court is uncertain whether this reference to payment for support services is what the parties understand as "maintenance fees." The court notes, further, that John Miller of DIB acknowledged in his testimony that sublicenses would not have been obligated, on termination of the Dealer License, to rely on Passport for maintenance services. (Miller Dep., DIB Exhibit 3, at 239:12-15.) Further, although neither party has specifically explained the function and nature of maintenance fees, the court presumes they are payments for services actually rendered by DIB and did not constitute a disguised royalty payment. If the court is correct, then any amounts owed PSI under this theory would have to be offset by the expense and cost PSI would have incurred in providing the services themselves. Nevertheless, DIB has not argued that Passport's claim for maintenance fees for breach of contract is speculative; DIB objects that any such claim fails as a matter of law. The court

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 15
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

overrules this objection without prejudice to other arguments DIB may make in response to this claim for damages. Its motion for summary judgment on this theory is denied.

> FN6. DIB argues that Passport's reliance on paragraph 9.5 of the Dealer License is misplaced, but perhaps this is because both parties (apparently inadvertently) omitted certain language in that paragraph when they quoted it in their briefs. (*See* PSI's Response in Opposition to the Motion of Do It Best Corporation for Partial Summary Judgment on Passport's Damage Claim, at 9; Plaintiff's Reply in Support of its Motion for Summary Judgment on Damages, at 5.)

B. Pre-Breach/Pre-Violation Damages

**\*18** Under any of the damages theories PSI has proffered, DIB argues, it is not entitled to recover damages for activity prior to the alleged breach of contract or other violation of PSI's rights. The court agrees. As reflected in PSI's answers to interrogatories, it claims that DIB's misappropriation of its trade secrets has occurred "[s]ince about March 14, 2001."(PSI's Supplemental Interrogatory Responses, PSI Exhibit TTT, at 14.) To the extent PSI now asserts it learned that DIB's trade secrets misappropriation began much earlier, that claim is inconsistent with its interrogatory responses and is therefore barred. Similarly, PSI acknowledged in its interrogatory answers that DIB was using PSI's copyrighted property with PSI's consent "[p]rior to February 14, 2001."(*Id.* at 17.)

In its opening memorandum on damages, DIB argued that, contrary to the opinion of PSI's expert witness, PSI is entitled to no lost profits under its breach of contract theory for any periods prior to the breach. (DIB's Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Damages, at 9.) Although the court recognizes that there are disputes concerning when, if at all, a contract breach occurred, PSI has not responded to this argument and, indeed, concedes that it is not seeking recovery for damages prior to any breach.

DIB's objection to recovery of amounts for pre-breach/pre-violation conduct is, therefore, sustained.

C. Statutory Damages

DIB claims that Passport is not entitled to statutory damages under the Copyright Act because DIB's alleged infringement commenced before Passport registered its copyright. Section 412 of the Act provides:

> In any action under this title, other than an action brought for a violation of the rights of the author under section 106A(a) or an action instituted under section 411(b), no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for-
>
> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or
>
> (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412. By denying an award of statutory damages and attorney's fees to parties that fail to promptly register their copyrights, Congress sought to encourage such copyright registration. *See Singh v. Famous Overseas, Inc.,* 680 F.Supp. 533, 536 (E.D.N.Y.1988). Passport alleges that DIB began infringing its copyrights on February 14, 2001. Passport did not file its copyright registrations, however, until more than a year later on May 29, 2002. Thus, DIB argues, Passport is not entitled to any statutory damages under § 412. (DIB Damages Mem., at 10-11.)

Passport concedes that statutory damages are generally unavailable when infringement occurs prior to registration, but argues that "DIB engaged in new infringements after the registration of [Passport's] copyrights which entitles it to maintain a right to elect statutory or actual damages on the post-registration infringements."(PSI Damages Resp., at 14.) Citing several district court cases from other jurisdictions, Passport claims that where there are differences between pre-registration and post-registration infringing activities, a plaintiff may recover statutory

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 16
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)
**2005 WL 743083 (N.D.Ill.)**

damages for the "new" post-registration violations. (*Id.*) (citing *Mason v. Montgomery Data, Inc., 741 F.Supp. 1282, 1285 (S.D.Tex.1990)* ("A 'new' or 'separate' basis for the award of statutory damages is created ... where there is a difference between pre-and post-registration infringing activities."); *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc., 609 F.Supp. 1325, 1331 (E.D.Pa.1985).*) Passport argues that DIB committed such new and distinct post-registration acts of infringement after 2002 because Karla Wygant, DIB's development manager of retail data processing, testified that DIB continued using code written by Passport even after purchasing source directly from Great Plains.

**\*19** DIB notes that several courts have rejected the argument that post-registration acts of infringement satisfy § 412 even when the first alleged infringement occurred prior to registration. In *Singh,* for example, the plaintiffs, musicians and composers of Indian music, claimed that the defendant, a company that manufactured and sold in the United States cassette recordings of Indian performances, committed copyright infringement by selling 1800 of the plaintiffs' cassettes without a license. *680 F.Supp. at 534.*The plaintiffs sought statutory damages under *17 U.S.C. § 504(c),* but the defendant argued that such damages were not available in light of § 412 because it had manufactured and sold cassettes in 1983, before the plaintiffs applied for a copyright of their work on July 27, 1984. *Id. at 535.*The plaintiffs insisted that they were entitled to statutory damages for each separate infringing sale made after July 1984 because each "commenced" on the day of its perpetration as contemplated by § 412. *Id.*

In rejecting this argument, the court first looked to the legislative history of § 412, noting that "Congress' evident purpose was to induce those owning copyrightable works to register them properly."*Id.* In the court's view,

> [t]he means chosen was to deny the "extraordinary" remedies of statutory damages and attorney's fees where registration is not promptly made. The threat of such a denial would hardly provide a significant motivation to register early if the owner of the work could obtain those remedies for acts of infringement taking place after a belated registration.

*Id.* at 536.The court thus held that the manufacture and sale of the cassettes in 1983 "commenced" an "infringement" within the meaning of § 412, and since the plaintiffs did not register their copyright until July 1984, they were not entitled to statutory damages. *Id.* See also *Joseph J. Legat Architects, P.C. v. U.S. Dev. Corp., No. 84 C 8803, 1991 WL 38714, at \*11 (N.D.Ill. Mar.20, 1991)* (noting that "if Congress had intended to permit recovery for acts of infringement which occurred prior to registration, then it could have used the word 'occurred,' rather than the word 'commenced' '"); *Mason, 741 F.Supp. at 1286* (plaintiffs alleging copyright infringement of their map sheets were not entitled to statutory damages where the defendants "[we]re accused of committing the same activity each time, for the same purpose, and using the same copyrighted material" both before and after the registration).

Passport urges that this case is more analogous to *Iowa State Univ. Research Foundation, Inc. v. American Broadcasting Cos., 475 F.Supp. 78 (S.D.N.Y.1979),* in which the defendant used the plaintiff's copyrighted film about an Olympic wrestler on three separate occasions in three different ways. First, the defendant used the material in a broadcast of a preview for the defendant's Olympic television coverage. *Id. at 80.*Second, the defendant used the material in the broadcast of a two and one-half minute segment during the Olympic coverage. Finally, the defendant used the material in a "Superstars" television program. *Id.*

**\*20** The court concluded that each broadcast constituted a separate act of infringement. In reaching this conclusion, the court relied on the "heterogeneity" test, which looks to differences in advertisers, financial arrangements, locales, audiences, and other "significant variables" to determine whether successive infringements are so similar that they should be treated as one continuing infringement. *Id.* at 82.The court found it significant that the broadcasts occurred at least two days and as much as nineteen months apart, and that the two broadcasts closest together in time were directed to different audiences during different parts of the day for different purposes. *Id.*

In this case, it is undisputed that DIB first infringed Passport's copyright before Passport filed a copyright registration. Even assuming that Passport is entitled to statutory damages for "new" and "distinct" acts of

infringement occurring after registration, it is not clear to the court what those "new" acts are in this case. Passport alleges that DIB infringed its copyrighted software in the same manner both before and after registration. The mere fact that Karla Wygant replaced code written by Passport with code written by Great Plains does not establish that DIB was committing a different activity for a different purpose after the registration than it was committing before the registration. *Cf. Mason,* 741 F.Supp. at 1286.

Unless PSI has evidence of independent acts of infringement that post-date May 2002, it may not be entitled to any recovery on its copyright claim.

*CONCLUSION*

For the reasons set forth herein, Plaintiff-Counter-Defendant Do It Best's motion for summary judgment on Defendant-Counter-Plaintiff Passport's trade secret misappropriation claim (Doc. No. 182) is denied. Its motion for summary judgment on the civil conspiracy claim (Doc. No. 183) is granted without prejudice to reconsideration. DIB's motion for partial summary judgment on Passport's damages claims (Doc. No. 184) is granted in part and denied in part. Its motion for summary judgment on Passport's copyright claim (Doc. No. 185) is denied. Its motion for summary judgment on Passport's breach of contract claim (Doc. No. 186) is granted in part and denied in part. Passport's motion for partial summary judgment of liability on the copyright claim (Doc. No. 189) is denied, and its motion for leave to file adjunct pleading relating to copyrightability (Doc. No. 266) is denied as moot.

N.D.Ill.,2005.
Do It Best Corp. v. Passport Software, Inc.
Not Reported in F.Supp.2d, 2005 WL 743083 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit G**



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

H Igram v. Page
N.D.Ill.,2000.

United States District Court, N.D. Illinois, Eastern Division.
Cassim IGRAM, Plaintiff,
v.
Linda PAGE, et al. Defendants.
**No. 98 C 8337.**

Feb. 28, 2000.

MEMORANDUM OPINION AND ORDER

LINDBERG, J.

**\*1** Plaintiff brings this action pursuant to the Copyright Act of 1976, Pub.L. 94-553, 90 Stat. 2541 *et seq.,*17 U.S.C.A. § 101*et seq.* (Copyright Act), the Illinois Uniform Deceptive Trade Practices Act (UDTPA), and common law tort and equity principles. Plaintiff Cassim Igram, author of the book, *Self-Test Nutritional Guide,* claims that text in his book was used without permission and in violation of his copyright, by Defendant Linda Rector Page, author of the allegedly infringing work, the 10th edition of *Healthy Healing.*The parties are before the Court on cross motions for summary judgment. Plaintiff moves for summary judgment on his claims of unjust enrichment, unfair competition, claims based on the Illinois Uniform Deceptive Trade Practices Act, copyright infringement, and contributory infringement. Plaintiff also requests this Court to issue a permanent injunction against Defendants. Defendants move for partial summary judgment on the issues of the scope of copyright infringement, for partial summary judgment as to the issue of willfulness, and summary judgment on Plaintiff's state law claims. For the reasons articulated below, both parties' motions for summary judgment shall be granted in part and denied in part. Further, Defendants' motion for summary judgment will be granted in part, and denied in part.

I. BACKGROUND

Plaintiff Cassim Igram is a doctor of osteopathy and the co-author and sole owner of the registered copyright of the book, *Self-Test Nutritional Guide* (Reg. No. TX 3-805-206 issued April 5, 1994). Published in 1994, *Self-Test Nutritional Guide,* is an original work of non-fiction which focuses on the improvement of "health and nutritional status through personalized tests."*Self-Test Nutritional Guide* (hereinafter *STNG* ). Igram asserts his book is the "first of its kind" in that it utilizes a series of questions and descriptions to help readers evaluate and remedy various nutritional maladies. Igram's book is divided into three main sections: Section I lists and describes a series of "Nutritional Deficiency Tests"; Section II lists "Dietary Tests"; and Section III lists "Illnesses and Syndromes." Dr. Igram is also employed by the North American Herb and Spice Company (NAHS). NAHS sells a line of nutritional supplements. Dr. Igram contends that copyright protected text from his book, *STNG,* appears without permission and in violation of his copyright in Defendants' book, the 10th Edition of *Healthy Healing.*

Defendant Linda Rector Page is the author of the 10th Edition of *Healthy Healing* (hereinafter HH10), first published on October 13, 1996. Linda Page holds an N.D. degree (doctor of naturopathy) and a Ph.D. in Nutrition. Ms. Page is married to Defendant Elliot Page, the owner president of Healthy Healing Enterprises, the corporation which originally published *HH10.HH10* is also a work of non-fiction which focuses on nutrition as a source of healing. HH10, was preceded by nine editions of *Healthy Healing,* the first of which was published in 1985. Combined, the ten editions of *Healthy Healing* have sold in excess of 400,000 copies.

**\*2** Between 1992 and 1997, Doris Wendt worked as a researcher for Ms. Page. Ms. Wendt worked on *HH10,* and specifically worked on Section 8, of *HH10,* the diagnostic section. The diagnostic section is the section where the vast majority of the alleged infringing text is found. Defendants contend that to the degree any infringement occurred, Ms. Wendt was responsible for the copying of text, and that Defendants had no knowledge of the origin of the allegedly infringing text. Ms. Wendt died in 1998, and consequently could not be deposed in this matter.

Linda and Elliot Page were the sole shareholders in a corporation called Crystal Star Herbal Nutrition (CSHN). CSHN sells nutritional supplements formulated by Ms. Page. In May of 1997, CSHN sold its assets to Geranium Ltd., which in turn sold those assets to Jones Products International (JPI) in June of 1997.

II. DISCUSSION

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

The parties are before the Court on cross motions for summary judgment. Summary judgment may be made "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially prove from the record an absence of a genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, (1986). The non-moving party must then provide specific facts demonstrating a genuine issue for trial exists. Fed.R .Civ.P. 56(e). The court must review the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).

A. COPYRIGHT INFRINGEMENT

Plaintiff asserts that infringing text is present in Section 3, Section 4, Section 6, and Section 8 of *HH10.*[FN1] Plaintiff complains of 1313 lines of word for word or substantially similar copying from approximately 95 pages of *STNG.* Plaintiff further asserts that the "guts" of two of the three sections of *STNG* were copied: the descriptions and tests from Sections I and III. The majority of this alleged copying is limited to Section 8 of *HH10,* the diagnostic section, which will be addressed separately below.

> FN1. Plaintiff also tangentially asserts claims of copyright infringement with respect to the publication of materials in addition to *HH10,* including an article entitled *Detoxification* .However, Plaintiff failed to plead these claims and nor were they included in Plaintiff's motions for summary judgment, except as argument in support of Plaintiff's motion for a permanent injunction. Nor has Plaintiff provided sufficient evidence such that a reasonable fact finder could find for Plaintiff on these claims. The Court does not find these claims to be sufficiently raised as independent claims of infringement in this action.

Only original expression may be copyrighted. *Fiest Publications Inc. v. Rural Telephone Service Company,* 499 U.S. 340 (1991).*Harper & Row Publishers v. Nation Enterprises,* 471 U.S. 539 (1985). Facts are not copyrightable, "[b]ecause no person can claim the original conception of facts, they are excluded from copyright protection." *Publications Intern, Ltd. v. Meredith,* 88 F.3d

473 (7th Cir.1996).

Further, ideas and descriptive phrases are not copyrightable. Plaintiff's assertion that the "guts" of *STNG'*s Sections I and III, is in part an attempt to claim protection for the concept of a self-questioning diagnostic approach to nutritional healing. However, the Copyright Act denies copyright protection in any "idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. S 102(b). Thus, Plaintiff cannot claim copyright protection for the idea of a self-diagnostic approach to nutritional healing, or the method of questioning and symptom listing he employed. *See,Igram v. Page,* 1999 WL 705895 (N.D.Ill.). Plaintiff also seeks protection for descriptive titles of various syndromes. For example, Plaintiff claims protection for the phrase "Sluggish Thyroid Syndrome." However, the descriptive phrases which Plaintiff seeks to protect cannot be construed to be an original work within the definition of the Act. *See,Arthur Retlaw & Associates, Inc. v. Travenol Laboratories, Inc.,* 582 F.Supp. 1010 (N.D.Ill.1984)*See,Igram v. Page,* 1999 WL 705895 (N.D.Ill.).

**\*3** Outside of Section 8, Plaintiff cites only eight pages of allegedly infringing text. Upon scrutinization of these eight pages, the Court finds only four instances in which protectable text had been copied.[FN2] The remainder of the text which Plaintiff cites outside of Section 8 is not protectable original expression. Instead this text constitutes either a listing of facts which lacked a sufficiently original arrangement such as would warrant copyright protection, or ideas and phrases which likewise lacked copyright protection. Therefore, the Court holds that to the degree there is copying outside of Section 8, it is too de minimis to be actionable as a matter of law.

> FN2. Surprisingly, as an assessment of the precise lines alleged to be copied are absolutely central to this analysis of copyright infringement, Plaintiff chose in his motion to identify the only pages in each text on which the alleged copying occurred, rather than the specific lines or even paragraphs. In some instances the allegedly copied lines were scattered over as many as five pages. As a result, for the Court to analyze Plaintiff's claims, the Court had to scour 107 pages of text looking for phrasing that appeared similar, and determining whether that text constituted a copyright violation. Through this process, the Court found only four

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

instances in which protectable text was copied outside of Section 8.

For example, the Court found the following to be an instance of substantially similar and word for word copying of original expression. This text is located in Section Four of *HH10:*

However, within Section 8, the Court found copying of protectable text consistent with that alleged by Plaintiff. The Court finds in favor of Plaintiff on the issue of copyright infringement with respect to the copying alleged in Section 8.

Plaintiff also seeks summary judgment on his contributory infringement claim. Plaintiff asks the Court to find that Ms. Page, HHE, and Mr. Page are all liable for contributory infringement by knowingly inducing others to distribute and sell *HH10.* However, to succeed in his claim for contributory infringement, Plaintiff must prove that Defendants knew of the infringing activities. *See,Rhien Building Company v. Gehrt,* 21 F.Supp.2d 896 (E.D.Wis.1998). There are material facts in dispute as to whether the Pages had knowledge of the infringing activity at the time when "induced others to distribute and sell *HH10."* Thus, the Court finds that summary judgment cannot be entered as to this claim.[FN3]

FN3. Plaintiff does not assert an argument for vicarious liability, which does not necessarily require knowledge of the infringing activity, so the Court does not consider the issue of vicarious liability.

Additionally, Plaintiff has moved for summary judgement on the issue of willfulness. A finding of willfulness is appropriate if, "the infringer knows that it is an act of infringement, or if the infringer acted in reckless disregard of the copyright owner's right ." *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 f.3d 502 (7th Cir.1994) *quoting,Video Views Inc. v. Studio 21 Ltd .,* 925 F.2d 1010, 1020 (7th Cir.1991). Willfulness is a question of fact, and the Court here finds that there are material facts in dispute with respect to the question of willfulness, so that summary judgment may not be granted on this issue.

B. STATE LAW CLAIMS

Plaintiff has moved for summary judgment with respect to his Illinois Uniform Deceptive Trade Practices Act

(UDTPA), unfair competition, and unjust enrichment claims. Defendants likewise move for summary judgment on these counts, asserting, inter alia, that all of Plaintiff's state claims are preempted by the Copyright Act.[FN4] Defendants are correct.

FN4. Because the issue of preemption is dispositive with respect to Plaintiff's state claims, the Court does not address the myriad of other fatal flaws plaguing Plaintiff's state claims, including but not limited to the lack of evidence on record to support essential elements in each of the three claims.

To determine whether a cause of action has been preempted by the Copyright Act, the Court employs a two-step analysis, as is required by 17 U.S.C. § 301(a). That section provides preemption will be found where (1) the work is fixed within a tangible form and comes within the subject matter of copyright as specified in § 102; and (2) the right is equivalent to any of the rights specified in § 106. 17 U.S.C. § 301(a). Here, the text in question unarguably is fixed within a tangible form and falls within the subject matter of copyright, so the Court must determine whether Plaintiff's claims assert rights that are equivalent to any of the rights outlined in 17 U.S.C. § 106.[FN5]

FN5. 17 U.S.C. § 106 provides in relative part:

106. Exclusive rights in copyrighted works

Subject to sections 107 through 121, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phono records;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phono records of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works,

pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly;

**\*4** The Seventh Circuit has held that to avoid preemption under the Copyright Act, Plaintiff's state claim must incorporate an extra element so that it is qualitatively different than a claim of infringement. *Baltimore Orioles Inc. v. Major League Baseball Players Assoc.,* 805 F.2d 663 (7th Cir.1986). To determine whether Plaintiff's state claims include an element which makes the claim qualitatively different than an infringement claim, the Court considers nature of the cause of action asserted in conjunction with the nature of the specific malfeasance alleged by Plaintiff. *See,Stephen & Hayes Construction v. Meadowbrook Homes, 988 F.Supp. 1194 (N.D.Ill 1998).*

## 1. UNJUST ENRICHMENT

Under Illinois law, for Plaintiff to mount a claim for equitable relief under an unjust enrichment theory, Plaintiff must demonstrate that Defendant received a benefit at Plaintiff's expense and that the benefit was unjust. *TRW Title Insurance Co. v. Security Union Title Insurance Co.,* 153 F.3d 822, 828 (7th Cir.1998). Plaintiff offers two distinct theories in support of his unjust enrichment claim. First, Plaintiff argues that (1) Ms. Page received a benefit from Dr. Igram in the form of the infringing text; (2) the benefit to the Ms. Page was at the expense of Dr. Igram; and (3) Ms. Page's retention of that benefit was unjust. However, this theory clearly does not incorporate an extra element which is qualitatively different than that of copyright infringement. Plaintiff is merely claiming that Defendants profited from the use of the copied text, at Plaintiff's expense.

In an effort to distinguish his unjust enrichment claim from infringement, Plaintiff offers a second theory of unjust enrichment liability, specifically that:

[I]t is not the content of *HH10* that give rise to Plaintiff's state claims. It is the fact that Ms.Page uses *HH10* as a whole to support her false public reputation, to portray

herself disingenuously as a nutritional scientist, as a diagnostician, and as a practitioner of alternative medicine ... She trades on a false, undeserved reputation, using it to sell supplements and books. Because she uses her reputation to see products *and because that reputation depends on the diagnostic section of HH10,* which she pirated from STNG, she has acquired ill-gotten gains, has competed unfairly and has been unjustly enriched.

Plain. Opposition to Pages' Motion for Summary Judgment. p. 3, ¶ 3, *emphasis added.*

However, this second theory of liability does not save Plaintiff's unjust enrichment claim from preemption because even had Plaintiff adequately supported this allegation with evidence, which he certainly has not, this alleged "extra element" is not material to the issue of unjust enrichment.[FN6]

> [FN6.] The Court will here note that although Plaintiff has made much of this allegation, Plaintiff has not provided sufficient evidence that Linda Page has "held herself out" to be a diagnostician, a nutritional scientist, and a practitioner of medicine such that a reasonable jury could find in favor of Plaintiff on this issue. Also, Plaintiff fails offer evidence demonstrating that Ms. Page is not a diagnostician or even what Plaintiff considers the qualifications of a diagnostician to be. Similarly, Plaintiff does not demonstrate how Ms. Page fails to merit the title of nutritional scientist, or what the minimum qualifications of a nutritional scientist might be, beyond citing Ms. Page's deposition testimony in which she generally purports to not be a scientist.

Primarily Plaintiff's second theory fails to be material the question of unjust enrichment because Plaintiff does not demonstrate how he conferred the benefit of this allegedly false reputation upon Ms. Page. Plaintiff claims to be injured by the infringement because Ms. Page's general reputation is bolstered by the infringing text and that Ms. Page's reputation promote the sales of CSHN products. Plaintiff identifies benefits Ms. Page has received in connection with the publication of *HH10*.Plaintiff argues that Ms. Page uses *HH10* as a whole to create a falsely positive reputation and that false reputation in fact "depends on the diagnostic section of *HH10.*"Plaintiff claims that Ms. Page has developed a false reputation as a diagnostician, a nutritional scientist, and a practitioner of alternative medicine, when in fact Plaintiff alleges Ms.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

Page is none of these. Plaintiff then seems to be claiming that the infringing text is the sole source of this reputation. However, the Court finds to the contrary. The record is devoid of evidence that Ms. Page's reputation *depends* on the diagnostic section of *HH10.*Plaintiff has provided the Court with no evidence creating a sufficient nexus between Ms. Page's professional reputation and her use of the copyrighted material, such that the Court could find that the benefits which Plaintiff identifies were the result of Ms. Page's infringement. On the contrary, the evidence indicates that the infringing text is isolated to one chapter of *HH10,* the diagnostic chapter. Further, Ms. Page produced nine editions of *HealthyHealing* prior to the publication of *HH10,* none of which contained infringing text. Plaintiff has not been able to satisfactorily demonstrate that Ms. Page received any particularized discernable benefit from the use of the infringing text. At best Plaintiff has made an amorphous argument that Ms. Page's general reputation was bolstered by the diagnostic section of *HH10,* yet Plaintiff points to no particular part of the record in which allegation is adequately supported.[FN7] Thus, the question of Ms. Page's general reputation is not material to the issue of unjust enrichment. Absent this allegation, Plaintiff's unjust enrichment claim does not extend beyond the scope of rights covered by the Copyright Act, and the Court finds this claim to be preempted as a matter of law.

> [FN7.] Additionally, Plaintiff fails to establish how this allegedly false reputation has been created to Plaintiff's detriment. Plaintiff asserts that Ms. Page's reputation serves to increase the sales of CSHN products, and that as an employee of NAHS, Plaintiff is harmed by the successful of CSHN products. Plaintiff does not offer sufficient evidence to support this claim. Plaintiff is not an owner of NAHS, nor has he a particular pecuniary interest in the corporation's profits, beyond that of an employee. Plaintiff points to no evidence which indicates he personally would profit by increased sales of NAHS products. Further, Plaintiff does not provide sufficient evidence that CSHN and NAHS are in direct competition, such that a jury could find in favor of Plaintiff on this point.

### 2. UDTPA and UNFAIR COMPETITION

**\*5** Plaintiff's UDTPA and unfair competition claims are also preempted by the Copyright Act. In his UDTPA claim, Plaintiff alleges that Defendants have created a likelihood of confusion among consumers by misrepresenting the source of the copied text. However, Plaintiff does not assert that Defendants made affirmative misrepresentations about the origin of the copied text. Rather, Plaintiff's claim rests on the fact that the text appears in *HH10* as the work of Ms. Page. Generally, within the context of copyright infringement, UDTPA claims which do not include an element of affirmative misrepresentation are preempted by the Copyright Act. See,*Tensor Group, Inc. v. Global Web Systems, 1999 WL 617818 (N.D.Ill).Goes Lithography Co. v. Banta Corp.,* 26 F.Suppp.2d 1042 (N.D.Ill 1998). Here, Plaintiff asserts only that consumers are confused as to the source of the work copied. This would be true in any instance of infringement and does not go beyond the scope of the Copyright Act. Therefore, Plaintiff's UDTPA claim is preempted.

Similarly, Plaintiff's claim of unfair competition is preempted by the Copyright Act. Plaintiff alleges no more than Defendants used the copied text to their advantage and Plaintiff's detriment. Further, while Plaintiff fails to adequately extend his false reputation argument to his UTDPA and unfair competition claims, the Court nonetheless notes that the degree to which Ms. Page holds herself out to be an expert in various fields is likewise immaterial to the UTDPA and unfair competition claims. Beyond just merely failing to produce evidence to support his false reputation argument, as discussed above, Plaintiff also fails to demonstrate: (1) how this false reputation created a likelihood of consumer confusion or constituted an affirmative misrepresentation as to the origin of the copied work so as to be material to a UDTPA claim; or (2) how this false reputation constituted the appropriation of another's labor or created unfair competition from which Plaintiff particularly suffered. Therefore, the Court finds these claims to be preempted by the Copyright Act.

### G. PERMANENT INJUNCTION

Finally, Plaintiff asks the Court to grant a permanent injunction in this case. A permanent injunction is appropriate where liability has been established and the threat of continuing infringement has been demonstrated. 17 U.S.C. § 502(a),*Columbia Pictures et al. v. Tucker,* 1997 WL 779093 (N.D.Ill.).*Broadcast Music, Inc. v. Niro's Palace, Inc.,* 619 F.Supp. 958, 963 (N.D.Ill.1985)

Here, while liability has been established, Plaintiff has failed to demonstrate a threat of continued infringement. Copyright liability has only been established with respect

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041
**2000 WL 263707 (N.D.Ill.)**

to Section 8 of *HH10*.Defendants have offered evidence demonstrating that the infringing section of *HH10* has not been published or distributed since this Court's issuance of the preliminary injunction in this case. There is no other evidence on record which indicates a threat of continued infringement exists. Therefore, the Court will deny the motion for a permanent injunction.

**\*6** ORDERED: Plaintiff's motion for summary judgement on the issue of copyright infringement is granted with respect to the copying alleged in Section 8 of the Tenth Edition of *Healthy Healing.*Plaintiff's motion for summary judgment with respect to the remainder of the copying alleged is denied. Defendants' motion for summary judgment with respect to unjust enrichment, violation of the UDTRA, and unfair competition is granted. Accordingly, the questions of willfulness with respect to copyright infringement, of contributory infringement, and damages will proceed to trial.

| | |
|---|---|
| *STNG,* p. 239: | The skin is a barometer of how rapidly an individual is aging. Americans often marvel at how elderly individuals from non-Western societies appear young and how their skin remains beautiful. |
| HH10, p. 126: | Your skin is a barometer of how rapidly you are aging. Americans often marvel at how elderly people from non-Western societies have such beautiful, youthful skin. |

N.D.Ill.,2000.
Igram v. Page
Not Reported in F.Supp.2d, 2000 WL 263707 (N.D.Ill.), 2000 Copr.L.Dec. P 28,041

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

*Westlaw.*

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 1400345 (N.D.Ill.), 2002 Copr.L.Dec. P 28,460, 63 U.S.P.Q.2d 1603
**2002 WL 1400345 (N.D.Ill.)**

H Villa v. Brady Pub.
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
Hiram VILLA, Plaintiff,
v.
BRADY PUBLISHING, Defendant.
**No. 02 C 570.**

June 27, 2002.

*MEMORANDUM OPINION*

KOCORAS, J.
**\*1** This matter comes before the court on the motions
of Plaintiff Hiram Villa ("Villa") to vacate our prior
judgment and for leave to amend his previous
complaint.

BACKGROUND

Villa is a graffiti artist who sometimes goes by the
pseudonym "UNONE." He specializes in outdoor
murals that incorporate highly stylized renditions of
the letters of his pseudonym. He claims that his
particular style of artwork is distinctive and
recognizable (though the precise nature of its contents
may not be) to anyone familiar with his work.

Defendant Brady Publishing ("Brady") published a
book entitled "Tony Hawk's Pro Skater 2 Official
Strategy Guide" ("the Guide"), which included a
reproduction of one of Villa's UNONE murals without
permission from Villa. Upon learning of the mural's
appearance in the Guide, Villa filed suit, alleging
copyright infringement and pendent state law claims
of deceptive business practice, invasion of privacy,
and violation of the right to publicity. Because Villa
has yet to register his copyright with the Copyright
Office, the copyright claim was dismissed, and we
declined to exercise supplemental jurisdiction over the
remaining state-law claims. Villa now moves to vacate
the prior judgment and seeks leave to amend the
complaint to allege diversity jurisdiction.

LEGAL STANDARD

Fed. R. Civ. Proc. 59(e) permits parties to file, within
ten days of the entry of judgment, a motion to alter or
amend the judgment. This procedural mechanism is
often invoked to alert the court to matters such as
newly discovered evidence or manifest errors of law
or fact. See *In re Prince,* 85 F.3d 314, 324 (7th
Cir.1996); *Russell v. Delco Remy Div. of General
Motors Corp.,* 51 F.3d 746, 749 (7th Cir.1995).
However, parties cannot use the rule to undo their own
procedural failures or to present new evidence or
arguments "that could and should have been presented
to the district court prior to judgment." *Moro v. Shell
Oil Co.,* 91 F.3d 872, 876 (7th Cir.1996). To be
successful, a Rule 59(e) motion "must clearly
establish either a manifest error of law or fact or must
present newly discovered evidence." *LB Credit Corp.,*
49 F.3d at 1267 (quoting *FDIC v. Meyer,* 781 F.2d
1260, 1268 (7th Cir.1986)). The decision to grant
relief under Rule 59(e) is left to the discretion of the
district court. *Prince,* 85 F.3d at 324.

Fed. R. Civ. Proc. 15(a) provides that leave to amend
"shall be freely given when justice so requires." As
with motions brought pursuant to Rule 59(e), the
decision whether to grant leave to amend a pleading
rests in the broad discretion of the trial court. See *Jones
v. Hamelman,* 869 F.2d 1023, 1026 (7th Cir.1989).
Despite the typically liberal application of leave under
Rule 15(a), it is appropriate to deny leave to amend
where "there has been undue delay or there would be
undue prejudice to the opposing party, or when the
amendment would be futile." *Wade v. Hopper,* 993
F.2d 1246, 1249 (7th Cir.1993). With these principles
in mind, we turn to the motions before us.

DISCUSSION

**\*2** Amendments to pleadings are liberally granted
consistent with Rule 15(a) standards throughout the
pendency of a suit. See *Rodriguez v. U.S.,* 286 F.3d 972,
980 (7th Cir.2002). Once judgment has been entered,
however, the complaint cannot be amended unless the
prior judgment is first vacated. *Diersen v. Chicago Car
Exchange,* 110 F.3d 481, 488 (7th Cir.1997). Villa
therefore moves to vacate our May 1 judgment,
claiming that the conclusion that we had no subject
matter jurisdiction in this case represented a manifest

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

error of law that would warrant relief under Rule 59(e).

Villa does not dispute that the only federal claim contained in his prior complaint was properly dismissed. Instead, he asserts for the first time that this court has diversity jurisdiction over the instant action. In response, Brady argues that because Villa knew or should have known that diversity was a possible source of jurisdiction at the time the original complaint was filed, this is an argument that should have been made prior to the entry of judgment. Consequently, Brady insists that relief is not called for under Rule 59(e).

If the amendment sought did not involve allegations of jurisdiction, we would be inclined to agree with Brady. District court opinions are not "mere first drafts, subject to revision and reconsideration at a litigant's pleasure."*Quaker Alloy Casting Co. v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988). Moreover, Rule 59(e) is not to be used to enable a party to complete his case after the court has ruled against him. *Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir.1995). The time for research and development of the plaintiffs' theories of recovery is before papers are filed, not after the court has spent significant time and effort on the assumption that the parties have put their best foot forward. However, pleadings can be amended to cure defective allegations of jurisdiction at any time, even after the entry of judgment. 28 U.S.C. § 1653; *Shaw v. Dow Brands, Inc.,* 994 F.2d 364, 368-69 (7th Cir.1993). As it appears from the allegations of the new complaint that the parties are in fact diverse, we vacate our prior decision that no federal jurisdiction could be asserted over Villa's state-law claims.

The conclusion that the proposed complaint rests on a solid jurisdictional footing is only the starting point of our inquiry in deciding whether leave to amend is warranted in this case. Although leave to amend is "freely given when justice so requires," justice does not allow a plaintiff to file an amendment that would ultimately prove futile, even if jurisdiction would lie for a viable claim. *SeeFoman v. Davis,* 83 S.Ct. 227, 230 (1962); *Wade,* 993 F.2d at 1249. Brady, relying on this proposition, argues that the state-law claims Villa advances in the proposed amended complaint are preempted by 17 U.S.C. § 301, thus rendering Villa's attempt to amend pointless.

Section 301 expressly provides that any state-law rights in copyrightable works that are "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression" are governed solely by the Copyright Act. A state-law right is preempted under this section if 1) the work is fixed in a tangible form and copyrightable under 17 U.S.C. §§ 102 and 103 and 2) the state-law right expressed is equivalent to those enumerated in 17 U.S.C. § 106: reproduction, derivation, display, and distribution. Both conditions must be satisfied before a claim is preempted under § 301.*Baltimore Orioles, Inc. v. Major League Baseball Players Assoc.,* 805 F.2d 663, 674 (7th Cir.1986).

**\*3** We assume, without deciding, that the work is copyrightable and was, at some point before its appearance in the Guide, fixed in a tangible form and focus our attention solely on the equivalence prong of the analysis. Preemption in this context does not necessarily apply categorically to a given statute or common-law right. A proper assessment of equivalence looks beyond the bare elements of the state-law cause of action to the particulars of each case.*Stephen & Hayes Construction, Inc. v. Meadowbrook Homes, Inc.,* 988 F.Supp. 1194, 1198-99 (N.D.Ill.1998). A claim escapes the preemption bar only if the rights alleged to have been violated are qualitatively different from those protected by copyright. *Id.* (Uniform Deceptive Trade Practices Act claim not preempted by § 301); *Ahn v. Midway Manufacturing Co.,* 965 F.Supp. 1134, 1138 (N.D.Ill.1997) (right of publicity claim preempted by § 301); *FASA Corp. v. Playmates Toys, Inc.,* 869 F.Supp. 1334, 1361 (N.D.Ill.1994) (unfair competition claim preempted by § 301). The labels a plaintiff affixes to a defendant's activities are insignificant if the complaint does not assert rights that fall outside the scope of those listed in § 106. *SeeFASA.,* 869 F.Supp. at 1361.

Count I of the instant complaint is equivocally titled "deceptive business practice." The specific legal underpinning of this count is unclear; Villa specifically mentions the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1*et seq.,* but characterizes Brady's actions in terms more properly suited to an action brought under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS

Not Reported in F.Supp.2d                                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 1400345 (N.D.Ill.), 2002 Copr.L.Dec. P 28,460, 63 U.S.P.Q.2d 1603
**2002 WL 1400345 (N.D.Ill.)**

510/1*et seq.* Compl., ¶¶ 9, 10. Both statutes prohibit the use of deceptive business practices, such as passing off another's goods as one's own and misrepresenting support or endorsement, for commercial gain. Whether Villa seeks to state a claim under either statute or both, and despite the fact that he characterizes Brady's actions with terms used within those statutes, the fact remains that the conduct he alleges as the basis of liability is the same: inclusion of a copy of his artwork in the Guide. Proposed Am. Compl., ¶ 9. The allegations of Count I therefore rest solely on the unauthorized reproduction, display, and distribution of Villa's artistic expression. As such, the rights Villa asserts in the amended complaint are qualitatively identical to those that would be form the basis of a copyright infringement claim. Accordingly, § 301 bars his attempt to style them as state-law causes of action.

Count II purports to bring a claim for invasion of privacy. Until 1999, the common-law tort of invasion of privacy in Illinois took one of four specific forms: 1) intrusion upon the seclusion of another; 2) public disclosure of private facts; 3) placing another in a false light before the public; and 4) appropriation of another's name or likeness. *Ainsworth v. Century Supply Co.,* 693 N.E.2d 510, 512 (Ill.App.Ct.1998). In June 1999, the Illinois legislature enacted the Right of Publicity Act. *See*765 ILCS 1075/1*et seq.* The act completely replaced the fourth incarnation, appropriation, with a broader statutory right to control the use of one's name or likeness. *See*765 ILCS 1075/60. Villa therefore can no longer do what he attempts to do in Count II, namely to assert a common-law cause of action for appropriation of his name.

**\*4** Finally, Count III alleges a violation of Villa's right of publicity. Villa does not make reference to the Right of Publicity Act, but because the act supplies the only basis remaining for such a claim in Illinois, we assume that he intended to invoke his statutory rights. Although this count recites the correct statutory language of improper use of a name without permission, and the mural does contain the letters UNONE, the conduct in question is once again the inclusion of the artwork. The fact that the mural incorporates the pseudonym is incidental; the essence of the behavior with which Villa truly takes issue is the reproduction, distribution, and display of his artwork without his permission. There is nothing in

the allegations of Count III that would not also implicate the rights contained in 17 U.S.C. § 106. Accordingly, the state-law claims within the amended complaint would be preempted under 17 U.S.C. § 301, and to allow Villa to file his amended complaint would be an exercise in futility. Because none of the claims Villa has advanced can survive, the action has no substance and is consequently dismissed.

CONCLUSION

Based on the foregoing, Villa's motion to vacate our prior judgment is granted. His motion for leave to file an amended complaint is denied, and because no viable claims exist, the action is dismissed.

N.D.Ill.,2002.
Villa v. Brady Pub.
Not Reported in F.Supp.2d, 2002 WL 1400345 (N.D.Ill.), 2002 Copr.L.Dec. P 28,460, 63 U.S.P.Q.2d 1603

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.